**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| AKIRA TECHNOLOGIES, INC., | |
| Plaintiff, | |
| v. | Civil Action No: 1:17-cv-00412 (LO/IDD) |
| CONCEPTANT, INC.,<br>NUCOGNITION, INC.,<br>JOSHUA PHIPPS,<br>ANDREY MIKHALCHUK, and<br>LISA HOULE | |
| Defendants. | |

## <u>FIRST AMENDED COMPLAINT</u>

1.      Akira Technologies, Inc., a Virginia corporation, by counsel, presents the following Complaint against Conceptant, Inc., NuCognition, Inc., Joshua Phipps, Andrey Mikhalchuk, and Lisa Houle, collectively the "Defendants," for misappropriation of trade secrets, breach of a duty of loyalty, unfair competition, business conspiracy, and for breach of contract arising from Mr. Phipps', Mr. Mikhalchuk's, and Ms. Houle's employment with Akira and subsequent competition with Akira through their company Conceptant, Inc.

## PARTIES

2.      Akira Technologies, Inc., is a Virginia corporation with its principal office located at 1747 Pennsylvania Ave NW Suite 600, Washington, DC 20002.

3.      Conceptant, Inc. is a Virginia corporation with its principal office located at 7323 Elmwood Drive, Falls Church, Virginia 22042.

1

4.      NuCognition, Inc. is a Virginia corporation with its principal office located at 7323 Elmwood Drive, Falls Church, Virginia 22042.

5.      Joshua Phipps is an individual residing at 3105 14th St NE Washington, District of Columbia 20017.

6.      Andrey Mikhalchuk is an individual residing at 9525 Debra Spradin Court, Burke, Virginia 22015.

7.      Lisa Houle is an individual residing at 7500 Ambergate Place # 5, McLean, Virginia 22102.

## JURISDICTION AND VENUE

8.      This federal action arises at law and in equity under the Federal Defense of Trade Secrets Act ("DTSA") 18 U.S.C. §1831 *et seq.* The Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c).

9.      This Court has supplemental jurisdiction over Akira's state claims arising under the Virginia Uniform Trade Secrets Act ("VUTSA") § 59.1–336, *et seq.,* for breach of a duty of loyalty, for unfair competition, for business conspiracy and for breach of contract pursuant to 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over Conceptant, Inc. because it is a Virginia corporation.

11.     This Court has personal jurisdiction over NuCognition, Inc. because it is a Virginia corporation.

12.     This court has personal jurisdiction over Mr. Phipps because he has caused damage to Akira in Virginia.

13.     This court has personal jurisdiction over Mr. Mikhalchuk because he resides in Virginia.

14.     This court has personal jurisdiction over Ms. Houle because she resides in Virginia.

15.     Venue is proper in this district under 28 U.S.C. § 1391(b) because four of the five defendants reside in this district, and the unlawful acts alleged occurred in this district.

## FACTUAL ALLEGATIONS

### *Introduction and Akira's FDA Business*

16.     Akira is a technology service provider to the Federal Government.

17.     The services Akira provide range from business planning and software requirement planning support for federal government "program management offices" to software development, to system integration.

18.     Akira divides its business operations into four operational business areas: three within the "services" business providing technology services to the Federal Government and one division responsible for selling computing equipment to the Federal Government, the "VAR" or "Value-Added Reseller" division.

19.     The service operational business areas are Defense – which supports the U.S. Department of Defense, Civilian, which supports United States Federal Agencies other than the Department of Defense, and Healthcare, which supports multiple military and civilian agencies which provide healthcare related services.

20.     Each business unit has a head of that unit, responsible for all of that unit's operations and responsible for strategic business planning for the unit. The heads of each of the units have held various titles at various times, depending on their seniority within Akira,

including "Director," "Vice President," and "Senior Vice President." The heads of each of the business units report directly to Srinivas Chennamaraja, Akira's CEO.

21.     Within its Health Care business unit, Akira works for the Food and Drug Administration (the "FDA"), the Department of Veterans Affairs (the "VA"), and the Department of Health and Human Services other than the FDA (the "HHS").

22.     Within its Health Care business unit, Akira's FDA work makes up approximately 80% of its total Health Care business by revenue, with HHS work comprising 10% to 15% of its Health Care business by revenue and VA work comprising 5% to 10% of its Health Care work by revenue.

23.     Within its Health Care business unit, substantially all of Akira's revenue attributable to the FDA is from Akira's "FDA ORA BIT" support contract.

24.     Akira's FDA ORA BIT support contract is a contract whereby Akira support the FDA's Office of Regulatory Affairs ("ORA") by providing technology services including program management support, analysis of current software, data analysis, data architecture and data modeling, business analysis, business process analysis services and business process re-engineering services, among other services.

25.     Akira's FDA ORA BIT support contract has been funded in an amount that averages over $3,000,000 per year, and has been renewed each year since the contract was first awarded to Akira in September, 2011.


***Akira Employs Mr. Phipps***

26.     On September 26, 2011, Akira hired Mr. Phipps to dual positions as both Lead Systems Architect for the FDA ORA BIT support contract and as Director, Healthcare

Technology. *Phipps' October 5, 2011 Compensation Agreement*, attached hereto as **Exhibit 1**.

27.     As Lead Systems Architect for the FDA ORA BIT support contract, Mr. Phipps was responsible for technology services including developing a system architecture, working with FDA employees and FDA organizations to determine future software development requirements, and providing general technology expertise to the FDA. Mr. Phipps reported to Akira's then project manager for the FDA ORA BIT support contract, Ronald Davis.

28.     Mr. Phipps worked as Lead Systems Architect for the FDA ORA BIT support contract until his resignation.

29.     Mr. Phipps also performed technical tasks similar to those he performed as a Lead Systems Architect on other health care technology contracts Akira received from other Federal agencies.

30.     Mr. Phipps simultaneously worked as Director, Healthcare Technology, until January 2016, when he was promoted to Senior Vice President, Healthcare. For his Director, Healthcare Technology position, Mr. Phipps reported to Eli Liang, who was at that time Akira's Chief Operating Officer. At some point while Mr. Phipps was Director, Healthcare Technology, his chain of command was changed so that he reported directly to Srinivas Chennamaraja, Chief Executive Officer of Akira.

31.     In January, 2016, Mr. Phipps was promoted to Senior Vice President, Healthcare from Director, Health Care Technologies and Lead Architect and reported directly to Srinivas Chennamaraja.

32.     As Senior Vice President, Healthcare, Mr. Phipps was charged with developing Akira's business strategy for pursuing information technology business within the Federal Health Care sector with a special focus on developing a pipeline of future opportunities at FDA. He was

also charged with creating prototypes for software that could be marketed to the Federal Health Care sector.

33.     As both Director, Healthcare Technology and as Senior Vice President, Healthcare, it was Mr. Phipps' job to identify new business opportunities for Akira to pursue within the Healthcare Technology field.

34.     As both Director, Healthcare Technology and as Senior Vice President, Healthcare, it was Mr. Phipps' job to decide whether Akira pursued or did not pursue a particular business opportunity, whether it was an opportunity Mr. Phipps had identified, or someone else within Akira had identified, and Akira's senior management deferred to Mr. Phipps regarding whether Akira should pursue certain business opportunities. *Emails Between Eli Liang, Srini Chennamaraja, Ryan Dunbar, and Josh Phipps*, attached as **Exhibit 9**.

35.     On November 28, 2016, Mr. Phipps resigned from Akira, effective December 15, 2016.

### *Akira Employs Ms. Houle*

36.     On October 13, 2011, Akira hired Ms. Houle to serve as Project Coordinator for Akira's FDA ORA BIT support contract. *Houle October 13, 2011 Compensation Agreement*, attached hereto as **Exhibit 2**.

37.     As Project Coordinator for the FDA ORA BIT support contract, Ms. Houle was responsible for managing project schedules across sub-project, coordinating meetings and taking meeting minutes, and coordinating project activities in support of the Project Manager. She reported to Akira's Project Manager at that time, Ronald Davis.

38.     On November 10, 2012, Akira promoted Ms. Houle to the position of Project Manager for the FDA ORA BIT support contract. In conjunction with this promotion, Ms. Houle signed another compensation agreement with confidentiality provisions. *Houle November 10, 2012 Compensation Agreement*, attached hereto as **Exhibit 3**.

39.     As Project Manager for the FDA ORA BIT support contract, Ms. Houle was responsible for every aspect of the day-to-day management of the project, including managing competing resource and delivery priorities, setting and managing the delivery schedule, incorporating client requests and requirements into the project, and keeping the client up to date on the work.

40.     As Project Manager, Ms. Houle first reported to Tom Peter, Vice President of Health, and then to Thomas Boyce, Vice President of Health and Mr. Peter's replacement when Mr. Peter left the company.

41.     As Project Manager, Ms. Houle also reported to the FDA Contracting Officer's Representative, Yimam Kelemework, who goes by "Kele," as Akira's representative.

42.     On January 15, 2016, Akira granted Ms. Houle a salary increase. In conjunction with the salary increase, Ms. Houle signed a new compensation agreement, which contained both non-disclosure and non-compete clauses. *Houle January 15, 2016 Compensation Agreement*, attached hereto as **Exhibit 4**.

43.     Ms. Houle served as Akira's Project Manager for the FDA ORA BIT support contract until November 28, 2016, when, having given Akira her two week notice on November 14, 2016, Ms. Houle resigned.

***Akira Employs Mr. Mikhalchuk***

7

44.     On October 5, 2012, Akira employed Andrey Mikhalchuk as an SOA Architect for its work for the U.S. Census Bureau. SOA stands for "Service Oriented Architecture" and is a process for developing software. *Mikhalchuk October 3, 2012 Agreement*, attached hereto as **Exhibit 5**.

45.     In January 2013, Akira promoted Mikhalchuk to the position of Chief Architect, and assigned him to work on various software development projects for Akira, including both "external" projects, meaning projects for Akira clients, and "internal" projects, meaning projects for Akira that were not delivered to any particular client.

46.     Chief Architect is the most senior technical position within the company, and as Chief Architect, Mikhalchuk was asked to perform various technical duties, including software development, network administration, and system administration.  He was therefore granted the highest level access to every Akira computer system.

47.     Among other external projects, Mikhalchuk was assigned to provide software development services on Akira's FDA ORA BIT support contract.

48.     As Chief Architect, Mr. Mikhalchuk's primary internal project was the management of "Akira Labs," which was a project whereby Akira build various software prototypes in the areas of healthcare IT, and "cloud migration" meaning the movement of client software and data from client computers to "the cloud."

49.     On November 7, 2016, Mikhalchuk resigned and his last date was November 21, 2016.

### *Mr. Phipps, Ms. Houle, and Mr. Mikhalchuk All Sign Non-Compete and Non-Disclosure Agreements*

50.     On October 5, 2011 in consideration for his employment by Akira, Mr. Phipps

signed a compensation agreement. **Exhibit 1**.

51.     The compensation agreement included the following confidentiality requirement:

"The Employee agrees to keep any and all of the Confidential Information from
being made known or disclosed to any person or entity, except for the exclusive use and
benefit of the Employer…" **Exhibit 1, Section 6b**.

52.     On October 13, 2011 in consideration for her employment by Akira, Ms. Houle

signed a compensation agreement.

53.     The compensation agreement included the following confidentiality requirement:

"The Employee agrees to keep any and all of the Confidential Information from
being made known or disclosed to any person or entity, except for the exclusive use and
benefit of the Employer…" **Exhibit 2, Section 6b**.

54.     On November 10, 2012, in consideration for an increase in her compensation, Ms.

Houle signed another compensation agreement, which had identical languages. **Exhibit 3,**

**Section 6b.**

55.     On January 12, 2015, in consideration for an increase in her salary and

compensation, Ms. Houle signed another compensation agreement. **Exhibit 4.**

56.     That compensation agreement included a merger clause and included the

following confidentiality requirement:

"The Employee agrees to keep any and all of the Confidential Information from
being made known or disclosed to any person or entity except for the exclusive use and
benefit of Akira…" **Exhibit 4, Section7b.**

57.     Mikhalchuk did not sign any employment related agreement that included a

confidentiality provision.

***Akira Creates And Uses Trade Secrets***

9

58. Akira creates and uses in its business many compilations of information which give Akira an advantage over competitors who do not know the information.

59. Some of those compilations were in the form of prototypes of software programs.

60. Akira developed a software prototype called "Semantic Layer Integration with eHMP" (the "eHMP Semantic Layer" software). This is a piece of software designed to simplify and automate the translation of medical records from one data format to another among different medical records systems.

61. Akira developed a software prototype called "Business Rules and Business Process Management Platform Implementation with eHMP" (the "eHMP Business Rules" software). This is a piece of software designed to automate the process by which electronic medical records are synchronized with each step within the series of record keeping, record checking, and record creating steps that are a part of every medical procedure.

62. Akira had plans to develop a software prototype called the "Patient Cohort Tool." This is a piece of software designed to ease the process by which clinical researchers can identify potential subjects for clinical trials, by allowing patients at various medical facilities to opt-in to a sharing of "de-identified" information about themselves.

63. Akira developed a software prototype whereby different sections of an Akira proposal to a client, that were likely to be re-used from time to time, could be stored separate from any specific proposal, and then by way of a software process assembled into a mostly completed proposal when needed.

64. Some of the compilations of information Akira claims as trade secrets are in the form of sales, business development and business strategy documents.

65.     Akira regularly created and used a report called the "Pipeline Report," which was a detailed compilation of the status of Akira's sales and business development efforts.

66.     Akira regularly created and used a report called the "Total Contract Value Report," which was a detailed compilation of the financial data on Akira's current and sought after contracts and opportunities.

67.     Akira regularly saved proposals that had been submitted for opportunities and used those proposals as templates for developing proposals; these proposals contain Akira's technical approaches to various technical problems, pricing data, and business strategy.

68.     A competitor with access to Akira's previously created proposals could place Akira at a competitive disadvantage because it would know the approach Akira has taken to solve various technical software problems, it would know Akira's pricing, and it would know Akira's business strategy.

69.     Akira regularly saved "past performance write-ups" which are detailed descriptions of Akira's performance on prior contracts for use as "past performance" credentials on future contracts.

70.     These write-ups contain a detailed description of the services Akira has provided under the contract to which they relate, and contain detailed descriptions of how Akira solved a particular technical problem or problems it encountered in performing the contract to which the write-up relates.

71.     A competitor with access to these past-performance write-ups would be able to know what specific technical solutions Akira proposed for certain technical problems, and what Akira's future sales focus is, based on what Akira has chosen to include, and what Akira has chosen to leave out of, those write-ups.

72.     Akira regularly produced and used ad-hoc sales documents of one form or another, such as sales presentations, sales spreadsheets, client data and potential client data documents, and sales status memos or briefings.

***Akira Takes Measures To Safeguard These Trade Secrets***

73.     Akira takes a number of measures to safeguard its trade secrets.

74.     Akira stores the software prototypes in an off-site computer system hosted by Amazon, called the "Amazon Web Services" platform. Akira's instantiation of the "Amazon Web Services" platform is called "Akira Labs."

75.     Akira stores trade secret information other than the software prototypes within two computer systems, one is stored externally within the "google drive" software, and the other is stored internally within a software system called "SharePoint."

76.     The "google drive" software is not the same product as the "Google Drive" that is accessible for free to the public, but rather is a part of a suite of online business tools Google offers called "Google Apps."

77.     As a part of "Google Apps," the "google drive" software is secured by a set of security protocols, including encryption of data in transit from the software to the user.

78.     The "Amazon Web Services" software is secured by a set of security protocols, including encryption of data in transit from the software to the user.

79.     The "Google Apps" and "Amazon Web Services" cloud based software are routinely used by millions of businesses in the United States to store trade secret data, and storage of trade secret data on those software platforms is reasonable as a method of securing those trade secrets.

80.     The "SharePoint" software is hosted on a computer at Akira's location. The computer is in a room that is locked and to which physical access is limited.

81.     Each of the Google Drive and the SharePoint system are password protected. Each employee of Akira receives a username and password and that employee's access to various areas within the Google Drive and the SharePoint system are limited based on that employee's role within the organization.

82.     Some of the data compilations, for example, proposals which are circulated outside of Akira or which are submitted to the Federal Government, are stamped with a confidential marking. The specific marking used differs from time to time, depending on the nature of distribution of the information.

### *Mr. Phipps, Mr. Mikhalchuk, and Ms. Houle Were Granted Access To Akira's Trade Secrets*

83.     Mr. Phipps, first as Director, Healthcare Technology, and later as Senior Vice President, Healthcare, was intimately involved in Akira's growth plans and business strategy, and therefore had unlimited access to Akira's trade secret sales and business strategy documents.

84.     Ms. Houle as a Project Manager was asked to assist on certain proposals within her areas of expertise, and was granted access to those subfolders of the past proposals folder within which were proposals she was asked to assist with.

85.     Mr. Mikhalchuk was the Chief Architect of the company. As Chief Architect, he was granted the highest level of access to every Akira computing system.

86.     As both Lead Systems Architect, and Senior Vice President, Healthcare, Mr. Phipps was asked to collaborate with Mr. Mikhalchuk in creating software prototypes and other internal software projects. In their collaboration, Mr. Phipps's role was to provide the overall product strategy and product development roadmap.

87.     Akira employs approximately 50 employees, but of those employees only five to six at any one time are granted access to Akira Labs.

88.     At the time of Mr. Phipps and Mr. Mikhalchuk's resignations, only the following people were granted access to Akira Labs: Srinivas Chennamaraja, CEO of Akira; Engineers Alex Grossman, Amit Anand, and Alex Ertel; and Mr. Phipps and Mr. Mikhalchuk.

89.     Mr. Phipps and Mr. Mikhalchuk, in addition to having access to the projects in Akira Labs, were tasked with developing these projects.

90.     Each Monday, and from time to time at other times if necessary, Akira holds a "business pipeline meeting" where executives responsible for different aspects of Akira's business development present the status of their business development efforts.

91.     Mr. Phipps, as Senior Vice President, Healthcare, would maintain a set of documents which would store the current status of Akira's business development within Healthcare. These documents were stored on the SharePoint server.

92.     The documents include within them general business forecasts, information that Mr. Phipps and other Akira employees had gleaned about specific prospective clients or opportunities.

### *Some of the Defendants form the company Chiron Solutions, Inc., and Compete with Akira*

93.     In March, 2015, Mr. Phipps, Mr. Mikhalchuk, Ms. Houle, with others, formed Chiron Solutions. *Chiron Solutions, Inc. Nevada State Corporation Record*, attached as **Exhibit 7**.[1]

94.     Mr. Mikhalchuk was the Director of Chiron Solutions. **Exhibit 7.**

---

[1] Exhibit 6 from the original Complaint related to a Defendant against whom Akira voluntarily dismissed the complaint. The exhibit number has been retained in this Amended Complaint for numbering consistency and a blank exhibit with that number has been attached.

95.     Mr. Phipps was the Secretary of Chiron Solutions. **Exhibit 7.**

96.     In November, 2015, while employed by Akira, Mr. Phipps solicited Akira's client U.S. Customs and Border Patrol to use Chiron to develop software. *Emails between Josh Phipps and Customs and Border Patrol*, attached as **Exhibit 8**.

97.     On February 18, 2016, while employed by Akira, Mr. Phipps, using an Akira email, sent a Chiron "Capability Statement" to Akira's Contracting Officer's Representative for the FDA ORA BIT project, Yimam Kelemework, who goes by "Kele." *Phipps email to Kelemework*, attached as **Exhibit 10** (p. 2); *Chiron Capabilities Statement attached to Phipps email to Kelemework*, attached as **Exhibit 11**.

98.     The Capability Statement described Health Technology services Chiron could perform for FDA. **Exhibit 11**.


### *The Defendants Continue to Plan for Competing with Akira*

99.     On June 18, 2016, Mr. Mikhalchuk distributed meeting notes describing a prior meeting in which each of Mr. Phipps, Ms. Houle, and Mr. Mikhalchuk had participated, and had discussed their ongoing business plans in depth. *Mikhalchuk June 18, 2016 email*, attached as **Exhibit 12**.

100.    The document included detailed plans to dissolve Chiron, but to continue the development of healthcare IT businesses, including Conceptant, and NuCognition. **Exhibit 12**

101.    The document included plans for Mr. Phipps to call Akira's client contact, Ms. Kelemework. **Exhibit 12**.

102.    The ongoing planning fit a pattern of activities the former employee Defendants had engaged in for over a year.

103.    On June 14, 2015, Mr. Phipps had shared an online "google drive" document from Akira's Google Drive account to Mr. Wood and Mr. Mikhalchuk at their Chiron Solutions email accounts at <chironsol.com>. *Phipps June 14, 2015 email*, attached as **Exhibit 13**.

104.    On August 7, 2015, Mr. Phipps had emailed Mr. Wood and Mr. Mikhalchuk at their Chiron Solutions email accounts as one link in a chain of emails discussing project management software suitable for their on-going side venture. *Phipps August 7, 2015 email*, attached as **Exhibit 14**.

### *Some of the Defendants Form Conceptant, Inc. and Compete with Akira*

105.    On June 19, 2016, while all three were employed at Akira, Mr. Phipps, Mr. Mikhalchuk, and Ms. Houle formed Conceptant. *Conceptant Articles of Incorporation*, attached as **Exhibit 15**.

106.    Ms. Houle is the CEO and President and a Director of Conceptant. **Exhibit 15**.

107.    Mr. Phipps is the Treasurer and a Director of Conceptant. **Exhibit 15**.

108.    Mr. Mikhalchuk is the Secretary and a Director of Conceptant. **Exhibit 15**.

109.    At some time prior to July 21, 2016, Conceptant ordered a company credit card for Mr. Mikhalchuk, and on July 21, 2016, Ms. Houle sent Mr. Mikhalchuk an email with an image of Mr. Mikhalchuk's new Conceptant credit card. *Emails and attached image of Mr. Mikhalchuk's Conceptant Credit Card (number redacted)*, attached as **Exhibit 16**.

### *Some of the Defendants form NuCognition, Inc. and Compete With Akira*

110.    On August 4, 2016 while all three were employed at Akira, Mr. Phipps, Mikhalchuk, and Ms. Houle, along with John Kirkwood who has no known affiliation or prior

affiliation with Akira, formed a company called NuCognition, Inc. *NuCognition Articles of Incorporation*, attached as **Exhibit 17**.

111.    Ms. Houle is a Director of NuCognition, Inc. **Exhibit 17**.

112.    Mr. Phipps is a Director of NuCognition, Inc. **Exhibit 17**.

113.    Mr. Mikhalchuk is a Director of NuCognition, Inc. **Exhibit 17**.

114.    NuCognition offers healthcare IT solutions, by among other things, designing clinical virtual reality technologies, or augmented reality technologies. *NuCognition Website at <nucognition.com>*, attached as **Exhibit 18**.

### *Conceptant, Inc. Bids On FDA Work and Wins FDA Work, and Mr. Phipps, Mr. Mikhalchuk, and Ms. Houle All Immediately Resign from Akira*

115.    In July, 2016, while all of its principals were employed at Akira, Conceptant proposed to create for the FDA an "FDA Population Health and Product Safety Platform." (the "Conceptant FDA PHPSP proposal") *Conceptant Draft Proposal*, attached as **Exhibit 19**.

116.    The proposal was to provide Healthcare related software development services, the exact services that Akira provides. **Exhibit 19**.

117.    Mr. Phipps, as Senior Vice President, Healthcare, should have added the opportunity to the Akira business pipeline documents, but he intentionally left it out of both the documents and his weekly business development updates to Akira's management.

118.    Conceptant proposed within this proposal to the FDA that it could provide a "Patient Cohort Tool," although this tool was in the planning phase and was intended to be housed in Akira Labs. **Exhibit 19, p. 6**.

119.    Conceptant included as its own "past performance" references contract that Akira, not Conceptant, had performed. **Exhibit 19, pp. 40 – 43**.

120.    Contracts numbered 14-233-SOL-00490, HHSF223201400164C, D11PX19157, HHSN 3162015 0 0 0 41 W, and HHSF223201510173C, referenced as Conceptant's relevant prior experience, were each contracts which Akira had performed and Conceptant had not performed. **Exhibit 19, pp. 40 – 43**.

121.    Akira discovered this proposal when the editor Conceptant had hired to review the proposal cc'd Akira's CEO, Srinivas Chennamaraja, on her email to Mr. Phipps of her notes on a draft of the proposal. The editor had in the past worked closely with Akira on a number of healthcare editing projects and was working with Akira on healthcare editing projects at that time as well.

122.    After discovering the draft proposal, Mr. Chennamaraja met with each of Mr. Phipps, Ms. Houle, and Mr. Mikhalchuk to discuss the issue.

123.    Mr. Phipps at his meeting stated that he did not submit the proposal, that it was a mistake to create the proposal, and that it would not happen again.

124.    Ms. Houle at her meeting stated that she did not see anything wrong with submitting a proposal for another company while working as an Akira employee; Mr. Channamaraja warned her that it was wrong to compete against your employer and told her to stop.

125.    Mr. Mikhalchuk at his meeting stated that he was not involved and that he did not know anything about the proposal or the activity.

126.     At the time of the meeting, Mr. Phipps had been an Akira employee for four years, and Ms. Houle for almost four years; Mikhalchuk was the most senior technical employee in the company. Having faith in the good intentions of its employees and their long service to Akira, Mr. Chennamaraja chose not to terminate the three employees.

127.     In spite of Mr. Phipps' claim that he did not submit the proposal, he must have, because on September 13, 2016, in response to the proposal, the FDA awarded Conceptant a contract to develop an "FDA Population Health and Product Safety Platform." $606,701.30 was obligated to the award. *Award Records for Conceptant, Inc., from the Federal Procurement Database System at <fpds.gov>*, attached as **Exhibit 20**.

128.     The contract was issued for the very work that Conceptant proposed to FDA while Mr. Phipps and Ms. Houle and Mr. Mikhalchuk were Akira employees.

129.     The contract was issued to Conceptant while Mr. Phipps, Ms. Houle, and Mr. Mikhalchuk were Akira employees.

130.     On November 7, November 14, and November 28th respectively, Mr. Mikhalchuk, Mr. Phipps, and Ms. Houle all resigned their positions at Akira.

131.     Mr. Wood had previously left the company in January 2016, and Ms. Munley had left in May, 2016.

132.     On November 17, 2016, roughly a week before she resigned, Ms. Houle forwarded all of Akira's ISO 9001 certification documentation to her personal email. *Lisa Houle Email of November 17, 2016*, attached as **Exhibit 21**.

### *By Submitting The Conceptant FDA PHPSP Proposal, The Defendants Directly Competed With Akira And Mis-Appropriated A Business Opportunity That Was Properly Akira's*

133.     Conceptant prepared and submitted the Conceptant FDA PHPSP proposal in response to an FDA Broad Agency Announcement, number FDABAA-16-00122.

134.     A Broad Agency Announcement is a Federal Government acquisition device, described in the Federal Acquisition Regulations at 48 U.S.C. § 35.016.

135.   A Broad Agency Announcement is the acquisition device by which a Federal

Agency procures basic scientific research and applied scientific research, as opposed to the

development of a specific scientific or technology system.

136.   On at least one occasion, in June, 2013, Srinivas Channamaraja lamented to Mr.

Phipps that Akira had missed an FDA Broad Agency Announcement, and directed him to seek

out FDA Broad Agency Announcements. *Email of June 13, 2013*, attached as **Exhibit 22**; *FDA*

*Broad Agency Announcement FDABAA-13-0019*, attached as **Exhibit 24** (the FDABAA-13-0019

document was attached to Mr. Chennamaraja's June 13, 2013 email to Mr. Phipps).

137.   On several other occasions, for example in September of 2012, Mr. Chennamaraja

directed Mr. Phipps to pursue FDA Broad Agency Announcements. *Email of Sept 12, 2013*,

attached as **Exhibit 23**.

138.   The 2013 Broad Agency Announcement Mr. Chennamaraja brought to Mr.

Phipps' attention sought the same services the FDA sought by way of the 2016 Broad Agency

Announcement, FDABAA-16-00122. *See* **Exhibit 24**, **pp. 3-13**; *FDABAA-16-00122*, attached as

**Exhibit 25** (see pp. 3 – 21).

139.   Both the 2013 Broad Agency Announcement and the 2016 Broad Agency

Announcement sought proposals, in identical language, in the following areas:

"1. Modernize Toxicology to Enhance Product Safety
2. Stimulate Innovation in Clinical Evaluations and Personalized Medicine to
Improve Product Development and Patient Outcomes
3. Support New Approaches to Improve Product Manufacturing and Quality
4. Ensure FDA Readiness to Evaluate Innovative Emerging Technologies
5. Harness Diverse Data through Information Sciences to Improve Health
Outcomes
6. Implement a New Prevention-Focused Food Safety System to Protect Public
Health
7. Facilitate Development of Medical Countermeasures to Protect Against Threats
to U.S. and Global Health and Security

8. Strengthening Social and Behavioral Science at FDA by Enhancing Audience Understanding

9. Strengthening the Global Product Safety Net" *See Exhibit 24*, p. 4, *Exhibit 25*, p. 4.

140.    Conceptant in its proposal in response to the 2016 Broad Agency Announcement, responded that its capabilities and proposed solution were in response to the FDA's specific requirements, which had not only been listed in the 2016 Broad Agency Announcement Conceptant responded to, but had also been listed identically in the 2013 Broad Agency Announcement Mr. Chennamaraja had cited to Mr. Phipps when he told him to seek out opportunities of that nature. *See Exhibit 19*, pp. 9, 10.

141.    Conceptant used the resumes of Akira personnel, specifically, Mr. Phipps, Mr. Mikhalchuk, and Ms. Houle, in the Conceptant FDA PHPSP proposal.

142.    Conceptant used Akira's past performance in the Conceptant FDA PHPSP proposal.

143.    Conceptant proposed using Akira's software prototypes in the Conceptant FDA PHPSP proposal.

144.    Conceptant used Akira personnel – Mr. Phipps, Ms. Houle, and Mr. Mikhalchuk – to write the Conceptant FDA PHPSP proposal.

145.    Conceptant used an Akira contractor, Amy Grossman, who had previously edited at least several Akira proposals, to edit the Conceptant FDA PHPSP proposal.

146.    Mr. Phipps was obligated to bring the 2016 FDA Broad Agency Announcement to Akira's attention.

147.    Srinivas Chennamaraja had specifically told Mr. Phipps to bring FDA Broad Agency Announcements to his attention, so that Akira could determine whether it would bid on them.

148.     Had Mr. Phipps brought the Broad Agency Announcement to Mr. Chennamaraja's attention, Akira would have submitted a proposal in response.

149.     Conceptant's FDA PHPSP proposal, written by Akira personnel, edited by Akira's proposal editing consultant, proposing Akira software prototypes, proposing Akira personnel resumes, and referencing Akira past performance, was identical to the proposal Akira would have written in response to the 2016 Broad Agency Announcement.

150.     The only difference between Conceptant's FDA PHPSP proposal and the proposal Akira would have submitted in response to the 2016 Broad Agency Announcement was the name of the company and the logo on the letterhead.

151.     Conceptant proposal was selected for Award by the FDA, therefore Akira's proposal – which would have been identical to the proposal Conceptant submitted – would have been selected for award by the FDA.

### *The Defendants Misappropriate Akira's Trade Secrets*

152.     Each of Mr. Phipps, Mr. Mikhalchuk, and Ms. Houle acquired Akira's trade secrets under circumstances that obligated them to maintain the secrecy of those trade secrets.

153.     Neither Conceptant nor Nucognition were authorized to see or use Akira's trade secrets.

154.     Mr. Phipps acquired Akira's trade secrets as a result of his employment by Akira in a senior technical position and in a senior business development position.

155.     Mr. Mikhalchuk acquired Akira's trade secrets as a result of his employment by Akira in a senior technical position.

156.     Ms. Houle acquired Akira's trade secrets as a result of her employment by Akira in a project management position.

157.    In addition, Mr. Phipps and Ms. Houle signed contracts which identified that they would receive Akira trade secret information and that they were only to divulge that information to the benefit of Akira.

158.    Conceptant and Nucognition acquired Akira's trade secrets through Mr. Phipps, Mr. Mikhalchuk and Ms. Houle, who are each either owners or officers or both of Conceptant and Nucognition.

159.    Each of Mr. Phipps, Mr. Mikhalchuk, and Ms. Houle disclosed Akira's trade secrets to Conceptant and Nucognition.

160.    Each of Mr. Phipps, Mr. Mikhalchuk, and Ms. Houle used Akira's trade secrets in Conceptant's proposal to the FDA for the Product Safety and Public Health Platform.

161.    Ms. Houle disclosed Akira's ISO 9001 certification documentation to Conceptant.

162.    Nucognition has advertised on its website capabilities that could only be derived from its use of Akira's trade secrets.

**COUNT I
(AGAINST ALL DEFENDANTS)
MISAPPROPRIATION OF A TRADE SECRET
UNDER THE DEFENSE OF TRADE SECRETS ACT
18 U.S.C. § 1836, *ET SEQ***

163.    Akira re-alleges and incorporates paragraphs 1 through 162 as if they were first set-forth herein.

164.    Mr. Phipps, Mr. Mikhalchuk and Ms. Houle each acquired knowledge of Akira trade secrets under circumstances that gave rise to a duty to limit their use of the trade secrets to uses which benefited Akira.

165.     Mr. Phipps, Mr. Mikhalchuk, and Ms. Houle acquired knowledge of Akira's trade secrets in the course of their employment as senior level technical employees, sales employees, or management level employees with Akira.

166.     Mr. Phipps, Mr. Mikhalchuk, and Ms. Houle signed contracts with Akira which created in each of them specific contractual duties to keep Akira's proprietary and trade secret information confidential.

167.     Conceptant acquired knowledge of Akira trade secrets by way of its owners or employees or agents Mr. Phipps, Mr. Mikhalchuk, and Ms. Houle.

168.     Conceptant therefore knew or had reason to know that the knowledge was derived from persons who owed a duty to Akira to maintain the secrecy of the trade secret information.

169.     Mr. Phipps, Mikhalchuk, Ms. Houle and Conceptant misappropriated those trade secrets when they took those trade secrets by improper means and when they used them to, among other things: (i) qualify Conceptant specifically for a contract with the FDA which Conceptant would not otherwise have qualified for; (ii) unlawfully divert potential Akira business with FDA to Conceptant, while Mr. Phipps, Mikhalchuk, and Ms. Houle were still employed at Akira; (iii) qualify Conceptant for ISO 9001 certification when Conceptant would otherwise not have qualified.

170.     Mr. Phipps, Mikhalchuk, Ms. Houle and Conceptant's misappropriation of the trade secrets damaged Akira when it deprived Akira of at least one and likely more opportunities to contract with FDA and other federal agencies, opportunities that went to Conceptant instead.

171.     NuCognition acquired knowledge of Akira trade secrets by way of its owners or employees or agents Mr. Phipps, Mr. Mikhalchuk and Ms. Houle.

172.     NuCognition therefore knew or had reason to know that the knowledge was

derived from persons who owed a duty to Akira to maintain the secrecy of the trade secret information.

173.    Mr. Phipps, Mr. Mikhalchuk, Ms. Houle, and NuCognition misappropriated those trade secrets when they took those trade secrets by improper means and when they used them to, among other things, present business capabilities of NuCognition that were trade secrets of Akira.

174.    Mr. Phipps, Mr. Mikhalchuk, Ms. Houle, and NuCognition's misappropriation of the trade secrets damaged Akira when it deprived Akira of opportunities that were appropriated for NuCognition's benefit rather than Akira's.

175.    The Defendants' misappropriation of trade secrets, including the sales documents – the Pipeline Reports, the Total Contract Value Reports, past performance write-ups, previously submitted proposals, and ad-hoc sales documents - damaged Akira when it allowed Conceptant and Nucognition to create a sales and growth strategy that directly builds on the information contained in Akira's trade secrets, and thereby allowed Conceptant and Nucognition to unfairly compete with Akira.

176.    The Defendants' misappropriation of trade secrets damaged Akira when the Defendants were unjustly enriched by using Akira's trade secrets without compensating Akira for that use.

**COUNT II**
**(AGAINST ALL DEFENDANTS)**
**MISAPPROPRIATION OF A TRADE SECRET**
**UNDER THE VIRGINIA UNIFORM TRADE SECRETS ACT**
**VA. CODE ANN. §§ 59.1-336 TO 59.1-343**

177.    Akira re-alleges and incorporates paragraphs 1 through 162 as if they were first

set-forth herein.

178.    The Defendants each acquired knowledge of Akira trade secrets under circumstances that gave rise to a duty to limit their use of the trade secrets to uses which benefited Akira.

179.    Mr. Phipps, Mr. Mikhalchuk, and Ms. Houle acquired knowledge of Akira's trade secrets in the course of their employment as senior level technical employees, sales employees, or management level employees with Akira.

180.    Mr. Phipps and Ms. Houle signed contracts with Akira which created in each of them specific contractual duties to keep Akira's proprietary and trade secret information confidential.

181.    Conceptant acquired knowledge of Akira trade secrets by way of its owners or employees or agents Mr. Phipps, Mr. Mikhalchuk, and Ms. Houle.

182.    Conceptant therefore knew or had reason to know that the knowledge was derived from persons who owed a duty to Akira to maintain the secrecy of the trade secret information.

183.    Mr. Phipps, Mikhalchuk, Ms. Houle and Conceptant misappropriated those trade secrets when they took those trade secrets by improper means and when they used them to, among other things: (i) qualify Conceptant specifically for a contract with the FDA which Conceptant would not otherwise have qualified for; (ii) unlawfully divert potential Akira business with FDA to Conceptant, while Mr. Phipps, Mikhalchuk, and Ms. Houle were still employed at Akira; (iii) qualify Conceptant for ISO 9001 certification when Conceptant would otherwise not have qualified.

184.    Mr. Phipps, Mikhalchuk, Ms. Houle and Conceptant's misappropriation of the trade secrets damaged Akira when it deprived Akira of at least one and likely more opportunities

to contract with FDA and other federal agencies, opportunities that wen to Conceptant instead.

185.    NuCognition acquired knowledge of Akira trade secrets by way of its owners or employees or agents Mr. Phipps, Mr. Mikhalchuk and Ms. Houle.

186.    NuCognition therefore knew or had reason to know that the knowledge was derived from persons who owed a duty to Akira to maintain the secrecy of the trade secret information.

187.    Mr. Phipps, Mr. Mikhalchuk, Ms. Houle, and NuCognition misappropriated those trade secrets when they took those trade secrets by improper means and when they used them to, among other things, present business capabilities of NuCognition that were trade secrets of Akira.

188.    Mr. Phipps, Mr. Mikhalchuk, Ms. Houle, and NuCognition's misappropriation of the trade secrets damaged Akira when it deprived Akira of opportunities that were appropriated for NuCognition's benefit rather than Akira's.

189.    The Defendants' misappropriation of trade secrets, including the sales documents – the Pipeline Reports, the Total Contract Value Reports, past performance write-ups, previously submitted proposals, and ad-hoc sales documents - damaged Akira when it allowed Conceptant and Nucognition to create a sales and growth strategy that directly builds on the information contained in Akira's trade secrets, and thereby allowed Conceptant and Nucognition to unfairly compete with Akira.

190.    The Defendants' misappropriation of trade secrets damaged Akira when the Defendants were unjustly enriched by using Akira's trade secrets without compensating Akira for that use.

**COUNT III**
**(AGAINST DEFENDANTS CONCEPTANT, PHIPPS, MIKHALCHUK, AND HOULE)**
**TORTIOUS INTERFERENCE**
**WITH A CONTRACT AND BUSINESS EXPECTANCY**

191.    Akira re-alleges and incorporates each of paragraphs 1 through 162 as if they were first set-forth herein.

192.    Mr. Phipps, Mr. Mikhalchuk, Ms. Houle, and Conceptant all have  a duty, based on common law, not to interfere with Akira's contracts or business expectancies.

193.    Akira had a reasonable expectation of future contracts with FDA. Specifically, Akira had a reasonable expectation that had Mr. Phipps, Mr. Mikhalchuk, and Ms. Houle bid the Health and Product Safety Platform work through Akira rather than through Conceptant, that work would have come to Akira rather than to Conceptant.

194.    All of Mr. Phipps, Mr. Mikhalchuk, Ms. Houle, and Conceptant knew that Akira could have bid the Health and Product Safety Platform work because Mr. Phipps, Mikhalchuk, and Ms. Houle worked for Akira on current FDA projects, were charged with representing Akira and Akira's capabilities to FDA, and knew Akira's capabilities.

195.    Had Mr. Phipps brought that opportunity to Akira, Akira would have submitted a proposal in response to the opportunity; it was identical to an opportunity that Akira had previously told Mr. Phipps to be on the look-out for.

196.    Had Akira submitted a proposal, Akira would have been awarded a contract. Conceptant, which was awarded a contract, submitted a proposal that was identical to the proposal Akira would have submitted. It used Akira personnel resumes, Akira past performance, Akira software prototypes, an Akira editor, and Akira employees who drafted other proposals for Akira – Mr. Phipps, Mr. Mikhalchuk, and Ms. Houle – drafted the proposal.

197.    Mr. Phipps, Mr. Mikhalchuk, Ms. Houle, and Conceptant intentionally acted to divert at least the Health and Product Safety Platform work to Conceptant rather than Akira, and likely acted to divert other federal government work to Conceptant rather than Akira.

198.    Akira was damaged by these intentional acts because Akira was at a minimum denied the opportunity to compete for the Health and Product Safety Platform work; and Akira was likely was denied the opportunity to compete for other federal work, state, and commercial work as well.

**COUNT IV**
**(AGAINST DEFENDANTS PHIPPS, HOULE AND MIKALCHUK)**
**BREACH OF DUTY OF LOYALTY**

199.    Akira re-alleges and incorporates each of paragraphs 1 through 162 as if they were first set-forth herein.

200.    Mr. Phipps was an at-will employee of Akira from September 21, 2011 through approximately December 15, 2016.

201.    Mr. Mikhalchuk was an at-will employee of Akira from October 13, 2011 through November 28, 2016.

202.    Ms. Houle was an at-will employee of Akira from October 5, 2012 through approximately November 7, 2016.

203.    As at-will employees of Akira, Mr. Phipps, Mr. Mikhalchuk, and Ms. Houle all had a duty arising out of the common law not to compete with Akira during the time of their employment with Akira.

204.   This duty is not specific to or limited by Mr. Phipps, Mr. Mikhalchuk, or Ms. Houle's job title or specific job duties, but rather exists as a result of the employer-employee relationship.

205.   During the time they were employees of Akira, over a period of several years, the defendants Phipps, Mikhalchuk, and Houle (the "former employee Defendants") planned to form a competing enterprise.

206.   During the time they were employees of Akira, the former employee Defendants executed that plan.

207.   During the time they were employees of Akira, the former employee Defendants formed three separate companies – Chiron Solutions, Inc., Conceptant, Inc., and NuCognition, Inc.

208.   During the time they were employees of Akira, the former employee Defendants submitted proposals in the name of these companies to at least one Akira client.

209.   As a result of the former employee Defendants' efforts, Conceptant, Inc. was awarded a contract by the FDA based on an opportunity which Akira was eligible to compete for and which the former employee Defendants were duty bound to bring to Akira rather than to appropriate for their own gain.

210.   Had Mr. Phipps brought that opportunity to Akira, Akira would have submitted a proposal in response to the opportunity; it was identical to an opportunity that Akira had previously told Mr. Phipps to be on the look-out for.

211.   Had Akira submitted a proposal, Akira would have been awarded a contract. Conceptant, which was awarded a contract, submitted a proposal that was identical to the proposal Akira would have submitted. It used Akira personnel resumes, Akira past performance,

Akira software prototypes, an Akira editor, and Akira employees who drafted other proposals for Akira – Mr. Phipps, Mr. Mikhalchuk, and Ms. Houle – drafted the proposal.

212.    Therefore, Mr. Phipps, Mr. Mikhalchuk, and Ms. Houle competed against Akira, while employees of Akira, in breach of their duty not to compete against Akira while employed by Akira.

213.    Mr. Phipps, Mr. Mikhalchuk, and Ms. Houle's breach of their duty of loyalty damaged Akira in that Akira was denied the benefit of their efforts on Akira's behalf, efforts for which Akira was paying by paying each of them generous salaries with generous benefits.

214.    Furthermore, Akira lost at least one contract, the FDA Health and Product Safety Platform opportunity that it would have been awarded but for Mr. Phipps, Mr. Mikhalchuk, and Ms. Houle's competition with Akira

**COUNT V**
**(AGAINST ALL DEFENDANTS)**
**COMMON LAW CIVIL CONSPIRACY**

215.    Akira re-alleges and incorporates each of paragraphs 1 through 162 as if they were first set-forth herein.

216.    The former employee Defendants planned a business strategy together by which they could breach their duties of loyalty to Akira, breach the non-compete and non-disclosure agreements that were in place with Akira, mis-appropriate Akira's trade secrets and unlawfully interfere with Akira's current contracts and future business opportunities.

217.    In furtherance of this strategy, the former employee Defendants created a series of companies: Chiron Solutions, Conceptant, and NuCognition.

218.    The former employee Defendants, by planning to compete with Akira, and by executing that plan, acted intentionally and purposefully.

31

219.     All of the Defendants, including the former employee Defendants, and Conceptant and NuCognition (the "company Defendants") acted together to mis-appropriate Akira trade secrets.

220.     The Defendants acted together to enable the former employee Defendants to breach their duty of loyalty to Akira.

221.     The Defendants acted together to divert at least one contract, the FDA Health and Product Safety Platform work from Akira to Conceptant.

222.     The Defendants acted together while the employee Defendants were employed at Akira to unlawfully solicit an unknown number of opportunities that were rightfully Akira to their own account.

223.     The Defendants had no lawful justification for their actions described herein.

224.     By acting intentionally, purposefully and without lawful justification, the Defendants acted with legal malice.

225.     Akira was damaged by the Defendants' conspiracy in that at a minimum: Akira lost the opportunity to compete for the FDA Health and Product Safety Platform work; and Akira's trade secrets have been unlawfully used to compete with Akira.


**COUNT VI**
**(AGAINST ALL DEFENDANTS)**
**STATUTORY BUSINESS CONSPIRACY**
**UNDER VA. CODE ANN. §§ 18.2-499 TO 18.2-500**

226.     Akira re-alleges and incorporates each of paragraphs 1 through 162 as if they were first set-forth herein.

227.     The former employee Defendants planned a business strategy together by which they could breach their duties of loyalty to Akira, breach the non-compete and non-disclosure

agreements that were in place with Akira, mis-appropriate Akira's trade secrets and unlawfully interfere with Akira's current contracts and future business opportunities.

228.     In furtherance of this strategy, the former employee Defendants created a series of companies: Chiron Solutions, Conceptant, and NuCognition.

229.     The former employee Defendants, by planning to compete with Akira, and by executing that plan, acted intentionally and purposefully.

230.     All of the Defendants, including the former employee Defendants, and Conceptant and NuCognition (the "company Defendants") acted together to mis-appropriate Akira trade secrets.

231.     The Defendants acted together to enable the former employee Defendants to breach their duty of loyalty to Akira.

232.     The Defendants acted together to divert at least one contract, the FDA Health and Product Safety Platform work from Akira to Conceptant.

233.     The Defendants acted together to solicit an unknown number of opportunities that were rightfully Akira to their own account.

234.     The Defendants had no lawful justification for their actions described herein.

235.     By acting intentionally, purposefully and without lawful justification, the Defendants acted with legal malice.

236.     When confronted about their plans, the former employee Defendants who were questioned about it lied about their actions, their intentions, and their knowledge of the plans.

237.     The former employee Defendants knew or should have known of their duty of loyalty to Akira, and their contractual, common law, and statutory duty not to mis-appropriate Akira trade secrets.

238.     In executing their business plan, and knowing or being charged with knowing that what they were planning was wrong both ethically and legally, the Defendants acted with a purposeful and willful disregard for their duties to Akira.

239.     Akira was damaged by the Defendants' conspiracy in that at a minimum: Akira lost the opportunity to compete for the FDA Health and Product Safety Platform work; and Akira's trade secrets have been unlawfully used to compete with Akira.


**COUNT VII**
**BREACH OF CONTRACT**
**(AGAINST DEFENDANT PHIPPS)**
**THE OCTOBER 5, 2011 COMPENSATION AGREEMENT**

240.     Akira re-alleges and incorporates each of paragraphs 1 through 162 as if they were first set-forth herein.

241.     In consideration for his employment with Akira, on October 5, 2011, Mr. Phipps signed a compensation agreement with Akira.

242.     The compensation agreement included the following non-disclosure terms:

> "The Employee agrees to keep any and all of the Confidential Information from being made known or disclosed to any person or entity, except for the exclusive use and benefit of the Employer…" Section 6b.

243.     Mr. Phipps breached the non-disclosure clause of the compensation agreement when he assisted in writing a proposal for Conceptant wherein Akira Confidential Information was disclosed to the FDA for Conceptant's benefit.

244.     Mr. Phipps breached the non-disclosure clause of the compensation agreement when he disclosed Akira's Confidential Information, namely Akira's software prototypes and Akira's plans for using those software prototypes to Nucognition.

245.    Mr. Phipps' breach of the contract damaged Akira when it deprived Akira of at least one and likely more opportunities to contract with FDA and other federal agencies, opportunities that went to Conceptant instead.

246.    Mr. Phipps' breach of the contract damaged Akira when it deprived Akira of opportunities which have gone to Nucognition as a result of Nucognition's advertising of Akira's software prototypes on its website.

**COUNT VIII**
**BREACH OF CONTRACT**
**(AGAINST DEFENDANT HOULE)**
**THE JANUARY 12, 2015 COMPENSATION AGREEMENT**

247.    Akira re-alleges and incorporates each of paragraphs 1 through 162 as if they were first set-forth herein.

248.    In consideration for her employment with Akira Ms. Houle signed a compensation agreement with Akira.

249.    The compensation agreement included the following non-disclosure terms:

"The Employee agrees to keep any and all of the Confidential Information from being made known or disclosed to any person or entity, except for the exclusive use and benefit of Akira" Section 7b.

250.    The compensation agreement included the following non-compete terms:

"…Employee agrees to devote all of his professional time, attention, and efforts to promote and further the business of Akira. Employee shall not, while employed full time by Akira, acquire any financial interest in or perform services for, as employee, consultant, independent contractor, volunteer, principal, or otherwise, any other entity or person doing work that is the same or similar to that of Akira…in consideration for receiving full-time employment from Akira, Employee agrees that for a period of 12 months after Employee is no longer employed by Akira, Employee will not perform services for…any other entity or person doing substantially the same work under the same Akira customer project or program for which Akira hired Employee." Section 10.

251.    Ms. Houle, along with Mr. Phipps and Mikhalchuk, planned to create Conceptant,

created Conceptant, and submitted at least one if not more than one proposal for work for which Akira was qualified.

252.     Ms. Houle breached the non-disclosure clause of the compensation agreement when she forwarded the ISO 9001 information to her personal email account for use by Conceptant and Nocognition.

253.     Ms. Houle breached the non-disclosure clause of the compensation agreement when she wrote a proposal for Conceptant wherein Akira Confidential Information was disclosed to the FDA for Conceptant's benefit.

254.     Ms. Houle breached the non-compete clause of the compensation agreement when she formed Conceptant, and through Conceptant competed with Akira for work at the FDA.

255.     Ms. Houle's breach of the contract damaged Akira when it deprived Akira of at least one and likely more opportunities to contract with FDA and other federal agencies, opportunities that went to Conceptant instead.


**RELIEF REQUESTED**

WHEREFORE, Akira respectfully requests the Court grant it the following relief:

1.     Judgment for Akira and against the Defendants on each of Akira's claims;

2.     Award Akira compensatory damages either in the form of actual damages, unjust enrichment damages, or both in an amount to be determined at trial;

3.     Award Akira exemplary damages of two times the compensatory damages awarded under the Federal Defense of Trade Secrets Act;

4.     Award Akira punitive damages to the maximum amount allowed by law under the Virginia Uniform Trade Secrets Act;

5.   Award Akira punitive damages under the common law to the maximum amount allowed by law;

6.   Award Akira treble its compensatory damages;

7.   Enjoin the Defendants from engaging in future use of Akira's trade secrets or confidential information;

8.   Enjoin the Defendants from engaging in future activities that would result in misappropriation of Akira's trade secrets or confidential proprietary information;

9.   Enjoin the Defendants from soliciting, either directly or indirectly, or otherwise initiating any further unlawful contact with any of Akira's existing or prospective customers or employees, or in the alternative, imposing a constructive trust for the purpose of depositing funds derived from Rohde's business relationships with Akira's existing and prior customers.

10.   Award Akira its costs, including reasonable attorney's fees, incurred in connection with this action, and

11.   Award Akira such other and further relief as this Court may deem just and proper.


Respectfully submitted,

AKIRA TECHNOLOGIES, INC.


By:_/s/_____
Christopher R. Shiplett
Virginia Bar No. 74210
RANDOLPH LAW, PLLC
252 N Washington St
Falls Church, VA 22046
(p) 703-652-3039
(f) 703-852-3976
(e) chris.shiplett@randolphlaw.com

37

*Attorney for Plaintiff*
*Akira Technologies, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, July 6, 2017, I have served Akira's first amended

complaint by filing the document with the CM/ECF system, which will deliver a copy to each

defendant through their attorneys, who's contact information is listed below.

Elaine Charlson Bredehoft
Virginia Bar No. 23766
ecb@cbcblaw.com

Peter C. Cohen
Virginia Bar No. 66346
pcohen@cbcblaw.com

CHARLSON BREDEHOFT
COHEN & BROWN, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
(703) 318-6808 Facsimile

*Counsel for Defendants, Conceptant, Inc.,*
*NuCognition, Inc., Joshua Phipps,*
*Andrey Mikhalchuk, and Lisa Houle*

_____/s/_____
Christopher R. Shiplett, Esq.
Virginia Bar No. 74210
*Attorney for Akira Technologies, Inc.*
RANDOLPH LAW, PLLC
252 N Washington St
Falls Church, VA 22046
(p) 703-652-3039
(f) 703-852-3976
(e) chris.shiplett@randolphlaw.com