**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

|  |  |  |
|---|---|---|
| AKIRA TECHNOLOGIES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:17cv00412 (LO/IDD) |
| | ) | |
| CONCEPTANT, INC., *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

This Memorandum is submitted on behalf of Defendants Conceptant, Inc.

("Conceptant"), NuCognition, Inc. ("NuCognition"), Joshua Phipps ("Mr. Phipps"), Lisa Houle

("Ms. Houle"), and Andrey Mikhalchuk ("Mr. Mikhalchuk") (collectively, "Defendants") in

support of their Motion to Dismiss the Amended Complaint filed by Plaintiff, Akira

Technologies, Inc. ("Akira").

The Amended Complaint has nine Counts as follows:

| | | |
|---|---|---|
| Count 1 | Against all Defendants | Misappropriation of a Trade Secret under the Defense of Trade Secrets Act |
| Count 2 | Against all Defendants | Misappropriation of a Trade Secret under the Virginia Uniform Trade Secrets Acts |
| Count 3 | Against Defendants Conceptant, Phipps Houle, and Mikhalchuk | Tortious Interference with a Contract and Business Expectancy |
| Count 4 | Against Defendants Phipps, Houle, and Mikhalchuk | Breach of Duty of Loyalty |

| Count 5 | Against all Defendants | Common Law Civil Conspiracy |
| Count 6 | Against all Defendants | Statutory Business Conspiracy |
| Count 7 | Against Defendant Phipps | Breach of Contract |
| Count 8 | Against Defendant Houle | Breach of Contract |

As explained in this Memorandum, accepting the allegations in the Amended Complaint as true, Counts 1 and 2 should be dismissed with prejudice because (1) the information Akira claims are "trade secrets" are not trade secrets as defined by the applicable Federal and state statutes and illustrative case law; (2) Akira failed to take reasonable measures to keep its information secret; (3) Akira itself did not consider the information to be "trade secrets" and did not instruct its employees to treat it as such; (4) Akira has not pled that it identified and labeled the information specifically as "trade secrets" as it was required to do by the Employment Agreements it had with its employees; (5) the Amended Complaint does not identify with any particularity how any of the alleged trade secrets were misappropriated; and (6) the Patient Cohort Tool is not a "Trade Secret."

Count 3 should be dismissed with prejudice because (1) Akira failed to provide any factual or legal basis for the speculative assertion that it had a "reasonable expectation of future contracts with the FDA;" (2) Akira cannot have a business expectancy in an opportunity predicated on the qualifications and continued employment of at-will employees;  (3) Akira admits in its pleading that the FDA's areas of research have stayed unchanged since 2013, and that Akira was aware of which areas of research the FDA was currently pursuing; and (4) Akira has pled that the duty underlying Count 3 arises under the Employment Agreements it had with its employees, which precludes Count 3 (a tort claim) from proceeding under Virginia's source-of-the-duty rule.

2

Count 4 should be dismissed with prejudice because (1) the acts ostensibly underlying the claimed breach of fiduciary duty were entirely lawful; (2) the law permitted Defendants to form their own companies before resigning from their employment with Akira; (3) Akira's allegations show that Defendants did not compete with it, took no business away from it, and did not interfere with any opportunity that Akira had an interest in or any intention or plans of pursuing; (4) Akira cannot validly claim the entire FDA agency as its client based on one contract with one department within the FDA; (5) Count 4 is precluded by the source-of-the-duty rule; (6) Defendants are not required to "forget" experience acquired over the course of their employment; and (7) Akira's claim for damages is speculative, devoid of factual support, and requires dismissal of Count 4.

Counts 5 and 6 should be dismissed with prejudice because (1) the acts ostensibly underlying the alleged conspiracy were all lawful; (2) the Amended Complaint contains no allegations underlying the speculative claim that the Defendants allegedly conspired "for the purpose" of willfully and maliciously injuring Akira; (3) it is not legally possible to accuse the individual Defendants of "conspiring" with the corporate Defendants given their positions as officers and directors of these entities; and (4) Akira has no non-speculative basis for claiming damages, requiring dismissal of Counts 5 and 6.

Count 7 should be dismissed with prejudice because (1) the portion of Defendant Phipps' Employment Agreement upon which Akira relies, by its terms, did not obligate him to bring new business opportunities to Akira's attention; (2) no such obligation appears in Mr. Phipps' Employment Agreement; (3) there can be no claim that Mr. Phipps breached a contractual obligation that does not exist; (4) Akira failed to allege any actual disclosure, to the FDA or

anyone else, of its confidential information; and (5) Akira's claim for damages against Mr. Phipps is speculative and requires dismissal of Count 7.

Count 8 should be dismissed with prejudice because (1) the portion of Defendant Houle's Employment Agreement upon which Akira relies, by its terms, did not obligate her to bring new business opportunities to Akira's attention; (2) no such obligation appears in Ms. Houle's Employment Agreement; (3) there can be no claim that Ms. Houle breached a contractual obligation that does not exist; (4) no facts have been pled, nor could they be, that Ms. Houle violated her non-compete with Akira; and (5) Akira's claim for damages against Ms. Houle is speculative and requires dismissal of Count 8.

In sum, Akira's Amended Complaint does not satisfy the Twombly and Iqbal standards for pleading causes of action in Federal Court, and does not meet the good faith requirement set forth by this Court in granting leave to amend the original Complaint.  "To survive a motion to dismiss, the complaint's factual allegations must be enough to raise a right to relief above the speculative level."  Kincaid v. Anderson, 2017 U.S. App. LEXIS 3854, at *3 (4th Cir. Mar. 3, 2017).  Akira's Amended Complaint does not meet this standard, that is, it does not "raise a right to relief above the speculative level."  More specifically, the Amended Complaint fails to "contain sufficient factual allegations, taken as true, to raise a right to relief above the speculative level and nudge [the] claims across the line from conceivable to plausible."  Birmingham v. PNC Bank, N.A., 846 F.3d 88, 92 (4th Cir. 2017).  Akira's claims remain at the speculative level and contain little to no "pleading of factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.[1]

---

[1] This is especially the case for Defendant, NuCognition, about which even in the Amended Complaint there is not a single specific allegation or any legal basis stated in the Complaint that supports the Counts against it.

As shown below, the central reason for dismissing Akira's Amended Complaint is that it fails the "mandate that a plaintiff demonstrate more than a sheer possibility that a defendant has acted unlawfully [and] relies upon naked assertions and unadorned conclusory allegations devoid of factual enhancement." Id.

## ARGUMENT

## I.  COUNTS 1 AND 2 SHOULD BE DISMISSED WITH PREJUDICE[2]

Akira claims in Counts 1 and 2 that Defendants misappropriated its trade secrets in violation of the Defense of Trade Secrets Act ("DTSA") and the Virginia Uniform Trade Secrets Act ("VUTSA"). First Amended Complaint ("Am. Compl.") ¶¶ 163-90.[3] In its Amended Complaint, however, the information identified by Akira fails to qualify as trade secrets, and also fails to sufficiently allege what "misappropriation" occurred under the DTSA and VUTSA.

The DTSA defines "trade secrets," in relevant part, as follows:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if –
>
> **(A)**  the owner thereof has taken reasonable measures to keep such information secret; and
>
> **(B)**  the information derives independent economic value, actual or potential, from not being generally known to, and not being readily

---

[2] Because the Federal and state statutes at issue are substantially identical, and the allegations in Counts 1 and 2 are identical, these counts are considered together.

[3] Notwithstanding Akira inexplicably folding Defendant NuCognition into Counts 1 and 2, there is not one single specific allegation or any legal basis stated in the Complaint that connects NuCognition to these Counts, and for this reason, the Motion to Dismiss Counts 1 and 2 as to NuCognition should be granted with prejudice without further discussion.

ascertainable through proper means by, another person who can
obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).[4]

As the definition makes clear, in order for information to qualify as a "trade secret," a plaintiff must show in its pleading that it took "reasonable measures to keep such information secret" and that the information is "not [ ] generally known" and "not [ ] readily ascertainable through proper means." Id.

According to the Amended Complaint, Plaintiff has now added the allegations that Defendants "misappropriated" "software prototype compilations" and "sales, business development, and business strategy documents" that Akira claim to be "trade secrets." *Am. Compl.* ¶¶ 58-82. The Amended Complaint also continues to assert trade secret status for a "software prototype" called "Patient Cohort Tool" which Akira claims it had "plans to develop." *Am. Compl.* ¶¶ 62. None of these supposed trade secrets are the proper subject of a trade secrets misappropriation claim.

### A.    Akira Did Not Take Reasonable Measures to Keep Its "Trade Secrets" Secret

Although the Amended Complaint attempts to introduce new "trade secrets' in an attempt to bolster Counts I and II, the Amended Complaint still suffers from a lack of sufficient allegations to show that any alleged trade secrets were the subject of reasonable measures to maintain their secrecy.

First, the Amended Complaint describes how Akira's past proposals and contracts are stored *externally* on a platform called "Google Drive." *Am. Compl.* ¶ 75. While Akira claims its employees are given usernames and passwords to access this information, *Am. Compl.* ¶ 77, 81,

---

[4] The VUTSA's definition of "trade secrets" is substantially similar. Va. Code Ann. § 59.1-336.

the Amended Complaint provides no description of how storing information on such an external

platform constitutes a "reasonable measure" to keep the information secret from others outside of

Akira.  In fact, the Google Terms of Service and Privacy Policy, which are publicly available

(Exhibit 1),[5] show that any information that is stored on the platform is accessible and usable by

Google and other third-parties:

> *We may review content* to determine whether it is illegal or violates our
> policies, and we may remove or refuse to display content that we reasonably
> believe violates our policies or the law.
>
> When you upload, submit, store, send or receive content to or through our
> Services, *you give Google (and those we work with) a worldwide license to
> use, host, store, reproduce, modify, create derivative works* (such as those
> resulting from translations, adaptations or other changes we make so that
> your content works better with our Services), *communicate, publish, publicly
> perform, publicly display and distribute such content.*
>
> *Our automated systems analyze your content (including emails)* to provide
> you personally relevant product features, such as customized search results,
> tailored advertising, and spam and malware detection. *This analysis occurs
> as the content is sent, received, and when it is stored.*
>
> <u>We may share</u> <u>non-personally identifiable information</u> publicly and with our
> partners – like publishers, advertisers or connected sites. For example, we
> may share information publicly <u>to show trends</u> about the general use of our
> services.

Exhibit 1 (emphasis added; see highlighted passages).

Given that information stored externally on Google Drive is accessible and usable by

Google and other third-parties, Akira cannot claim that storing its contracts on such a platform

constitutes a "reasonable measure to keep such information secret," or that the information it

stores there constitutes "trade secrets" under the DTSA and VUTSA.  <u>See</u> <u>Microstrategy Servs.</u>

<u>Corp. v. OpenRisk, LLC</u>, 2015 U.S. Dist. LEXIS 32719, at *22 (E.D. Va. Mar. 17, 2015)

("[T]rade secret protection is eviscerated when otherwise protected information is disclosed to

---

[5] <u>See</u> <u>supra</u> note 8.

others who have no obligation to protect its confidentiality").  Additionally, Akira's conclusory allegation that "'Google Apps' and 'Amazon Web Services' cloud based software are *routinely used by millions of businesses* in the United States to store trade secret data," devoid of any factual support, is insufficient to cure this issue.

Second, the Amended Complaint contains allegations that explicitly show that Akira did not rigorously protect its trade secrets.  It is well-established that "[t]he crucial characteristic of a trade secret is secrecy rather than novelty."  Dionne v. Se. Foam Converting & Packaging, Inc., 240 Va. 297, 302-03, 397 S.E.2d 110, 113 (1990).  Furthermore, the "intangible nature" of a trade secret presents a huge, but not insurmountable, burden on the owner to protect its secrets from disclosure."  Young v. Design, Inc. v. Teletronics Int'l, Inc., 2001 U.S. DIST. LEXIS 21851, at *17 (E.D. Va. Jul 31, 2001) (citing Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1002 (1984)).

Here, the Amended Complaint alleges that "Mr. Phipps shared an online 'google drive' document from Akira's Google Drive account to Mr. Wood and Mr. Mikhalchuk at their Chiron Solutions email accounts at <chironsol.com>."  *Am. Compl.* ¶ 106.  A "google drive" account that permits employees to share documents with external email addresses cannot be considered subject to reasonable efforts to remain secret, and the information contained within cannot receive trade secret status.  A "google drive" account that permits unfettered access to employees, by allowing them to share documents with their external email addresses, cannot be considered a reasonable effort to maintain secrecy from third parties, and the information contained within thus cannot receive trade secret status.  Management Concepts v. Kraemer, 2004 Va. Cir. LEXIS 391, at *17-18 (Fairfax Apr. 26, 2004) (noting that while information at issue was proprietary, plaintiffs failed to take sufficient steps to maintain its secrecy); Religious

<u>Tech. Ctr. v. Lerma</u>, 897 F. Supp. 260, 266 (E.D. Va. 1995) (rejecting status as trade secret due to the information being released publicly, despite the Plaintiff having taken "extraordinary measures to try and maintain the secrecy" of the information, including "elaborate security measures"); <u>S&S Computers & Design, Inc. v. Paycom Billing Servs.</u>, 2001 U.S. Dist. LEXIS 25874, at *6 (W.D. Va. Apr. 5, 2001) (granting status as trade secret because Plaintiff maintained secrecy in part by limiting access to information).

### B.      Akira Granted Access to Its "Trade Secrets" to Defendants

Akira does not allege, because it cannot, that any of the Defendants "acquired" Akira's trade secrets "by improper means." The Amended Complaint confirms that Akira granted Defendants Phipps, Houle, and Mikhalchuk proper access to the information. *Am Compl.* ¶¶ 83-92. While the Amended Complaint alleges that these Defendants passed on the information to Defendants Conceptant and NuCognition, the Amended Complaint does not allege, and cannot, that either corporate Defendant "[knew] or ha[d] reason to know that the [information] was acquired by improper means," since, as the Amended Complaint acknowledges, the information had been properly acquired by the individual Defendants. <u>See</u> <u>id</u>.

Furthermore, Akira cannot claim that Defendants acquired the information at issue "under circumstances giving rise to a duty to maintain the [information's] secrecy," given Akira's failure to plead that it "labeled or identified" the information specifically as a trade secret, as it was required to do under the "Confidential Information" sections of the Employment Agreements it had with its employees. <u>See</u> Exhibit 1 to Amended Complaint, p. 3, ¶ 6(a); Exhibit 4 to Amended Complaint, p. 4, ¶ 7(a).

### C.   Akira Does Not Allege Any
###      Misappropriation of Its Software Prototypes

In its new additions to the Amended Complaint, Akira asserts trade secret status over several "software prototypes:"  a "Semantic Layer Integration with eHMP" prototype, "Business Rules and Business Process Management Platform Implementation with eHMP" prototype, and an unnamed "software prototype whereby different sections of an Akira proposal to a client…could be stored separate from any specific proposal, and then by way of a software process assembled into a mostly completed proposal when needed." *Am. Compl.* ¶¶ 59-63. Akira further alleges that these prototypes are stored on its "google drive" account, and that "Conceptant proposed using Akira's software prototypes in the Conceptant FDA PHPSP proposal." *Am. Compl.* ¶ 142.

An employee has a "general right to make use of knowledge and skills acquired through experience in a field or industry for which he is best suited."  <u>Lasership v. Watson</u>, 79 Va. Cir. 205, 210 (Fairfax 2009).  In other words, an employee is not required to "forget" knowledge and skills gained through employment after separation.  A reading of Conceptant's FDA proposal, *Am. Compl.* Ex. 19, shows that Conceptant never proposed providing the FDA with Akira work product.  The proposal provides a timeline in which various prototypes are to be developed, and the proposal never suggests that Conceptant has existing software deliverables that can be immediately delivered to the FDA.  *See* Ex. 19, p. 45 (Agile software development milestones); p. 46 (Appendix D, "Proposed project doesn't involve any Intellectual Property.")  At most, the proposal suggests using "Semantic layer integration" as an additional "feature" of Conceptant's to-be-developed Personal Citizen Portal, which is a common solution to the type of data challenges the FDA project sought to solve.  Ex. 19, p. 14.

Moreover, Akira does not allege any actual misappropriation of its software prototypes, only "proposed" misappropriation. The VUTSA and DTSA do not provide any remedy for intended misappropriation. *See* Va. Code § 59.1-336 (misappropriation defined as "*acquisition of a trade secret*" or "*disclosure* or use of a trade secret") (emphasis added). Akira therefore cannot state a claim for trade secret misappropriation of its software prototypes, and Counts I and II should be dismissed.

### D. Akira's "Sales, Business Development and Business Strategy Documents" Are Not Identified with Particularity, Were Not Misappropriated, and Have No Competitive Economic Value

Akira's Amended Complaint also seeks trade secret protection for various "sales, business development, and business strategy documents," which on closer reading appear to be ordinary bits of business data that are regularly kept by all companies:  a "Pipeline Report" recording the "status of Akira's sales and business development efforts," a "Total Contract Value Report" compiling "current and sought after contracts and opportunities," past proposals, and "ad hoc sales documents of one form or another." *Am. Compl.* ¶¶ 64-72.

Akira fails to identify its "past proposals" and "ad hoc sales documents" with particularity, which is required in order to ascertain whether these documents are each qualified for trade secret status and whether they have been misappropriated. Akira has therefore failed in its burden to identify in detail these trade secrets, and Counts I and II should be dismissed as to these documents. Trandes Corp. v. Guy F. Atkinson Co., 996 F.2d 655, 661 (4th Cir. 1993) (plaintiff bears burden of identifying trade secrets in sufficient detail to establish each element of a trade secret.)

Akira further fails to allege that its "Pipeline Report" and "Total Contract Value Report" have any competitive economic value, or were misappropriated resulting in damages to Akira. It

11

is not enough for Akira to make conclusory allegations that these documents were "misappropriated."  *See Am. Compl.* ¶ 175.  Akira cannot claim misappropriation of these documents, either.

### E.     The "Patient Cohort Tool" Is Not a "Trade Secret"

According to the Amended Complaint, Defendants revealed "trade secrets" by identifying in their FDA grant proposal a "software prototype" called "Patient Cohort Tool" which Akira claims it "had plans to develop [ ] in Akira Labs."  *Am. Compl.* ¶¶ 85, 119.  "Akira Labs" is described in the Amended Complaint as a folder that Akira maintains on another external platform called "Amazon Web Services."  *Am. Compl.* ¶¶ 78-9.  However, as with Google Drive, the Amended Complaint provides no description of how storing information externally on "Amazon Web Services" constitutes a "reasonable measure" for keeping the information secret.  In fact, the Amazon Web Services Terms of Service, which are also publicly available,[6] show that information stored on the platform is accessible and usable by Amazon and potentially by other third-parties:

> *You will provide information or other materials related to Your Content (including copies of any client-side applications) as reasonably requested by us to verify your compliance with the Agreement.*  We may monitor the external interfaces (e.g., ports) of Your Content to verify your compliance with the Agreement.  You will not block or interfere with our monitoring, *but you may use encryption technology or firewalls to help keep Your Content confidential.*

Exhibit 2 (emphasis added; see highlighted passages).

While the Amazon Terms of Services make mention of, and even suggest the use of, "encryption technology or firewalls to help keep [information] confidential," there is no allegation in the Amended Complaint that Akira has used these measures to safeguard the information it stores on this platform.  Accordingly, Akira cannot claim that storing its "software

---

[6] See infra note 7.

prototypes," including the "Patient Cohort Tool," externally on Amazon Web Services constitutes a "reasonable measure to keep such information secret," or that the information it stores there are "trade secrets" under the DTSA and VUTSA.

For the reasons given above, Counts 1 and 2 should be dismissed with prejudice.

## II.    COUNT 3 SHOULD BE DISMISSED WITH PREJUDICE

Although Akira has added new allegations that Srinivas Channamaraja, an Akira employee, had directed Mr. Phipps to "seek out FDA Broad Agency Announcements" in 2013, Akira still has not alleged that Akira *specifically would have submitted and won a bid for the FDA Population Health and Product Safety Platform opportunity had it known about it*.  Instead, Akira attempts to dance around this problem by alleging that Mr. Phipps failed to bring the 2016 Broad Agency Announcement (BAA) to Akira's attention, and only makes the vague allegation that "Had Mr. Phipps brought the Broad Agency Announcement to Mr. Chennamaraja's attention, Akira would have submitted a proposal in response."

Akira's entire line of argument is that Akira would have submitted an identical proposal had Mr. Phipps brought the BAA to its attention, and that Akira would have been guaranteed an award of the contract because Conceptant was awarded the contract on the basis of Mr. Phipps', Ms. Houle's, and Mr. Mikhalchuk's expertise.  *Am. Compl.* ¶¶ 148-51.  Akira's argument, however, ignores the crucial point that Mr. Phipps, Ms. Houle, and Mr. Mikhalchuk are at-will employees, and were under no obligation to remain in Akira's employ at any time.  *Am. Compl.* ¶¶ 200-202.

"An at-will contract is a mere expectancy and the plaintiff is entitled to 'no legal assurance that he will realize the expected gain.'" Skillstorm, Inc. v. Elec. Data Sys., LLC, 666 F. Supp. 2d 610, 616 (E.D. Va. 2009) (citing Duggin v. Adams, 234 Va. 221, 226, 360 S.E.2d

832, 836 (1987)).  Akira cannot state a legitimate business expectancy in the FDA PHPSP

proposal where it also alleges that it would have *exclusively* relied on the qualifications and

expertise of at-will employees, particularly employees who have already demonstrated a

willingness and desire to leave Akira.  Williams v. Dominion Tech. Partners, LLC, 265 Va. 280,

289 (2002) (plaintiff must prove with "reasonable certainty that absent defendant's intentional

misconduct, plaintiff would have continued in the relationship or realized the expectancy");

Commercial Roofing & Sheet Metal Co. v. Gardner Eng'g, 60 Va. Cir. 384, 386-87 (Fairfax

2002) ("Expectations of being allowed to bid on a project does not rise to the level of a

reasonable expectation of further contractual relations").

     Furthermore, Akira's conclusory statement that it *would* have made a bid in response to

the FDA BAA is still insufficient to show a "concrete move in that direction."  *Am. Compl.* ¶¶

148-51.  Moore v. United Int'l Investigative Services, Inc., 209 F. Supp. 2d 611, 619-20 (E.D.

Va. 2002) (plaintiff must allege and prove existence of expectancy based "upon something that is

a concrete move in that direction").   Akira still does not allege that the FDA BAA falls within its

existing lines of business, or that it had been searching for the same or identical opportunity as

the FDA PHPSP opportunity.  To the extent, therefore, that Count 3 is based on the speculative

claim of what Akira *might* have done had it known of the opportunities, which is insufficient as a

matter of law.

     Count 3 should also be dismissed under Virginia's "source of duty" rule.  See Augusta

Mut. Ins. Co. v. Mason, 274 Va. 199 (2007).  In Augusta, the Virginia Supreme Court held that if

the duty underlying a cause of action arises from a contract between the parties, the plaintiff's

remedies are confined to the law of contracts and tort remedies are prohibited.  Id. at 206-08.

Here, the alleged duty underlying Count 3 has been pled to be contractual in nature, as shown by

Counts 7 and 8 of the Amended Complaint where it is stated that Defendants Phipps and Houle were required by their Employment Agreements with Akira to bring business opportunities to the attention of Akira's management, and that their alleged failure to do so constitutes a breach of that contractual duty. *Am. Compl.* ¶¶ 212-21. Because Akira pleads that the alleged duty underlying Count 3 is contractual in nature, Count 3 should be dismissed with prejudice.

For all the reasons stated, Count 3 should be dismissed with prejudice.

## III.   COUNT 4 SHOULD BE DISMISSED WITH PREJUDICE

Akira claims in Count 4 that Defendants Phipps, Houle, and Mikhalchuk breached their fiduciary duties by "plan[ning] to form a competing enterprise" and by "submit[ting] proposals in the name of these companies to at least one Akira client." *Am. Compl.* ¶ 206, ¶ 209. Each one is addressed in turn.

### A.   Forming Competing Companies

It is not a breach of fiduciary duty for employees to put plans in place to compete against their employers before resigning. <u>Feddeman & Co. v. Langan Assocs., P.C.</u>, 260 Va. 35, 42 (2000) ("We agree that, prior to resignation, these defendants were entitled to make arrangements to resign, including plans to compete with their employer, and that such conduct would not ordinarily result in liability for breach of fiduciary duty"); <u>see</u> <u>also</u> <u>Williams</u>, 265 Va. at 289 ("[A]n employee has the right to make arrangements during his employment to compete with his employer after resigning his post"). Accordingly, the allegation that Defendants Phipps, Houle, and Mikhalchuk, prior to their resignations, formed companies to compete with Akira cannot provide the basis for a breach of fiduciary duty claim as a matter of law.

## B.      Submitting Proposals and "Competing"

This aspect of Count 4 suffers from the same infirmities as Count 3.  While Akira complains that Defendants Phipps, Houle, and Mikhalchuk did not alert Akira to the FDA BBA, Akira could not have been reasonably certain of winning the work had it bid due to its wholesale reliance on the qualifications and expertise on at-will employees.  The "resumes" and "past performance" that Akira claims are specific to the individual Defendants, who were each entitled to leave Akira at any time.  *Am. Compl.* ¶¶ 212.  Without such allegations, Count 4's claim for damages is wholly speculative, requiring dismissal.

Furthermore, Akira cannot claim that the whole of the FDA was its "client."  *Am. Compl.* ¶ 209.  The FDA is a huge bureaucracy.  <u>See</u> Exhibit 3 (FDA Organizational Chart).[7]  Akira has *one contract* with *one office* within the FDA – the Office of Regulatory Affairs.  *Am. Compl.* ¶ 22-25 .  Akira does not allege – and cannot allege – that Defendants competed for the business of Akira's customer, the FDA's Office of Regulatory Affairs.  The proposal allegedly won by Defendants was submitted to a different office of the FDA, namely, the Office of Acquisitions and Grants Services.  <u>See</u> Exhibit 19 to Amended Complaint, page 3 of 60 (top); <u>see also</u> Exhibit 4 (description of FDA's Office of Acquisitions and Grants Services).  There is no allegation in this case, nor could there be, that the Office of Acquisitions and Grants Services is Akira's customer, or that Akira had any plans or any intention of seeking work or research and development grants from that Office.

 Finally, Count 4 should be dismissed because, like Count 3, Akira has pled that the alleged duty to bring business opportunities to Akira's attention – the gravamen of the breach of fiduciary duty claim – is contractual in nature.  <u>See</u> Counts 7 and 8 of the Amended Complaint.  Given that pleading, Akira's potential remedies in this matter are confined to the law of

---

[7] <u>See</u> https://www.fda.gov/AboutFDA/CentersOffices/OrganizationCharts/ucm393155.htm.

contracts, Augusta Mutual, supra, and the breach of fiduciary duty claim (Count 4) should be dismissed with prejudice.

## IV.   COUNTS 5 AND 6 SHOULD BE DISMISSED WITH PREJUDICE[8]

In Counts 5 and 6, Akira reprises its allegations that Defendants conspired to compete against Akira while they were employees by creating their own companies and diverting business opportunities to themselves using Akira's trade secrets. *Am. Compl.* ¶¶ 220-243. However, the law is clear that the underlying acts of an alleged conspiracy must be unlawful, or unlawful means were used to accomplish lawful objectives. Commercial Business Sys. v. BellSouth Servs., 249 Va. 39, 48 (1995).

As shown above, each of the alleged acts or means underlying the alleged conspiracy was not unlawful. Contrary to Counts 1 and 2, there were no "trade secrets" of Akira's that were "misappropriated" in violation of the DTSA and VUTSA. Contrary to Count 3, Defendants did not unlawfully interfere with Akira's business given that Akira cannot legally rely on the performance of at-will employees to create a business expectancy. Contrary to Count 4, the law permitted Defendants to plan to compete with Akira by creating their own companies before they resigned. And contrary to Count 4, the Amended Complaint shows that Defendants did not seek business from Akira's customer, the FDA's Office of Regulatory Affairs, and alleges that Defendants sought a research and development grant from a different office of the FDA (the Office of Acquisitions and Grants Services) that was not Akira's customer and with whom Akira had no interest or history in doing business.

In short, Akira has failed to plead any unlawful acts or means that could provide the predicate for a conspiracy. Akira also cannot base a conspiracy claim upon pure speculation, as

---

[8] Because the allegations of conspiracy are identical, Counts 5 and 6 are addressed together.

it tries to do in ¶ 226 of the Amended Complaint ("The Defendants acted together while the employee Defendants were employed at Akira to solicit an unknown number of opportunities that were rightfully Akira to their own account").

The Amended Complaint is also devoid of allegations that Defendants conspired "*for the purpose* of willfully and maliciously injuring [Akira] in [its] reputation, trade, business or profession." Va. Code § 18.2-499A (emphasis added). Moreover, a corporation and its officers are legally incapable of forming a conspiracy. Fox v. Deese, 234 Va. 412, 428 (1987). In this regard, Akira alleges that Defendants Phipps, Houle, and Mikhalchuk are officers and directors of Conceptant (*Am. Compl.* ¶¶ 106-108, 158) and directors of NuCognition (*Am. Compl.* ¶¶ 111-13, 158). As a matter of law, therefore, the "conspiracy" that Akira alleges occurred between the individual Defendants and the corporate Defendants is legally impossible, and for this reason as well, Counts 5 and 6 should be dismissed with prejudice.

Even accepting the allegations in the Amended Complaint as true, Akira does not have a legal basis for alleging an actionable business expectancy in the FDA PHPSP contract because it did not have a business expectancy in the continued employment of the at-will employees underlying its supposed proposal. Without a credible business expectancy, Akira has no factual or legal basis for seeking damages against Defendants, and no causes of action for tortious interference (Count 3), breach of fiduciary duty (Count 4), and conspiracy (Counts 5 and 6).

Accordingly, the conspiracy claims (Counts 5 and 6) should be dismissed with prejudice. See Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co., 191 F. Supp. 2d 652 664 (E.D. Va. 2002) (dismissing business conspiracy claim where the plaintiff provided "no specific factual basis" for it); GEICO v. Google, Inc., 330 F. Supp. 2d 700, 706 (E.D. Va. 2004)

(dismissing business conspiracy claim because the "facts alleged were not sufficiently specific" to support the claim).

## V.     COUNT 7 SHOULD BE DISMISSED WITH PREJUDICE

Count 7 alleges that Defendant Phipps breached ¶ 6(b) of his Employment Agreement with Akira "when he assisted in writing a proposal for Conceptant when Akira Confidential Information was disclosed to the FDA for Conceptant's benefit," "when he disclosed Akira's Confidential Information, namely Akira's software prototypes and Akira's plans for using those software prototypes to NuCognition," "when it deprived Akira of at least one and likely more opportunities to contract with FDA and other federal agencies, opportunities that went to Conceptant instead," and "when it deprived Akira of opportunities which have gone to NuCognition as a result of NuCognition's advertising of Akira's software prototypes on its website." *Am. Compl.* ¶¶ 247-250.

First, the portion of ¶ 6(b) that Akira quotes in Count 7, by its terms, did not obligate Mr. Phipps to bring new business opportunities to Akira's attention or to refrain from competing with Akira after his separation from the company:

> The Employee agrees to keep any and all of the Confidential Information
> from being made known or disclosed to any person or entity, except for
> the exclusive use and benefit of the Employer ….

See also Exhibit 1 to Amended Complaint, p. 3, ¶ 6(a) (definition of "Confidential Information" does not include an obligation to bring new business opportunities to Akira's attention, the purported obligation that Mr. Phipps is accused of breaching in Count 7). A review of Mr. Phipps' Employment Agreement, which Akira attached as Exhibit 1 to the Amended Complaint, shows that the "obligation" which ostensibly forms the basis of Count 7 is not found anywhere in

the Amended Complaint, and in the absence of such a contractual obligation, there can be no cause of action for its breach.

Second, Akira has not alleged any actual disclosure of Akira Confidential Information, either to the FDA or anywhere else.  Akira has provided a Conceptant proposal in which Conceptant references personal knowledge the individual Defendants derived from their employment at Akira, but Akira does not allege that the Defendants actually disclosed any software prototypes, Akira documents, or Akira information to the FDA.  The Amended Complaint also does not contain any allegations specifying how or when "Akira Confidential Information" was disclosed to NuCognition, or any damages to Akira as a result.  This is pure conjecture without any factual support even alleged.  For these reasons, Count 7 should be dismissed with prejudice.

## VI.    COUNT 8 SHOULD BE DISMISSED WITH PREJUDICE

Count 8 alleges that Defendant Houle breached ¶ 7(b) of her final Employment Agreement with Akira by "creat[ing] Conceptant and submit[ting] at least one if not more proposal for work for which Akira was qualified," when she "forwarded the ISO 9001 information to her personal email account for use by Conceptant and NuCognition," "when she wrote a proposal for Conceptant wherein Akira Confidential Information was disclosed to the FDA for Conceptant's benefit," "when she formed Conceptant, and through Conceptant competed for work at the FDA," and "when it deprived Akira of at least one and likely more opportunities to contract with FDA and other federal agencies, opportunities that went to Conceptant instead." *Am. Compl*. ¶¶ 252-259.

First, the portion of ¶ 7(b) that Akira quotes in Count 8, by its terms, did not obligate Ms. Houle to bring new business opportunities to Akira's attention:

> The Employee agrees to keep any and all of the Confidential Information from being made known or disclosed to any person or entity, except for the exclusive use and benefit of the Akira ….

See also Exhibit 4 to Amended Complaint, p. 4, ¶ 7(a) (definition of "Confidential Information" does not include an obligation to bring new business opportunities to Akira's attention, which is the ostensible obligation that Ms. Houle is accused of breaching in Count 8). A review of Ms. Houle's final Employment Agreement, which Akira attached as Exhibit 4 to the Amended Complaint, shows that the "obligation" which ostensibly forms the basis of Count 8 is not found anywhere in the Employment Agreement, and in the absence of such a contractual obligation, there can be no cause of action for its breach.

Second, Count 8 also references the non-compete clause of Ms. Houle's final Employment Agreement, which states in part that "Employee … shall not, while employed full time by Akira … do[] work [for another entity] that is the same or similar to that of Akira*." Am. Compl.* ¶ 250.[9] However, in the paragraphs of the Amended Complaint that discuss Conceptant (*Am. Compl.* ¶¶ 106-09, 116-32) and NuCognition (*Am. Compl.* ¶¶ 111-14) there are no allegations or any factual support for the assertion that either corporate entity "does work that is the same or similar to that of Akira." The very opposite conclusion can logically be drawn based on the allegation that Conceptant obtained a research and development grant from an office of the FDA that is not Akira's customer and to whom Akira does not allege it had any interest in providing services, and given the description of what NuCognition does in Exhibit 18 to the Amended Complaint (patient-focused solutions for people in the *private sector* with cognitive

---

[9] Count 8 does not expressly accuse Ms. Houle of breaching her non-compete; it simply quotes from her non-compete. Am. Compl. ¶ 250

challenges) as compared to what Akira does ("[A] technology service provider to the *Federal Government*," *Am. Compl.* ¶ 18) (emphasis added).[10]

Finally, what was stated about Mr. Phipps applies with equal force to Ms. Houle.  Since Akira had no business expectancy in the FDA PHPSP opportunity that was ultimately awarded to Conceptant, it has no basis to claim that Ms. Houle damaged it, and thus, no cause of action for breach of contract.  And the assertion that, had it not been for Ms. Houle's alleged breach of contract, Akira had "likely more opportunities to contract with FDA and other federal agencies," is pure conjecture.  For these reasons, Count 8 should be dismissed with prejudice.

## **CONCLUSION**

As stated at the outset, Akira's Amended Complaint does not "raise a right to relief above the speculative level" and fails to "nudge the claims across the line from conceivable to plausible."  Kincaid, 2017 U.S. App. LEXIS 3854, at *3; Birmingham, 846 F.3d at 92.  On June 22, 2017, this Court provided leave to Plaintiff to amend its Complaint only "if Plaintiff has a good faith basis to proceed...."  The Plaintiff has not met that burden.  Because the Amended Complaint is based on "a sheer possibility" of claims that are "devoid of factual enhancement," id., and for the other reasons stated above, Defendants' Motion to Dismiss the Amended Complaint should be granted, and the claims asserted in the Amended Complaint should be dismissed with prejudice.

---

[10] Count 8 quotes another passage from Ms. Houle's non-compete that during the year after she leaves Akira, she is to refrain from "doing substantially the same work under the same Akira customer project or program for which Akira hired [her]."  Am. Compl. ¶ 250.  The non-compete is referring to the "Akira FDA ORA BIT support contract" for which Ms. Houle was hired, Am. Compl. ¶¶ 36-43, but there is no allegation in the Complaint, nor could there be, that Ms. Houle is "doing substantially the same work" for Conceptant as she did for Akira under the FDA ORA BIT contract.

July 20, 2017                                   Respectfully submitted,


                                               ____/s/_____
                                               Elaine Charlson Bredehoft
                                               Virginia Bar No. 23766
                                               ecb@cbcblaw.com
                                               Peter C. Cohen
                                               Virginia Bar No. 66346
                                               pcohen@cbcblaw.com
                                               CHARLSON BREDEHOFT
                                                 COHEN & BROWN, P.C.
                                               11260 Roger Bacon Drive, Suite 201
                                               Reston, Virginia 20190
                                               (703) 318-6800 Telephone
                                               (703) 318-6808 Facsimile

                                               *Counsel for Defendants, Conceptant, Inc.,*
                                               *  NuCognition, Inc., Joshua Phipps,*
                                               *  Andrey Mikhalchuk, and Lisa Houle*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of July, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Christopher R. Shiplett
Virginia Bar No. 74210
chris.shiplett@randolphlaw.com
RANDOLPH LAW, PLLC
252 N Washington Street
Falls Church, Virginia 22046
(703) 652-3039 Telephone
(703) 852-3976 Facsimile

*Counsel for Plaintiff,*
 *Akira Technologies, Inc.*


_____/s/_____
Peter C. Cohen
Virginia Bar No. 66346
pcohen@cbcblaw.com
CHARLSON BREDEHOFT
 COHEN & BROWN, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
(703) 318-6808 Facsimile

*Counsel for Defendants, Conceptant, Inc.,*
 *NuCognition, Inc., Joshua Phipps,*
 *Andrey Mikhalchuk, and Lisa Houle*