**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | |
|---|---|
| AKIRA TECHNOLOGIES, INC.    ) | |
|                     ) | |
|     Plaintiff,           ) | |
|                     ) | |
|       v.               ) | Civil Action No. 1:17cv00412 (LO/IDD) |
|                     ) | |
| CONCEPTANT, INC., *et al.*    ) | |
|                     ) | |
|     Defendants.        ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS IN THE FIRST AMENDED COMPLAINT

March 8, 2018

Elaine Charlson Bredehoft
Virginia Bar No. 23766
ecb@cbcblaw.com
Peter C. Cohen
Virginia Bar No. 66346
pcohen@cbcblaw.com
CHARLSON BREDEHOFT
 COHEN & BROWN, P.C.

# **TABLE OF CONTENTS**

**MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**……….................. 2

   I.     AKIRA'S BUSINESS DEVELOPMENT EFFORTS………………............... 2

        A.    Akira Targets High Probability Set-Aside Contracts………….............… 2

        B.    Not Being High Probability Wins, Akira Does Not Focus
             on BAAs……………………………………………………............… 4

        C.    Akira Disregarded Specific BAAs………………………….............… 6

   II.    DEFENDANTS DID NOT "MISAPPROPRIATE" ANY AKIRA
          TRADE SECRET……………………………………………............……. 8

        A.    Defendants Did Not "Misappropriate" a "Patient Cohort
             Tool," Because Akira Never Had a "Patient Cohort Tool"….............… 8

        B.    Akira Never Had Other "Software Prototypes" That Could
             Be "Misappropriated"……………………………………............... 10

        C.    Defendants Did Not "Misappropriate" Akira's Business
             Development Documents ……………………………............... 11

   III.   THE CONCEPTANT PROPOSAL DID NOT INCLUDE AKIRA
          TRADE SECRETS………………………………………............... 12

   IV.   THE 2016 BAA………………………………………............……. 15

        A.    Aware Of the 2016 BAA, Akira Chose Not To Submit a
             Proposal……………………………………............………… 15

        B.    Akira's Proposal Would Not Have Been Identical To
             Conceptant's Proposal…………………………………............... 16

        C.    Whether Akira Would Have Been Awarded the 2016
             BAA Had It Submitted a Bid Is a Matter Of Speculation….............… 17

   V.    DEFENDANTS NEVER COMPETED WITH AKIRA OR
          INTERFERED WITH ANY OPPORTUNITIES…………............……. 18

**LEGAL ARGUMENT**…………………………………............……. 21

   I.     SUMMARY JUDGMENT SHOULD BE GRANTED ON
          COUNTS 1-2 OF THE FIRST AMENDED COMPLAINT……. .............……21

II.     SUMMARY JUDGMENT SHOULD BE GRANTED ON
        COUNT 3 OF THE FIRST AMENDED COMPLAINT…….………................. 23

III.    SUMMARY JUDGMENT SHOULD BE GRANTED ON
        COUNT 4 OF THE FIRST AMENDED COMPLAINT…….………................ 26

IV.     SUMMARY JUDGMENT SHOULD BE GRANTED ON
        COUNTS 5-6 OF THE FIRST AMENDED COMPLAINT…………................. 29

V.      SUMMARY JUDGMENT SHOULD BE GRANTED ON
        COUNT 7 OF THE FIRST AMENDED COMPLAINT…….………................. 31

III.    SUMMARY JUDGMENT SHOULD BE GRANTED ON
        COUNT 8 OF THE FIRST AMENDED COMPLAINT…….………................ 34

**CONCLUSION**……………………………………………………………................ 37

This Memorandum is submitted on behalf of Defendants Joshua Phipps ("Phipps"), Lisa Houle ("Houle"), and Andrey Mikhalchuk ("Mikhalchuk"), and former Defendants Conceptant, Inc. ("Conceptant"), and NuCognition, Inc. ("NuCognition") (collectively "Defendants"). Defendants Phipps, Houle, and Mikhalchuk move for summary judgment on each Count in the First Amended Complaint ("FAC") filed by Plaintiff Akira Technologies, Inc. ("Akira").  The Counts are as follows:

| | | |
|---|---|---|
| Count 1 | All Defendants | Misappropriation of a Trade Secret Defense of Trade Secrets Act |
| Count 2 | All Defendants | Misappropriation of a Trade Secret Virginia Uniform Trade Secrets Acts |
| Count 3 | Defendants Conceptant, Phipps, Houle and Mikhalchuk | Tortious Interference with a Contract and Business Expectancy |
| Count 4 | Defendants Phipps, Houle and Mikhalchuk | Breach of Duty of Loyalty |
| Count 5 | All Defendants | Common Law Civil Conspiracy |
| Count 6 | All Defendants | Statutory Business Conspiracy |
| Count 7 | Defendant Phipps | Breach of Contract |
| Count 8 | Defendant Houle | Breach of Contract |

During discovery, Defendants served a series of Requests for Admissions and other discovery requests on Akira that yielded dozens of material admissions by Akira.  See Summary Judgment Exhibits ("Ex.") filed with this Memorandum.  These admissions, combined with deposition admissions made by Akira's Chief Executive Officer and owner (Srinivas Chennamaraja) and Akira's President (Eli Liang) dispose of the Counts above.  The admissions are set out below (with citations to the record), and based on them, summary judgment should be entered for Defendants Phipps, Houle, and Mikhalchuk on all Counts in the FAC.

1

# MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

## I.    AKIRA'S BUSINESS DEVELOPMENT EFFORTS

1.    Akira started in 2003.  Ex. 1 at 8:18-19.  Akira exclusively provides services to the Federal Government.  Ex. 2 at 8 (Admission 51).  Akira divides its operations into four divisions: three providing technology services to the Federal Government and one selling computer equipment to the Federal Government.  Ex. 3 at 17 (Admission 58).  Akira does not have a business area devoted to basic or applied scientific research.  Id. at 17-18 (Admission 59).

### A.    Akira Targets High Probability Set-Aside Contracts

2.    Akira's business development efforts are the responsibility of Mr. Chennamaraja and Mr. Liang.  Ex. 1 at 9:18-22, 22:13-24:9; Ex. 4 at 43:17-19, 52:13-14.   Akira's efforts are focused on "high probability" Set-Aside Contracts where the pool of competitors is pre-selected and smaller than the pool seeking Full and Open Contracts which is larger and open to all competitors in the marketplace.  Ex. 1 at 11:10-12:19, 15:10-16:6; 29:3-30:2; 48:6-18; 58:20-59:1; Ex. 4 at 24:16-25:14.  Akira "rarely" seeks Full and Open Contracts "because it's hard to go after full and open contracts."  Ex. 1 at 12:11-12; Ex. 4 at 27:11-17, 32:20-22 ("We typically have not been bidding full and open" because "you're competing against a broader set of potential bidders").

3.    To research opportunities, Akira personnel (including Mr. Chennamaraja and Mr. Liang) regularly view public databases, including www.fbo.gov, where Federal agencies list solicitations and requests for proposals.  Ex. 1 at 24:10-18, 26:16-27:9, 28:20-29:2; Ex. 3 at 16 (Admission 53).  Mr. Liang is the "main person" who reviews these databases.  Ex. 4 at 37:1-6.  The fbo.gov site lists opportunities for both Set Aside Contracts and Full and Open Contracts.  Ex. 1 at 28:2-5.  Other Akira personnel who viewed the fbo.gov website for opportunities were

Craig Fitzpatrick (searching for defense- and veterans-related opportunities), Tom Peters (searching for Food and Drug Administration ("FDA") and health-related opportunities), and Tom Boyce (also searching for FDA and health-related opportunities).  Id. at 32:1-33:1; 50:3-17; 51:7-10; 52:9-20; 81:8-20.

4.      It was a "shared responsibility" to look for FDA opportunities.  Ex. 4 at 42:8-18. Defendant Phipps was not required to look for FDA opportunities.  Id. at 44:9-45:1 ("We did not require him to do it").  Akira's success in generating FDA opportunities did not depend on Mr. Phipps.  Id. at 45:21-46:3.  It was ultimately Mr. Liang's responsibility to identify FDA opportunities.  Id. at 47:4-5 ("I identified all the opportunities").  Akira personnel would place potential opportunities in the pipeline for consideration.  Ex. 1 at 62:4-20.

5.      Mr. Chennamaraja, and at times Mr. Liang, made final decisions on which opportunities Akira would pursue.  Id. at 10:5-13, 42:2-43:5; Ex. 4 at 89:3-7.  Akira has a "B&P" (Bids and Proposals) team and process in place to prepare submissions in response to Federal agency listings.  Ex. 1 at 62:21-71:22; see Ex. 4 at 80:1-89:1 (Mr. Liang extensively describing the B&P proposal preparation process).  Mr. Liang spearheads the B&P process.  Ex. 1 at 62:21-71:22; Ex. 4 at 55:10-13.  The B&P team prepares outlines of the written proposal, "win themes" to aim at, pricing schedules to include, and drafts to circulate for review and revision.  Ex. 1 at 62:21-71:22; Ex. 4 at 80:1-89:1.  The B&P process is divided into three teams: the "pink team" (early discussion of the opportunity before much content is prepared); "red team" (ensuring win themes are being hit); and "gold team" (final review of the proposal before submission).  Ex. 4 at 80:1-89:1.  All bids and proposals that Akira submits in response to Federal agency listings go through the B&P process.  Id. at 68:19-69:1.

**B.       Not Being High Probability Wins, Akira Does Not Focus on BAAs**

6.       A Broad Agency Announcement ("BAA") is the acquisition device by which a Federal agency procures basic and applied scientific research as opposed to the development of a specific scientific or technology system.  Ex. 3 at 15-16 (Admission 51).  BAAs are part of the Full & Open market and are published at the www.fbo.gov website.  Id. at 16 (Admission 52).

7.       While Mr. Chennamaraja "[doesn't] know that much about BAAs," Ex. 1 at 78:2-3, he knows BAAs "have longer cycles [that] can stay for a long time" in which "[y]ou never know when they're going to make a decision."  Id. at 74:14-17.  Simply put, the "BAA process can take forever."  Ex. 4 at 96:18-21.  Because the probability of winning BAAs is low, BAAs do not represent best-win opportunities for Akira.  Ex. 1 at 75:7-12, 76:5-11; Ex. 4 at 60:4-6 ("BAAs have a lower win probability") and 63:20-21 ("BAAs were not a high probability kind of activity").  As a consequence, "we [Akira] did not focus much on the BAAs … [and] didn't go after the BAAs."  Ex. 1 at 74:20-22, 76:4, 175:21-176:1 (Akira "didn't go after any BAAs").

8.       Between 2003 (when Akira was formed) and 2016, Akira did not submit a single bid in response to a BAA.  Ex. 1 at 76:19-22, 106:3-8, 201:3-6; Ex. 4 at 59:16-18.  Out of hundreds of proposals that Akira submitted between 2011 and 2016 (the time period of this case), none were in response to a BAA.  Ex. 4 at 60:12-61:6, 160:12-17; Ex. 3 at 16 (Admission 55).  During that time, Akira did not submit a single bid in response to another research and development vehicle called a SBIR (Small Business Innovation Research).  Ex. 1 at 77:8-18.  In its 15-year history (2003-2018), Akira bid (and lost) on only one BAA, which came after Defendants Phipps, Houle and Mikhalchuk left Akira.  Id. at 80:14-81:5.

9.       During Defendants Phipps', Houle's, and Mikhalchuk's employment with Akira, not a single BAA issued by the Federal Government was identified or tracked by any Akira

personnel as a potential opportunity in Akira's "Pipeline Reports" (FAC ¶ 65), "Total Contract Value Reports" (FAC ¶ 66), "sales, business development and business strategy documents" (FAC ¶ 64), or in Akira's "ad-hoc sales documents" including "sales presentations, sales spreadsheets, client data and potential client data documents, and sales status memos or briefings" (FAC ¶ 72).  Ex. 5 at 1-2 (Interrogatories 2-4).  Between 2014 (when formal business development meetings began at Akira) and 2016, there were no discussions of BAAs during the meetings.  Ex. 1 at 82:5-18.

10.     While FAC ¶ 137 claims "Mr. Chennamaraja directed Mr. Phipps to pursue FDA Broad Agency Announcements" citing Mr. Chennamaraja's September 12, 2012 email to Mr. Phipps (Exhibit 23 to the FAC), nowhere in Mr. Chennamaraja's September 12, 2012 email to Mr. Phipps do the words "direct" or "I direct you" appear.  Ex. 6 at 10-11 (Admissions 38-39); Ex. 7.

11.     While FAC ¶ 136 claims "Mr. Chennamaraja … directed [Mr. Phipps] to seek out FDA Broad Agency Announcements" citing Mr. Chennamaraja's June 13, 2013 email to Mr. Phipps (Exhibit 22 to the FAC), nowhere in Mr. Chennamaraja's June 13, 2013 email to Mr. Phipps did Mr. Chennamaraja "direct [Mr. Phipps] to seek out FDA Broad Agency Announcements."  Ex. 6 at 10 (Admission 37); Ex. 8.  Mr. Chennamaraja cannot recall ever directing Mr. Phipps to seek out BAA opportunities from the FDA.  Ex. 1 at 86:6-9.

12.     Mr. Peters and Mr. Boyce, who were in charge of seeking health-related opportunities from the FDA and elsewhere, never came to Mr. Chennamaraja with a BAA opportunity.  Id. at 82:19-83:3.  Mr. Liang, who was in charge of Akira's overall business development efforts, never came to Mr. Chennamaraja with a BAA opportunity.  Id. at 85:1-4.  Mr. Fitzpatrick, who was in charge of seeking defense-related opportunities, mentioned "very,

very few" BAA opportunities.  Id. at 83:4-22.  Mr. Chennamaraja himself only brought up BAAs "in passing."  Id. at 85:5-15.  Mr. Chennamaraja cannot recall any concrete BAA opportunity being brought to his attention during the time period of this case (2011-2016).  Id. at 87:4-9.

**C.     Akira Disregarded Specific BAAs**

13.     In 2012, Akira was aware of a BAA opportunity involving the University of Michigan, and declined to pursue it.  Ex. 3 at 17 (Admission 56).  In an email at the time, Mr. Liang stated, "This BAA process will take FOREVER.  I've gone through this before.  It is the process for research projects just only one step better than SBIRs."  Id. at 17 (Admission 57); Ex. 9.  Mr. Liang's email was meant to discourage Akira personnel from pursuing the BAA.  Ex. 1 at 94:11-22.  The BAA "fell off the radar in terms of [ ] our focus," including Mr. Chennamaraja's radar.  Id. at 92:20-93:10.

14.     On June 13, 2013, Mr. Phipps sent an email to Mr. Chennamaraja.  Ex. 6 at 1 (Admission 1); Ex. 8.  Attached to Mr. Phipps' June 13, 2013 email was a BAA issued by the FDA (FDABAA-13-00119) ("2013 BAA").  Ex. 6 at 2-3 (Admissions 4-6, 8); Ex. 10.  Mr. Phipps brought the 2013 BAA to Mr. Chennamaraja's attention.  Ex. 6 at 3 (Admissions 7, 9).  When Mr. Phipps stated "Also, look at this" in his 5:11 pm email to Mr. Chennamaraja on June 13, 2013, Mr. Chennamaraja understood Mr. Phipps was referring to the 2013 BAA appearing at the bottom of the email chain.  Id. at 3 (Admission 10).

15.     After Mr. Phipps had asked Mr. Chennamaraja to "look at this," Mr. Chennamaraja, at some point after receiving Mr. Phipps' June 13, 2013 email, looked at the 2013 BAA appearing at the bottom of the email chain.  Id. at 3-4 (Admission 11).  Mr. Chennamaraja did not respond to the email that Mr. Phipps had sent to him at 5:11 pm on June 13, 2013.  Id. at

4 (Admission 12).  Mr. Chennamaraja did not inform Mr. Phipps, or anyone within Akira, that he (Mr. Chennamaraja) was interested in pursuing the 2013 BAA.  Id. at 4 (Admissions 13-14).

16.     Mr. Chennamaraja did not instruct or direct Mr. Phipps, or anyone within Akira, to pursue the 2013 BAA.  Id. at 4-5 (Admissions 15-16).  Mr. Chennamaraja did not instruct or direct Mr. Phipps, or anyone within Akira, to prepare a submission on Akira's behalf in response to the 2013 BAA.  Id. at 5 (Admissions 17-18).  The 2013 BAA was never added to Akira's pipeline.  Id. at 5 (Admission 19).

17.     In 2014, the FDA issued another BAA (FDABAA-14-00120) ("2014 BAA").  Ex. 11.  The 2014 BAA was never added to Akira's pipeline, and Akira did not provide the FDA with any submission in response to the 2014 BAA.  Ex. 6 at 6 (Admissions 22-23).

18.     In 2015, the FDA issued another BAA (FDABAA-15-00121) ("2015 BAA").  Ex. 12.  The 2015 BAA was never added to Akira's pipeline, and Akira did not provide the FDA with any submission in response to the 2015 BAA.  Ex. 6 at 7 (Admissions 26-27).

19.     In 2016, the FDA issued another BAA (FDABAA-16-00122) ("2016 BAA").  Ex. 13.  The 2016 BAA sought the same services as in the 2013 BAA.  FAC ¶ 138; compare Exs. 10 and 13.  Akira can provide no documentary evidence that Defendant Phipps was responsible for adding the 2016 BAA to Akira's pipeline.  Ex. 14 at 27 (Request 61).

20.     Mr. Chennamaraja (Akira CEO and owner) became aware of the 2016 BAA in July 2016.  Ex. 1 at 155:12-156:9.  Had it wished, Akira could have submitted a proposal in response to the 2016 BAA.  Id. at 185:15-21, 200:13-21.  That Defendant Conceptant submitted a proposal to the 2016 BAA did not preclude Akira from submitting its own proposal to the 2016 BAA.  Ex. 2 at 3-4 (Admission 15).[1]

---

[1] Akira caveats Admission 15 with "had it known about the [2016] BAA proposal." It did know of it – in July 2016, when Mr. Chennamaraja learned of it.  Ex. 1 at 155:12-156:9.

21.     Akira did not provide the FDA with any submission in response to the 2016 BAA. Ex. 6 at 8 (Admissions 30-31); Ex. 1 at 200:13-21.  Akira can provide no documentary evidence that the 2016 BAA was of any economic interest to Akira, that responding to such a BAA was part of Akira's strategy focus, or that Akira would have profited from the 2016 BAA had it chose to respond.  Ex. 14 at 32-33 (Request 77) and 41 (Request 95).

22.     In 2017, the FDA issued another BAA (FDABAA-17-00123N) ("2017 BAA"). Ex. 15.  By this time, Defendants Phipps, Houle, and Mikhalchuk were no longer employed by Akira.  FAC ¶¶ 200-02.  The 2017 BAA was never added to Akira's pipeline, and Akira did not provide the FDA with any submission in response to the 2017 BAA.  Ex. 6 at 9 (Admissions 34-35).

## II.     DEFENDANTS DID NOT "MISAPPROPRIATE" ANY AKIRA TRADE SECRET

### A.     Defendants Did Not "Misappropriate" a "Patient Cohort Tool," Because Akira Never Had a "Patient Cohort Tool"

23.     Akira claims Defendants misappropriated a software prototype called the "Patient Cohort Tool."  FAC ¶ 118.  Akira never developed a software prototype called the "Patient Cohort Tool."  Ex. 3 at 2 (Admissions 3-4); Ex. 16 at 4 (Interrogatory 6) ("No [such] prototype was ever created"); Ex. 1 at 118:11-13.

24.     Akira claims it was planning to develop a "Patient Cohort Tool."  FAC ¶ 62. Akira never planned to develop a "Patient Cohort Tool."  Ex. 1 at 118:11-17 ("[W]e never planned the development"); 125:22-126:2 ("Q.  And there were no plans to build it, correct?  A. Well, you could say that, yeah").  Akira can produce no documentary evidence that it had plans to develop a software prototype called the "Patient Cohort Tool."  Ex. 3 at 1-2 (Admission 2). Akira can produce no documentary evidence that it had made any progress towards developing a prototype called the "Patient Cohort Tool."  Ex. 14 at 16 (Request 28).

25.     The idea of a "Patient Cohort Tool" was not Akira's.  Ex. 2 at 8 (Admission 48).

A "Patient Cohort Tool" was conceived by Defendant Phipps in 1999, years before his

employment with Akira, except he called it "Med4All."  Ex. 17 (Interrogatory 19).  Mr. Phipps

revisited the idea between 2005 and 2009 (again, years before his employment with Akira),

renaming it "mobile Personal Medical Record (mPMR)."  Id.  Akira did not understand that it

owned Mr. Phipps' ideas that he conceived of before his employment with Akira.  Ex. 1 at

117:12-19.

26.     Akira never discussed developing a "Patient Cohort Tool" prototype with

Defendants Houle or Mikhalchuk.  Ex. 3 at 3 (Admissions 7-10).  Akira can produce no

documentary evidence that it discussed a software prototype called the "Patient Cohort Tool"

with Defendant Phipps.  Id. at 2 (Admission 6).  While Mr. Chennamaraja vaguely recalls *one

conversation* with Mr. Phipps (during the course of five years of employment) over breakfast

that generally discussed "synthetic data, how to generate patients into the data," Mr.

Chennamaraja cannot confirm that a "Patient Cohort Tool" was specifically discussed.  Ex. 1 at

120:13-121:22.  After this one conversation, Akira never made any effort to develop a "Patient

Cohort Tool."  Id. at 123:17-21; 124:13-15.

27.     Akira never stored a software prototype called the "Patient Cohort Tool" in the

"Amazon Web Services" platform referred to in FAC ¶ 74.  Ex. 3 at 3-4 (Admissions 11-12).

Akira never stored a software prototype called the "Patient Cohort Tool" in the "Akira Labs"

referred to in FAC ¶ 74.  Id. at 4-5 (Admissions 13-15).  In fact, "Akira Labs …did not develop

any software prototypes."  Ex. 16 at 3-4 (Interrogatory 5).  Akira never stored a software

prototype called the "Patient Cohort Tool" in the "google drive software" referred to in FAC

¶ 75.  Ex. 3 at 5 (Admissions 16-17).  Akira never stored a software prototype called the "Patient

Cohort Tool" in the "SharePoint software" referred to in FAC ¶ 80.  Id. at 5-6 (Admissions 18-

19).

28.     Akira never labeled or identified a software prototype called the "Patent Cohort

Tool" as "Confidential" or a "Trade Secret."  Id. at 6-7 (Admissions 20-23).

**B.     Akira Never Had Other "Software Prototypes" That Could Be "Misappropriated"**

29.     Akira can produce no documentary evidence that any Defendant misappropriated

the "software prototype called 'Semantic Layer Integration with eHMP'" (FAC ¶ 60), or that

such a prototype ever existed.  Ex. 3 at 7 (Admission 25); Ex. 18 at 4 (Request 12); Ex. 14 at 15

(Request 24).  In fact, no such "prototype" ever existed.  Ex. 16 at 4 (Interrogatory 6) ("No

[such] prototype was ever created").  Akira has no knowledge of Defendants Phipps, Houle, and

Mikhalchuk disclosing such a "prototype" to anyone outside of Akira.  Ex. 1 at 139:6-13; Ex. 4

at 139:4-10.

30.     Akira can produce no documentary evidence that any Defendant misappropriated

the "software prototype called 'Business Rules and Business Process Management Platform

Implementation with eHMP'" (FAC ¶ 61), or that such a prototype ever existed.  Ex. 3 at 8

(Admission 27); Ex. 18 at 5 (Request 13); Ex. 14 at 15 (Request 24).  In fact, no such

"prototype" ever existed.  Ex. 16 at 4 (Interrogatory 6) ("No [such] prototype was ever created").

Akira has no knowledge of Defendants Phipps, Houle, and Mikhalchuk disclosing such a

"prototype" to anyone outside of Akira.  Ex. 1 at 139:14-140:20; Ex. 4 at 139:11-18.

31.     No Defendant misappropriated the "software prototype" described in FAC ¶ 63.

Ex. 3 at 8-9 (Admissions 28-29); Ex. 1 at 142:2-15.  Akira has no documentary evidence that

such a "prototype" exists.  Ex. 14 at 17 (Requests 31-32).   In fact, the "prototype" was never built.  Ex. 1 at 140:21-141:7.

### C.   Defendants Did Not "Misappropriate" Akira's Business Development Documents

32.   Akira can produce no documentary evidence that any Defendant misappropriated a "Pipeline Report" (FAC ¶ 65).  Ex. 3 at 9 (Admission 31); Ex. 18 at 5 (Request 15).  Akira has no knowledge of Defendants Phipps, Houle, and Mikhalchuk disclosing a "Pipeline Report" to anyone outside of Akira.  Ex. 1 at 136:9-11, 137:1-7; Ex. 4 at 137:19-22.

33.   Akira can produce no documentary evidence that any Defendant misappropriated a "Total Contract Value Report" (FAC ¶ 66).  Ex. 3 at 10 (Admission 33); Ex. 18 at 5-6 (Request 16).  In fact, no such reports exist.  Ex. 14 at 18 (Request 34) (when asked to produce examples of the report, Akira responded "None").  Akira has no knowledge of Defendants Phipps, Houle, and Mikhalchuk disclosing a "Total Contract Value Report" to anyone outside of Akira.  Ex. 1 at 136:12-21, 137:8-18; Ex. 4 at 138:10-15.

34.   Akira can produce no documentary evidence that any Defendant misappropriated one or more of the "proposals" described in FAC ¶ 67.  Ex. 3 at 10-11 (Admission 35); Ex. 18 at 6 (Request 17).  Akira has no knowledge of Defendants Phipps, Houle, and Mikhalchuk disclosing a "proposal" to anyone outside of Akira.  Ex. 1 at 137:19-138:7; Ex. 4 at 138:16-20.

35.   Akira can produce no documentary evidence that any Defendant misappropriated any "past performance write-ups" (FAC ¶ 69).  Ex. 3 at 11 (Admission 37); Ex. 18 at 6 (Request 18).  No such "write-ups" even exist.  Ex. 14 at 18 (Request 36) (when asked to produce examples of the "write-ups," Akira responded "None").

36.     Akira can produce no documentary evidence that any Defendant misappropriated any "ad-hoc sales documents" described in FAC ¶ 72.  Ex. 3 at 12 (Admission 39); Ex. 18 at 6 (Request 19); Ex. 1 at 142:17-145:15; Ex. 4 at 138:21-139:3, 142:20-143:14.

37.     Akira never labeled or identified the "ISO 9001 certification documentation" (FAC ¶ 161) as "Confidential" or a "Trade Secret."  Ex. 3 at 14-15 (Admissions 46-49). Defendant Conceptant did not need "ISO 9001 certification documentation" to be awarded the 2016 BAA, and Conceptant's proposal to the FDA did not include any reference to the "ISO 9001 certification."  Ex. 2 at 2 (Admissions 4-5).  Akira can produce no documentary evidence that Defendants Conceptant and NuCognition used or disclosed the ISO 9001 documentation to anyone.  Ex. 14 at 37 (Request 85) and 45-46 (Request 106).

## III.     THE CONCEPTANT PROPOSAL DID NOT INCLUDE AKIRA TRADE SECRETS

38.     Defendant Conceptant submitted a proposal to the FDA in response to the 2016 BAA.  Ex. 19.  None of the "prototypes of software programs" referred to in FAC ¶ 59 appears in the Conceptant proposal.  Ex. 20 at 4 (Admission 1).[2]

39.     The "software prototype called Semantic Layer Integration with eHMP" (FAC ¶ 60) does not appear in the Conceptant proposal.  Id. at 4 (Admission 2).  The "prototype" is non-existent.  See ¶ 29 supra.

40.     The "software prototype called Business Rules and Business Process Management Platform Implementation with eHMP" (FAC ¶ 61) does not appear in the

---

[2] Exhibit 20 contains Conceptant's First Request for Admissions on Akira.  The Requests were served on December 29, 2017 (Ex. 21) and Akira's counsel acknowledged receipt and stated there were no objections to the Requests (Ex. 22).  Akira never answered the Requests.  Per the rules, the Request for Admissions are deemed admitted and the facts they state are conclusively established.  Fed. R. Civ. P. 36 (a)(3) & (b); Burwick v. Pilkerton, 700 Fed. Appx. 214, 215 n. 1 (4th Cir. 2017) (due to failure to timely respond, "by operation of [Rule 36] her responses were deemed admitted"); Somerville v. Dobson, 2011 U.S. Dist. LEXIS 156380, at **15-16 & notes 16, 18 (E.D. Va. Mar. 8, 2011) (denying the plaintiff's request to submit belated responses to the defendant's requests for admissions after the defendant had filed its motion for summary judgment and deeming the requests admitted and conclusively established for purposes of summary judgment).

Conceptant proposal.   Ex. 20 at 4 (Admission 3).  The "prototype" is non-existent.  <u>See</u> ¶ 30 <u>supra</u>.

 41. The "software prototype" referred to in FAC ¶ 63 does not appear in the Conceptant proposal.   Ex. 20 at 4 (Admission 4).  The "prototype" is non-existent.  <u>See</u> ¶ 31 <u>supra</u>.

 42. No "sales ... document," no "business development … document," and no "business strategy document" (FAC ¶ 64) appear in the Conceptant proposal.   Ex. 20 at 4 (Admissions 5-7).

 43. No "Pipeline Report" (FAC ¶ 65) appears in the Conceptant proposal.  <u>Id</u>. at 5 (Admission 8).

 44. No "Total Contract Value Report" (FAC ¶ 66) appears in the Conceptant proposal.  <u>Id</u>. at 5 (Admission 9).  No such reports exist.  <u>See</u> ¶ 33 <u>supra</u>.

 45. No "regularly saved proposal" (FAC ¶ 67) appears in the Conceptant proposal. Ex. 20 at 5 (Admission 10).

 46. No "past performance write-up" (FAC ¶ 69) appears in the Conceptant proposal. <u>Id</u>. at 5 (Admission 11).  No such "write-ups" exist.  <u>See</u> ¶ 35 <u>supra</u>.

 47. No "sales presentation" (FAC ¶ 72) appears in the Conceptant proposal.  Ex. 20 at 5 (Admission 12).

 48. No "sales spreadsheet" (FAC ¶ 72) appears in the Conceptant proposal.  <u>Id</u>. at 5 (Admission 13).

 49. No "client data" (FAC ¶ 72) appears in the Conceptant proposal.  <u>Id</u>. at 5 (Admission 14).

50.     No "potential client data" (FAC ¶ 72) appears in the Conceptant proposal.  Id. at 5 (Admission 15).

51.     No "sales status memo" (FAC ¶ 72) appears in the Conceptant proposal.  Id. at 5 (Admission 16).

52.     No "sales status briefing" (FAC ¶ 72) appears in the Conceptant proposal.  Id. at 5 (Admission 17).

53.     Akira can provide no documentary evidence that it identified any of the documents described in FAC ¶ 72 as trade secrets.  Ex. 14 at 19 (Request 38).

54.     No "software prototype" which "Akira stores … in an off-site computer system hosted by Amazon" (FAC ¶ 74) appears in the Conceptant proposal.  Ex. 20 at 5 (Admission 18).

55.     No "software prototype" which Akira stores in "Akira Labs" (FAC ¶ 74) appears in the Conceptant proposal.  Id. at 6 (Admission 19).  No "prototypes" are even stored in "Akira Labs."  See ¶ 27 supra.

56.     No "trade secret information" which "Akira stores … externally within the 'google drive' software" (FAC ¶ 75) appears in the Conceptant proposal.  Id. at 6 (Admission 20).

57.     No "trade secret information" which "Akira stores … internally within a software system called 'SharePoint'" (FAC ¶ 75) appears in the Conceptant proposal.  Ex. 20 at 6 (Admission 21).

58.     In its proposal to the FDA, Conceptant did not "use[] Akira's past performance" (contrary to ¶ 142 in the FAC).  Id. at 6 (Admission 22).

59.     In its proposal to the FDA, Conceptant did not "propose[] using Akira's software prototypes" (contrary to FAC ¶ 143).  Id. at 6 (Admission 23).

14

60.     No trade secret of Akira's appears, is identified, revealed, or discussed in Conceptant's proposal.  Id. at 6 (Admissions 24-27).

61.     Contrary to FAC ¶ 160, Defendants Phipps, Houle, and Mikhalchuk did not use Akira's trade secrets in Conceptant's proposal to the FDA.  Id. at 6-7 (Admissions 28-30).

62.     The resumes of Defendants Phipps, Houle, and Mikhalchuk that appear in the Conceptant proposal are their personal property, not Akira's.  Ex. 2 at 1 (Admission 1).

## IV.     THE 2016 BAA

### A.     Aware Of the 2016 BAA, Akira Chose Not To Submit a Proposal

63.     Akira claims it would have submitted a proposal in response to the 2016 BAA had it known about it.  FAC ¶ 148.  Mr. Liang (Akira President in charge of business development) disputed this at his deposition:

> Q.     Can you tell me for sure that had Josh [Phipps] or Lisa [Houle] brought that BAA FDA opportunity to yours and the CEO's attention that Akira definitely would have submitted a bid in response to it?
>
> A.     I would say I can't …. I'm being completely honest.  I haven't analyzed the Conceptant thing, so I myself have no strong feeling about whether we would bid it or not.

Ex. 4 at 162:13-18, 166:2-5.

64.     Mr. Chennamaraja (Akira CEO and owner) learned of the 2016 BAA in July 2016 when he saw Conceptant's draft proposal to the BAA.  Ex. 1 at 155:12-156:9.  Mr. Chennamaraja confirmed Akira had the opportunity to respond to the 2016 BAA, but chose not to:

> Q.     But Akira, you would agree with me, had the opportunity to apply for that BAA and chose not to, correct?
>
> A.     Well, at that time, again, we had different priorities of working on different proposals.

Q.      So Akira chose not to respond to that BAA, correct?

A.      Yeah…

Id. at 200:13-21.

65.     After learning of the 2016 BAA and Conceptant's draft proposal, Mr.

Chennamaraja did not direct Defendant Phipps, or anyone at Akira, to submit a proposal to the

FDA.  Id. at 184:6-185:2.  Akira could have submitted Conceptant's proposal to the 2016 BAA

as its own:

Q.      If [Defendant Phipps] told you that the draft proposal had not been submitted on
        behalf of Conceptant, why didn't you at that point say, hey, Josh, why don't we
        make this an Akira proposal and refine it and submit it to the FDA?

A.      That's a good point.  Again, I was probably distracted and that thought never
        came to me.

Id. at 182:16-183:2; see id. at 185:15-21 (admitting again Akira "could have" submitted a

proposal to the 2016 BAA).

**B.      Akira's Proposal Would Not Have Been Identical To Conceptant's
         Proposal**

66.     Akira claims that any proposal of its own to the 2016 BAA would have been

identical to Conceptant's proposal.  FAC ¶¶ 149-50.  Akira can provide no documentary

evidence to support this claim.  Ex. 14 at 32 (Request 74).

67.     All proposals Akira submits in response to a solicitation by a Federal agency go

through a rigorous process of development, refinement, and final review led by Mr. Liang and

Akira's B&P team.  See ¶ 5 supra.  This includes any proposal Akira would have prepared in

response to the 2016 BAA – it would have gone through the same rigorous B&P proposal

writing process described above.  Ex. 1 at 191:6-10; Ex. 4 at 176:11-177:15.  Akira can provide

no documentary evidence of any proposal that was submitted on Akira's behalf that was

prepared and submitted without the involvement of the B&P team.  Ex. 14 at 32 (Requests 75-76); Ex. 23 at 2 (Interrogatory 3).

68.     Akira does not know if its' pricing, WRAP rate, and proposal design in any proposal it would have submitted in response to the 2016 BAA would have been the same as the pricing, WRAP rate, and proposal design that appeared in the Conceptant proposal.  Ex. 2 at 6 (Admission 34) (Akira confirming it is "without knowledge" on the matter).  Akira's pricing in any proposal to the 2016 BAA would "absolutely not" have been identical to Conceptant's pricing and "very likely" would have been different.  Ex. 4 at 177:16-178:20.

69.     What Akira's plan was for executing the 2016 BAA had it bid for and won the BAA is a matter of speculation.  Ex. 1 at 194:9-22, 195:11-13.

70.     Akira's proposal would have looked different from Conceptant's proposal.  Ex. 4 at 176:11-21 (Mr. Liang acknowledging any Akira proposal "would have maybe changed in some ways.  Maybe some parts would have even gotten better, other parts would have gotten worse").  There is no assurance that any potential Akira proposal in response to the 2016 BAA would have made it out of the B&P proposal writing process described above.  Id. at 91:10-19, 94:15-95:2 ("So many, many cases where we stop in the middle").

### C.    Whether Akira Would Have Been Awarded the 2016 BAA Had It Submitted a Bid Is a Matter Of Speculation

71.     Akira claims it would have won the 2016 BAA award had it submitted a proposal.  FAC ¶ 151.  Akira can provide no documentary evidence to support this claim.  Ex. 14 at 43 (Request 100).

72.     Mr. Liang testified there was no guarantee Akira would have won the 2016 BAA:

Q.      If Akira had submitted a bid to that 2016 FDA BAA, am I correct in saying that there is no guarantee that Akira would have been awarded that contract?

A.    Of course there's no guarantee ever on a contract ….

Q.    Can you say with certainty that had Akira submitted a proposal and response to the 2016 FDA BAA that it would have gotten the award?

A.    No.  It's never true.  I mean, it's never true on any bid except a sole source that if you submit a bid that you will get it, so no.

Ex. 4 at 168:13-18, 176:1-6.

73.    In any Akira proposal to the 2016 BAA, Defendants Phipps, Houle, and Mikhalchuk would have been identified as Akira's key employees.  Ex. 1 at 196:8-197:6. Defendants Phipps, Houle, and Mikhalchuk were at-will employees of Akira.  FAC ¶¶ 200-02. Akira admits that at-will employees can resign between the time of proposal submission and contract award.  Ex. 1 at 195:16-196:8; Ex. 4 at 169:5-18, 170:8-15.

## V.    DEFENDANTS NEVER COMPETED WITH AKIRA OR INTERFERED WITH ANY OPPORTUNITIES

74.    Akira can provide no documentary evidence that the Defendants interfered with Akira's current contracts or future business opportunities.  Ex. 14 at 44 (Request 102).

75.    Akira can provide no documentary evidence that the enterprises Defendants formed competed with Akira in any way, including specific projects where Akira and any of the Defendants were in competition and bidding on the same project.  Id. at 17-18 (Request 33) and 40 (Request 92).  Akira verified on February 16, 2018 that it "is currently unaware of any specific projects where it was in competition with Defendants and bidding on the same project." Ex. 23 at 1 (Interrogatory 1).  Akira cannot identify any specific business opportunity that it was considering that Defendants Houle, Mikhalchuk, and NuCognition interfered with.  Ex. 1 at 147:13-19, 149:19-15; Ex. 4 at 144:12-18.

76.    Akira has, and has had, a contract with the FDA to provide support services for the FDA's Office of Regulatory Affairs.  FAC ¶ 24.  Akira can provide no documentary evidence

that any Defendant, during the time of Defendants Phipps', Houle's, and Mikhalchuk's employment with Akira, ever sought, bid for, and/or obtained (on behalf of himself, herself, or itself) any work or contract from the FDA that involved supporting the FDA's Office of Regulatory Affairs.  Ex. 3 at 13 (Admission 43); Ex. 18 at 7 (Request 21).

77.     Nothing in the employment agreements in this case prevented Defendants from forming their own companies.  Ex. 2 at 12 (Admission 74).

78.     Defendants Phipps and Mikhalchuk formed Chiron Solutions, Inc ("Chiron Solutions").  Ex. 24.  Akira has no knowledge of Chiron Solutions competing with it or of it interfering with a business opportunity that Akira was considering.  Ex. 2 at 2 (Admission 7); Ex. 1 at 152:9-11.

79.     Akira has no knowledge of Chiron Solutions offering its services to the U.S. Customs and Border Protection.  Ex. 2 at 3 (Admission 10).  Akira can provide no documentary evidence that Chiron Solutions offered to develop software for the U.S. Customs and Border Protection.  Ex. 14 at 25 (Request 57).

80.     Chiron Solutions has never been awarded work or a contract by anyone.  Ex. 25 at 268:22.  Chiron Solutions has been defunct since March 2016.  Ex. 24 (business license expired 3/31/16).

81.     Defendants Phipps, Houle, and Mikhalchuk formed NuCognition.  Ex. 26. NuCognition was created to develop solutions for cognitively impaired individuals and work with Cognitive Rehabilitation Centers.  Ex. 25 at 269:9-14; Ex. 27 at 11:13-14, 12:15-20.  Akira does not develop solutions for cognitively impaired individuals and does not work with Cognitive Rehabilitation Centers.  Ex. 2 at 8 (Admission 45).  Akira has not had any contracts in the cognitive impairments/disabilities sector.  Ex. 16 at 1-2 (Interrogatory 1).

19

82.     Akira has no knowledge of NuCognition competing with it or interfering with any business opportunity Akira was considering.  Ex. 2 at 2 (Admission 8); Ex. 1 at 152:12-15. Akira has no knowledge of NuCognition "depriv[ing] Akira of business opportunities that were appropriated for NuCognition's benefit rather than Akira's" (as alleged in FAC ¶ 174).  Ex. 2 at 5 (Admission 23); Ex. 28 at 2 (Interrogatory 2) (Akira verifying on February 16, 2018 that it "is currently unaware of any opportunities that were appropriated for NuCognition's benefit").  Akira has no knowledge of Defendants disclosing trade secrets to NuCognition.  Ex. 4 at 137:6-13.  Akira has no knowledge of NuCognition damaging Akira.  Ex. 1 at 204:6-11.

83.     NuCognition is not capable of conducting any business with the Federal Government or in the private sector as it does not have a business license or a SAM (System for Award Management) registration.  Ex. 29 at 11-12, 13 (Interrogatories 5, 9).

84.     Defendant Conceptant performs its BAA work for the Office of the Chief Scientist, which is within the FDA's Office of the Commissioner.  Ex. 25 at 281:2-6; Ex. 27 at 181:21-182:3.

85.     At no time during Defendants Phipps', Houle's, and Mikhalchuk's employment with Akira did Akira have a contract with the FDA to provide services or research for the Office of the Commissioner or the Office of the Chief Scientist.  Ex. 6 at 11 (Admissions 40, 42).

86.     Akira can produce no documentary evidence that it pursued a contract or solicitation with the FDA to provide services or research for the Office of the Commissioner or the Office of the Chief Scientist during Defendants Phipps', Houle's, and Mikhalchuk's employment with Akira.  Ex. 30 at 9 (Requests 24, 26).

87.     Akira can produce no documentary evidence that Defendant Houle competed with Akira.  Ex. 14 at 46 (Request 107).

# LEGAL ARGUMENT

## I.   SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNTS 1 AND 2 OF THE FIRST AMENDED COMPLAINT

An extensive trade secret analysis is unnecessary in this case.  Akira admits a software prototype called the "Patient Cohort Tool," which it claims Defendants misappropriated, does not exist.  Material Facts ¶ 23.  Since a "Patient Cohort Tool" does not exist, Akira cannot claim it has been misappropriated.  See MicroStrategy Inc. v. Li, 268 Va. 249, 263 (2004) ("In order for a plaintiff to establish … a trade secret violation, [it must establish] the existence of a trade secret … [and] if a plaintiff fails to prove [that] required element, the plaintiff is not entitled to relief under the Act").  Akira additionally admits (contrary to the allegations in the FAC) it had no plans to develop a "Patient Cohort Tool;" made no progress towards developing such a prototype; a "Patient Cohort Tool" was never its idea to begin with;[3] and no "Patient Cohort Tool" is stored in any of Akira's allegedly secure platforms.  Id. ¶¶ 24-25, 27.  Akira further admits that no "Patient Cohort Tool" appears in Conceptant's proposal to the FDA.  Id. ¶ 38.

The same applies to Akira's other alleged "software prototypes."  Akira admits the non-existence of a "Semantic Layer Integration with eHMP;" the non-existence of a "Business Rules and Business Process Management Platform Implementation with eHMP;" and the non-existence of the "software prototype" described in FAC ¶ 63.  Id. ¶¶ 29-31.  Defendants cannot be accused of "misappropriating" things that do not exist.  Akira also admits it has no evidence of any "misappropriation" of such things, or of Defendants disclosing such things to anyone outside of Akira.  Id.  Akira further admits such non-existent "prototypes" do not appear in Conceptant's

---

[3] See Space Sys./Loral , LLC v. Orbital ATK, Inc., 2018 U.S. Dist. LEXIS 17756, at *13 (EDVA Feb. 2, 2018) (only "[a]n owner of a trade secret that is misappropriated may bring a civil action . . ." ) (emphasis added).

proposal to the FDA.  Id. ¶¶ 39-41.  Akira's admissions go further – that no "software prototype" or "trade secret" that is allegedly stored in any of its platforms appears in the Conceptant proposal, and that Defendants Phipps, Houle, and Mikhalchuk did not propose using any of Akira's so-called "prototypes" or "trade secrets" in the Conceptant proposal.  Id. ¶¶ 54-57.

The same applies to Akira's so-called business development documents.  Assuming such documents to be "trade secrets" – which is a stretch[4] – Akira admits it has no evidence of Defendants "misappropriating" such documents or disclosing such documents to anyone outside of Akira.  Id. ¶¶ 32-36.  This includes the so-called "Pipeline Reports," the "Total Contract Value Reports," "sales documents," "business development documents," "business strategy documents," "regularly saved proposals," "past performance write-ups," "sales presentations," "sales spreadsheets," "client data," "potential client data," "sales status memos," and "sales status briefings."  Id.  In fact, Akira can provide no proof that some of these documents even exist.  Id. ¶¶ 33, 35 ("Total Contract Value Reports" and "past performance write-ups").  Akira further admits that none of these documents were disclosed in Conceptant's proposal to the FDA. Id. ¶¶ 42-52.

In addition, this Court has stated that in order to pursue a trade secrets violation claim, a plaintiff must proffer an expert.  Trident Prods. & Servs., LLC v. Canadian Soiless Wholesale Ltd., 859 F. Supp. 2d 771, 781 (E.D. Va. 2012) ("The common designation and use of testifying experts in trade-secret makes Trident's unwillingness to bring one forward indeed striking. Given that technical and scientific matters are almost always at issue, it is hard to locate previous trade-secret cases where testifying experts did *not* appear on behalf of the plaintiff …") (emphasis in original).  Akira did not proffer an expert in this case.

---

[4] For example, Akira admits it has no evidence that it identified any of the business documents described in FAC ¶ 72 as trade secrets.  Id. ¶ 53.

Again, an extensive trade secret analysis is not required.  Based on Akira's admissions and failure to proffer an expert, summary judgment on Counts 1 and 2 of the First Amended Complaint should be granted for Defendants Phipps, Houle, and Mikhalchuk.

## II.      SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNT 3 OF THE FIRST AMENDED COMPLAINT

According to Count 3, Defendants interfered with Akira's ability to pursue the 2016 BAA, and had it known of the 2016 BAA, Akira would have submitted a proposal and won the contract.  FAC ¶¶ 148-51.  An abbreviated analysis of this claim will suffice.

While Akira claims it was unaware of the 2016 BAA, Mr. Chennamaraja's testimony conclusively establishes the opposite:

- He learned of the 2016 BAA in July 2016;

- His knowledge gave Akira the opportunity to submit a proposal to the 2016 BAA;

- As CEO and owner, he could have directed Akira personnel, including Defendant Phipps, to prepare a submission to the 2016 BAA; and/or

- He could have sought to submit Conceptant's proposal as Akira's proposal; instead

- He *chose* not to submit a proposal to the 2016 BAA; and

- As a consequence, Akira did not respond to the 2016 BAA.

Material Facts ¶¶ 64-65.

Summary judgment should be entered for Defendants on Count 3.  By Mr. Chennamaraja's own admission, Defendants did not "interfere" at all with Akira's ability to submit a proposal to the 2016 BAA.  Mr. Chennamaraja (Akira) was *aware* of the opportunity, and *chose* not to respond.  In addition, Akira's self-serving claim that it was ever interested in the 2016 BAA in the first place is dubious at best.  In its 13-year history between 2003 (when it

began) up through the time of the 2016 BAA, Akira had never once submitted a proposal in response to a BAA. Id. ¶ 8. Out of hundreds of proposals Akira submitted between 2011 and 2016 (the time period of this case), not one responded to a BAA. Id. The record is clear that both Mr. Chennamaraja and Mr. Liang disliked BAAs, and that BAAs were never the focus of Akira's business development efforts or strategy. Id. ¶¶ 7, 13. Mr. Chennamaraja ignored an equivalent BAA in 2013 when Defendant Phipps brought it to his attention. Id. ¶¶ 14-16. Even Mr. Liang waffled on the claim that Akira would have ever been interested in the 2016 BAA (id. ¶ 63), and Mr. Chennamaraja, by his admitted inaction in responding to the 2016 BAA, showed his lack of interest in the 2016 BAA.

Akira's logic is also seriously flawed. It claims it would have submitted the identical proposal as Conceptant's proposal to the 2016 BAA, and if Conceptant won the award, it must follow Akira would have won it too. FAC ¶¶ 150-52. As stated, Akira *had* the opportunity to adopt the Conceptant proposal as its own, and chose not to. In any event, Mr. Liang confirmed that any Akira proposal to the 2016 BAA would *not* have been identical to Conceptant's proposal. Material Facts ¶ 70. For starters, Akira's pricing in any proposal would "absolutely" have been different than Conceptant's. Id. ¶ 68. Akira is also "without knowledge" on whether its WRAP rate and proposal design would have been identical to Conceptant's. Id. As Mr. Liang described, any proposal by Akira to the 2016 BAA would have underwent Akira's rigorous B&P "pink team, red team, and gold team" process for developing, preparing, finalizing, and submitting bids in response to Federal agency listings. Id. ¶¶ 5, 67. And as Mr. Liang confirmed, there is no assurance that any such Akira proposal to the 2016 BAA would have even survived the B&P proposal preparation process. Id. ¶ 70. In the end, there is little

certainty, and much doubt and speculation, that any such "identical proposal" would have been forthcoming to the FDA.

At his deposition, Mr. Chennamaraja could not even articulate what Akira's plan would have been to execute the 2016 BAA had Akira been awarded the contract, agreeing that the matter was speculative.  Id. ¶ 69.  At bottom, Akira's claim that it would have submitted a proposal identical to Conceptant's proposal is indeed a matter of pure speculation.  In any event, such a contention is refuted by Mr. Liang's acknowledgement – and he would know as the leader of Akira's B&P proposal writing process – that any such proposal would not have been identical to Conceptant's proposal.

Equally speculative is Akira's claim it would have won the 2016 BAA had it submitted a proposal.  Mr. Liang himself confirmed there is no certainty that Akira would have won the 2016 BAA.  Id. ¶ 72.  He made clear that when it comes to Federal agency contracting, there is *never* certainty that a bidder will ever win a contract.  Id.  Such certainty is also speculative under Virginia law.  Akira admits Defendants Phipps, Houle, and Mikhalchuk were at-will employees who would have been listed as the key employees in any Akira proposal to the 2016 BAA.  Id. ¶ 73.  Akira also correctly admits that such at-will employees can resign between the time of proposal submission and contract award.  Id.  "An at-will contract is a mere expectancy and the plaintiff is entitled to no legal assurance that he will realize the expected gain."  Skillstorm, Inc. v. Elec. Data Sys., LLC, 666 F. Supp. 2d 610, 616 (E.D. Va. 2009) (citing Duggin v. Adams, 234 Va. 221, 226, 360 S.E.2d 832, 836 (1987)).  Akira cannot claim a business expectancy in the 2016 BAA when it would have relied on the expertise of at-will employees who could have resigned between the proposal submission and contract award, particularly employees who demonstrated a willingness and desire to leave Akira.  Williams v. Dominion Tech. Partners,

LLC, 265 Va. 280, 289 (2002) (plaintiff must prove with "reasonable certainty that … [it] would have continued in the relationship or realized the expectancy"); Commercial Roofing & Sheet Metal Co. v. Gardner Eng'g, 60 Va. Cir. 384, 386-87 (Fairfax 2002) ("Expectations of being allowed to bid on a project does not rise to the level of a reasonable expectation of further contractual relations").

In sum, the *only* opportunity Akira claims was interfered with was the 2016 BAA. Material Facts ¶¶ 74-82 (Akira admitting it is unaware of and has no evidence of interference with any of its current contracts, future business opportunities, specific projects, or other specific business opportunities, including by entities formed by Defendants). As shown, there was no interference with the 2016 BAA. Akira acknowledges it was aware of the 2016 BAA; that it could have submitted a bid in response to it; and that it chose not to. In addition, Akira's claims that it would have submitted the same proposal as Conceptant, and that it was certain of winning the contract, are speculative at best, and, in any event, are refuted by Akira's own admissions. For the reasons stated, summary judgment should be entered for Defendants Phipps, Houle, and Mikhalchuk on Count 3.

## III.    SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNT 4 OF THE FIRST AMENDED COMPLAINT

Count 4 alleges that Defendants Phipps, Houle, and Mikhalchuk breached a fiduciary duty of loyalty by competing with Akira while being employed with Akira. FAC ¶¶ 203-14. Akira's admissions dispose of this claim.

Akira admits there is no evidence that the enterprises Defendants formed competed with Akira in any way, including specific projects where Akira and any of the Defendants were in competition and bidding on the same project. Material Facts ¶ 75. Akira further admits it cannot identify any specific business opportunity it was considering that Defendants Houle, Mikhalchuk,

and NuCognition competed for or interfered with.  Id.  These admissions alone dispose of Count 4.

While Defendants Phipps and Mikhalchuk formed Chiron Solutions, Akira admits it has no knowledge or evidence of Chiron Solutions competing with it or of it interfering with a business opportunity that Akira was considering.  Id. ¶ 78.  More specifically, Akira has no knowledge or evidence of Chiron Solutions offering its services to the U.S. Customs and Border Protection, including developing software for the agency.  Id. ¶ 79.  In fact, Chiron Solutions has never been awarded work or a contract by anyone, and has been defunct since March 2016.  Id. ¶ 80.

While Defendants Phipps, Houle, and Mikhalchuk formed NuCognition to develop solutions for cognitively impaired individuals and work with Cognitive Rehabilitation Centers, Akira admits that it does not operate in this space, that is, it does not develop solutions for cognitively impaired individuals, does not work with Cognitive Rehabilitation Centers, and has had no contracts in the cognitive impairments/disabilities sector.  Id. ¶ 81.  Akira additionally admits it has no knowledge or evidence of NuCognition competing with it or interfering with any business opportunity Akira was considering; admits it has no knowledge or evidence of NuCognition depriving Akira of business opportunities that were appropriated for NuCognition's benefit rather than Akira's; admits it has no knowledge or evidence of Defendants disclosing trade secrets to NuCognition; and admits it has no knowledge or evidence of NuCognition damaging Akira.  Id. ¶ 82.

As discussed, while Defendants Phipps, Houle, and Mikhalchuk formed Conceptant to pursue the 2016 BAA, Akira admits it did not operate at all in the BAA space during the 13-year history between its inception as a company (2003) up to and including the time of the 2016

BAA.  Id. ¶¶ 7-9.  Mr. Chennamaraja made plain his reasons for staying away from BAAs: they "have longer cycles [that] can stay for a long time" in which "[y]ou never know when they're going to make a decision."  Id. ¶ 7.  Mr. Liang was more blunt and emphatic: "This BAA process will take FOREVER."  Id. ¶¶ 7, 13.  For Akira, BAAs represented low-win opportunities.  Id. ¶ 7.  This explains why between 2003 and 2016, Akira did not submit a single bid in response to a BAA; why out of hundreds of proposals it submitted between 2011 and 2016, none were in response to a BAA; why not a single BAA during that time was identified or tracked by any Akira personnel in any of Akira's business development documents; why there were no discussions of BAAs during business development meetings; why Mr. Chennamaraja cannot recall any concrete BAA opportunity being brought to his attention during the time period of this case; why Akira passed up the BAA opportunity with the University of Michigan; and why Akira disregarded the 2013, 2014, 2015, 2016, and 2017 BAAs issued by the FDA.  Id. ¶¶ 8-9, 12-13.

Given this record of admissions by Akira, it cannot rationally be concluded that Conceptant's pursuit of the 2016 BAA somehow placed it or Defendants Phipps, Houle, or Mikhalchuk "in competition" with it.  See Home Paramount Pest Control Cos. v. Shaffer, 282 Va. 412, 416 (2011) (for there to be "competition … the [ ] activity must be of the same type as that *actually engaged in* by the former employer") (emphasis added).  The record is clear that Akira had no interest whatsoever in BAAs; that it did not operate in the BAA space; that BAAs had no place in Akira's business development efforts or strategy; and that pursuing BAAs was not part of Akira's business model.  See Lampman v. DeWolff Boberg & Assocs., 319 Fed. Appx 293, 302 (4th Cir. 2009) (because "DBA lacks a legitimate interest in prohibiting

competition *in portions of the world in which it does not operate*, the clause is void as a matter of law and therefore unenforceable") (emphasis added).

Akira further admits that Defendants did not compete with any of Akira's current contracts or future business opportunities. Id. ¶ 74. Akira admits no Defendant ever interfered with or competed for Akira's major revenue-producing contract to support the FDA's Office of Regulatory Affairs. Id. ¶ 76. Akira further admits it has no business dealings with the FDA's Office of the Chief Scientist, for whom Conceptant provides its BAA services. Id. ¶¶ 85-86.

Based on these dispositive admissions, summary judgment should be entered for Defendants Phipps, Houle, and Mikhalchuk on Count 4 of the First Amended Complaint.

## IV.   SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNTS 5-6 OF THE FIRST AMENDED COMPLAINT

Counts 5 and 6 allege that Defendants Phipps, Houle, and Mikhalchuk conspired with each other and with former Defendants Conceptant and NuCognition to harm Akira. Defendants Phipps, Houle, and Mikhalchuk are owners, directors, and/or officers of Conceptant and NuCognition. FAC ¶¶ 105-08, 110-13. It is black letter law that owners, directors, and officers of a corporation cannot legally conspire with each other or with the corporations they serve. Phoenix Renovation Corp. v. Rodriguez, 258 F. Appx. 526, 539 (4th Cir. 2007) ("Under Virginia law, a corporation cannot conspire with its agents, nor can agents of a corporation, acting within the scope of their agency, conspire together. Such a 'conspiracy' is a legal impossibility because the actors are not separate persons for purposes of the conspiracy statute, but rather form part of a single entity, the corporation, which cannot conspire with itself") (citing Charles E. Brauer Co. v. NationsBank of Va., N.A., 251 Va. 28, 36 (Va. 1996)); see also Fox v. Deese, 234 Va. 412, 428 (1987).

Because a conspiracy of the kind alleged in Counts 5 and 6 was not legally possible, summary judgment should be entered for Defendants on these counts.  See Rodriguez, 258 Fed. Appx. at 539 (affirming summary judgment on statutory business conspiracy claim because the alleged conspiracy was not legally possible); Am. Chiropractic v. Trigon Healthcare, 367 F.3d 212, 223-25 (4th Cir. 2004) (affirming summary judgment on conspiracy claims on the same ground); Vollette v. Watson, 937 F. Supp. 2d 706, 727-29 (E.D. Va. 2013) (granting summary judgment on common law conspiracy claim on the same ground); see Cole v. Daoud, 2016 U.S. Dist. LEXIS 39749, at *42 (E.D. Va. Feb. 17, 2016) (since "all of the defendants were integrally involved in Viridia … they cannot conspire with it or with each other in matters related to it").

In addition, the predicate acts that supposedly form the basis of the alleged conspiracy in Counts 5 and 6 do not exist.  See supra (no trade secret violations; no tortious interference with contract or business expectancy; no actual competition giving rise to a breach of fiduciary duty). Commercial Business Sys. v. BellSouth Servs., 249 Va. 39, 48 (1995) (underlying acts of an alleged conspiracy must be unlawful or unlawful means were used to accomplish lawful objectives) (citing Hechler Chevrolet, Inc. v. Gen. Motors Corp., 337 S.E.2d 744, 748 (Va. 1985)).  With no predicate acts, there is no conspiracy claim.  See Taylor v. CNA Corp., 782 F. Supp. 2d 182, 205 (E.D. Va. 2010) (granting summary judgment on conspiracy claim because "none of the substantive torts [underlying the conspiracy] alleged by [the plaintiff] survive summary judgment"); Johnson v. D & D Home Loans Corp., 2008 U.S. Dist. LEXIS 24114, at *17 (E.D. Va. Jan. 23, 2008) (granting summary judgment on conspiracy count due to no evidence of underlying unlawful acts or purpose); Busch v. Christian Broad. Network, 2007 U.S. Dist. LEXIS 27171, at *17-18 (E.D. Va. Apr. 12, 2007) (granting summary judgment for the same reason).

Lastly, to sustain a claim under Virginia's business conspiracy statute, Akira must proffer evidence that Defendants acted with malice and specifically intended to injure Akira's business. Gen. Assurance of Am., Inc. v. Overby-Seawell Co., 533 Fed. Appx. 200, 205-06 (4th Cir. 2013).  At best, the evidence shows that Defendants Phipps, Houle, and Mikhalchuk acted to promote their own business interests and those of Conceptant and NuCognition.  Id. ("The balance of the record fails to establish that OSC acted with malice and intended to injure GAA's business, but merely shows that OSC acted to promote its legitimate business interests … Given this lack of evidence of improper motive, we conclude that the district court did not err in awarding summary judgment to OSC on the business conspiracy claim"); see also Petroleum Suppliers v. BP P.L.C., 452 F. Supp. 2d 641, 650 (E.D. Va. 2006) ("[A] party's intent to make a profit does not on its own constitute malice"), aff'd, 268 Fed. Appx. 236 (4th Cir. 2008) (affirming grant of summary judgment because there was no "evidence either of a conspiracy …or legal malice on behalf of either company," and therefore "any injury … is not actionable under the Virginia Business Conspiracy Act").

For the reasons above, summary judgment on Counts 5 and 6 should be entered for Defendants Phipps, Houle, and Mikhalchuk.

## V.   SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNT 7 OF THE FIRST AMENDED COMPLAINT

Count 7 alleges that Defendant Phipps breached his employment agreement with Akira "when he assisted in writing a proposal for Conceptant wherein Akira Confidential Information was disclosed to the FDA for Conceptant's benefit."  FAC ¶ 243.  The employment agreement defines "Confidential Information" as

> … certain proprietary, confidential information and trade secrets of the Employer relating to and useful in the Employer's business and labeled or identified by the Employer as proprietary, confidential information (collectively, the "Confidential

31

Information"), including without limitation, the Employer's business plan, marketing strategies, financial statements and projections, contacts with actual and potential customers, vendors, sponsors, advertisers, members and partners, software and hardware specifications and all written and electronic copies thereof.

Ex. 31 at 2, ¶ 6(a).

Akira's claim cannot withstand its admissions.  Akira admits that none of its so-called "software prototypes" were disclosed in Conceptant's proposal to the FDA, and admits that Conceptant's proposal did not propose using any Akira software prototype.  Material Facts ¶¶ 38-41, 54-55, 59.  Akira admits Mr. Phipps did not "misappropriate" any of these so-called "prototypes" or disclose such "prototypes" to anyone outside of Akira, including the FDA.  Id. ¶¶ 23-31.  Indeed, Akira admits such "prototypes" do not exist.  Id.

Akira further admits that none of its business development documents were disclosed in Conceptant's proposal to the FDA.  Id. ¶¶ 42-52.  This includes all of the documents identified in the FAC (no disclosure of "sales documents" "business development documents,""business strategy documents," "Pipeline Reports," "Total Contract Value Reports," "regularly saved proposals," "past performance write-ups," "sales presentations," "sales spreadsheets," "client data," "potential client data," "sales status memos," "sales status briefings").  Id.  Akira admits that Mr. Phipps did not disclose such documents to anyone outside of Akira, including the FDA. Id. ¶¶ 32-36.

Akira also admits that Mr. Phipps did not disclose any Akira trade secrets in the Conceptant proposal to the FDA.  Id. ¶¶ 56-57, 60-61.  Nor is there any evidence that Mr. Phipps disclosed to the FDA information that Akira specifically "labeled or identified as proprietary confidential information."  Ex. 31 at 2, ¶ 6(a).

Based on Akira's admissions, summary judgment on this portion of Count 7 should be entered for Mr. Phipps.  Count 7 next alleges that Mr. Phipps breached his employment

agreement by "disclos[ing] … Akira's software prototypes and Akira's plans for using those software prototypes to NuCognition." FAC ¶ 244. Akira's admissions dispose of this claim as well. No such "prototypes" exist; Akira had no plans to develop or use such "prototypes;" and Mr. Phipps did not (and could not) disclose such non-existent "prototypes" to anyone outside of Akira, including NuCognition. Material Facts ¶¶ 23-31. Summary judgment on this portion of Count 7 should be entered for Mr. Phipps.

Count 7 next alleges that Mr. Phipps breached his employment agreement by "depriv[ing] Akira of at least one and likely more opportunities to contract with FDA and other federal agencies, opportunities that went to Conceptant instead." FAC ¶ 245. The only conceivable opportunity ¶ 245 could be referring to is the 2016 BAA. But as shown, Akira was not deprived of anything. Akira CEO and owner Mr. Chennamaraja independently learned of the 2016 BAA in July 2016, and he decided to forego the opportunity. Material Facts ¶¶ 63-65. It was *Mr. Chennamaraja* who deprived Akira of the 2016 BAA, by deciding not to pursue it. Summary judgment on this portion of Count 7 should be entered for Mr. Phipps.

Lastly, Count 7 alleges that Mr. Phipps breached his employment agreement by "depriv[ing] Akira of opportunities which have gone to NuCognition as a result of NuCognition's advertising of Akira's software prototypes on its website." FAC ¶ 246. However, Akira admits it has no knowledge or evidence of NuCognition depriving Akira of business opportunities that were appropriated for NuCognition's benefit rather than Akira's. Material Facts ¶ 82. More broadly, Akira admits it has no knowledge or evidence of NuCognition competing with it or interfering with any business opportunity Akira was considering, and admits it has no knowledge or evidence of NuCognition damaging Akira. Id. Summary judgment on this portion of Count 7 should also be entered for Mr. Phipps.

For the reasons stated, summary judgment should be entered for Mr. Phipps on Count 7 in its entirety.

## VI.    SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNT 8 OF THE FIRST AMENDED COMPLAINT

Count 8 alleges that Defendant Houle "breached the non-disclosure clause of her compensation agreement when she forwarded the ISO 9001 information to her personal email account for use by Conceptant and NuCognition."  FAC ¶ 252.  Under the "non-disclosure" clause, Ms. Houle "agree[d] to keep any and all of the Confidential Information from being known or disclosed to any other person or entity …"  Ex. 32 at 3, ¶ 7(b).  Ms. Houle's compensation agreement defined "Confidential Information" as "certain proprietary, confidential information and trade secrets of Akira relating to and useful in Akira's business **and** labeled or identified by Akira as proprietary, confidential information (collectively, the "Confidential Information") …"  Id. ¶ 7(a) (emphasis added).

Akira admits that it never labeled or identified the ISO 9001 information as "Confidential" or a "Trade Secret."  Material Facts ¶ 37.  Under the plain terms of Ms. Houle's compensation agreement, the "ISO 9001 information" did not constitute "Confidential Information," and by sending such non-confidential information to her personal email account, Ms. Houle was not in breach of the non-disclosure clause of the agreement.  Akira also admits that Conceptant did not need the ISO 9001 information to be awarded the FDA contract, and admits Conceptant's proposal to the FDA did not include any reference to the ISO 9001 information.  Id.  Akira further admits it has no evidence that Conceptant or NuCognition used or disclosed the ISO 9001 information to anyone.  Id.  Summary judgment on this portion of Count 8 should be entered for Ms. Houle.

Count 8 next alleges that Ms. Houle breached her compensation agreement "when she wrote a proposal for Conceptant wherein Akira Confidential Information was disclosed to the FDA for Conceptant's benefit."  FAC ¶ 253.  As with Count 7, this claim cannot withstand Akira's admissions that none of its so-called "software prototypes" were disclosed in Conceptant's proposal to the FDA; that Conceptant's proposal did not propose using any Akira software prototypes; that Ms. Houle did not "misappropriate" any of these so-called "prototypes" or disclose such "prototypes" to anyone outside of Akira, including the FDA; that such "prototypes" do not exist; that none of Akira's business development documents were disclosed in Conceptant's proposal to the FDA including the documents identified in the FAC; and Ms. Houle did not disclose such documents to anyone outside of Akira, including the FDA. Material Facts ¶¶ 23-36, 38-52, 54-55, 59.

Akira also admits that Ms. Houle did not disclose any Akira trade secrets in the Conceptant proposal to the FDA.  Id. ¶¶ 56-57, 60-61.  Nor is there any evidence that Ms. Houle disclosed to the FDA information that Akira specifically "labeled or identified as proprietary confidential information."  Ex. 32 at 3, ¶ 7(a).  Summary judgment on this portion of Count 8 should be entered for Ms. Houle.

Count 8 next alleges that "Ms. Houle breached the non-compete clause of the compensation agreement when she formed Conceptant, and through Conceptant competed with Akira for work at the FDA."  FAC ¶ 254.  Ms. Houle's forming of Conceptant (with Defendants Phipps and Mikhalchuk) in itself is not a breach of her non-compete.  See Williams v. Dominion Tech. Partners, LLC, 265 Va. 280, 289 (2002); Feddeman & Co. v. Langan Assocs., P.C., 260 Va. 35, 42 (2000).  Moreover, Akira admits that the employment agreements in this case did not prevent Defendants from forming their own companies.  Material Facts ¶ 77.

Akira also admits that Ms. Houle and Conceptant did not compete with it for work at the FDA. For starters, Akira admits it has no evidence that Ms. Houle and Conceptant competed with Akira *in any way*, including specific projects where Akira and Conceptant and Ms. Houle were in competition and bidding on the same project. Id. ¶ 75. Akira further admits it cannot identify any specific business opportunity that it was considering that Conceptant and Ms. Houle competed for or interfered with. Id.

Akira also admits that Conceptant and Ms. Houle did not compete for (or seek or bid for) the work Akira does for the FDA's Office of Regulatory Affairs. Id. ¶ 76. Akira further admits it had no contracts or business with the FDA's Office of the Commissioner or the Office of the Chief Scientist (for whom Conceptant performs its BAA work) during the time of Ms. Houle's employment with Akira. Id. ¶¶ 84-85. When asked to provide proof that it ever sought any business or contracts from either of these offices during the time of Ms. Houle's employment, Akira responded that it "has no responsive documents in its ownership or control," meaning, no proof. Id. ¶ 86.

Furthermore, given Akira's admissions that it did not operate in the BAA space from its inception as a company (2003) through the time of the 2016 BAA during which period Akira prepared and submitted hundreds of proposals, but not one in response to a BAA; Mr. Chennamaraja's and Mr. Liang demonstrable dislike for BAAs because they "take FOREVER" and represent low-win opportunities; the failure by Akira personnel to identify or track a single BAA in any of Akira's business development documents; the lack of any discussions of BAAs during business development meetings; Mr. Chennamaraja's inability to recall a single concrete BAA opportunity being brought to his attention during the time period of this case; and Akira passing up specific BAA opportunities, like the one with the University of Michigan in 2012,

36

and the 2013, 2014, 2015, 2016, and 2017 BAAs issued by the FDA (Material Facts ¶¶ 7-9, 12-13) – given all these admissions, it cannot rationally be concluded that Conceptant and Ms. Houle, by pursuing the 2016 BAA, were engaged in "work that is the same or similar to that of Akira." Ex. 32 at 4, ¶ 10(a).

Stated otherwise, Akira cannot credibly claim that Conceptant and Ms. Houle were "in competition" with it in "a portion of the world [BAAs] in which [Akira] does not operate" and does not "actually engage in." Lampman, 319 Fed. Appx at 302; Shaffer, 282 Va. at 416; see also Material Facts ¶¶ 75, 87 (Akira twice admitting it has no evidence that Ms. Houle competed with it). Summary judgment should be entered for Ms. Houle on this portion of Count 8.[5]

Lastly, Count 8 alleges that Ms. Houle breached her compensation agreement by "depriv[ing] Akira of at least one and likely more opportunities to contract with FDA and other federal agencies, opportunities that went to Conceptant instead." FAC ¶ 255. As stated, the only conceivable opportunity ¶ 255 could be referring to is the 2016 BAA. As with Mr. Phipps, the record shows Ms. Houle did not deprive Akira of anything. Akira's CEO and owner Mr. Chennamaraja learned of the 2016 BAA on his own and independently decided to forego the opportunity. Material Facts ¶¶ 63-65. If anyone "deprived" Akira of the 2016 BAA, it was Mr. Chennamaraja. Summary judgment on this portion of Count 8 should be entered for Ms. Houle.

For the reasons stated, summary judgment should be entered for Ms. Houle on Count 8 in its entirety.

## CONCLUSION

For the reasons stated above, summary judgment should be entered for Defendants Phipps, Houle, and Mikhalchuk on all Counts in the First Amended Complaint.

---

[5] While there is a serious issue of whether the non-compete in Ex. 32 is valid and enforceable under Virginia law, the Court need not address this issue head-on given Akira's admissions which dispose of Count 8 even if the non-compete were found valid and enforceable.

March 8, 2018                          Respectfully submitted,


                                       ____/s/_____
                                       Elaine Charlson Bredehoft
                                       Virginia Bar No. 23766
                                       ecb@cbcblaw.com
                                       Peter C. Cohen
                                       Virginia Bar No. 66346
                                       pcohen@cbcblaw.com
                                       CHARLSON BREDEHOFT
                                         COHEN & BROWN, P.C.
                                       11260 Roger Bacon Drive, Suite 201
                                       Reston, Virginia 20190
                                       (703) 318-6800 Telephone
                                       (703) 318-6808 Facsimile

                                       *Counsel for Defendants, Joshua Phipps,*
                                         *Andrey Mikhalchuk, and Lisa Houle and*
                                         *Counter-Plaintiffs, Joshua Phipps and*
                                         *Andrey Mikhalchuk*

## CERTIFICATE OF SERVICE

        I hereby certify that on the 8th day of March, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

                        Christopher R. Shiplett
                        Virginia Bar No. 74210
                        chris.shiplett@randolphlaw.com
                        RANDOLPH LAW, PLLC
                        252 N Washington Street
                        Falls Church, Virginia 22046
                        (703) 652-3039 Telephone
                        (703) 852-3976 Facsimile

                        *Counsel for Plaintiff,*
                          *Akira Technologies, Inc.*


                        ____/s/_____
                        Peter C. Cohen
                        Virginia Bar No. 66346
                        pcohen@cbcblaw.com
                        CHARLSON BREDEHOFT

                                    38

COHEN & BROWN, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
(703) 318-6808 Facsimile

*Counsel for Defendants, Joshua Phipps,
Andrey Mikhalchuk, and Lisa Houle and
Counter-Plaintiffs, Joshua Phipps and
Andrey Mikhalchuk*

39