**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

AKIRA TECHNOLOGIES, INC.,

        Plaintiff,

   v.

CONCEPTANT, INC., *et al.*

        Defendants.

Civil Action No. 1:17cv00412 (LO/IDD)

---

**MEMORANDUM IN SUPPORT OF PLAINTIFF/COUNTER-DEFENDANT,
AKIRA TECHNOLOGIES, INC.'S, MOTION FOR SUMMARY JUDGMENT ON ITS
CLAIMS AND PARTIAL SUMMARY JUDGMENT ON THE COUNTERCLAIMS**

For a period of three years, from November 2013, through November 2016, Josh Phipps ("Phipps"), Akira's Director, Healthcare IT, secretly planned to begin a competing company and gain work for that company from Akira's primary services client, the U.S. Food and Drug Administration (the "FDA"). Phipps, and fellow Akira employees he enlisted as co-conspirators, began a company, Chiron Solutions, Inc. ("Chiron"), and attempted to compete with Akira through that company. When that didn't work, Phipps, and his conspirators Andrey Mikhalchuk ("Mikhalchuk"), Akira's Chief Architect, and Lisa Houle ("Houle"), Akira's Project Manager for its FDA contract, the FDA ORA BIT support contract, closed down Chiron and opened another company, Conceptant, Inc. ("Conceptant"), which submitted a proposal to the FDA for software development work, and was awarded a contract for that work. Phipps, Houle, and Mikhalchuk worked concurrently for Akira and Conceptant from September 2016, through November 2016.

After the FDA made its first payment to Conceptant, Phipps, Houle, and Mikhalchuk resigned from Akira.

Akira Technologies, Inc. submits a motion for summary judgment in this matter. Akira seeks summary judgment on each of its remaining claims against each of the remaining defendants, as follows: (i) Count IV: breach of the duty of loyalty against Phipps, Houle, and Mikhalchuk; (ii) Counts V and VI: statutory and common law conspiracy against Phipps, Houle, and Mikhalchuk; (iii) Count VII: breach of contract against Phipps; (iv) and Count VIII: breach of contract against Houle. Akira further seeks summary judgment on its request for punitive damages, with the amount of the award to be determined. Akira further requests partial summary judgment on the counter claims in the issue, specifically summary judgment on Phipps' claims for a sales bonus, on Phipps' and Mikhalchuk's claims for a performance bonus, and on Mikhalchuk's claim for a sales bonus related to the DLA Web Services Contract. Akira avers that there are no material disputes of fact on any of the items Akira raises here and that it is entitled to judgment as a matter of law on each of these items.

## STATEMENT OF UNDISPUTED FACTS

### *Akira's Founding and Akira's Business Generally*

1.      Akira was formed in May 2003 by its Chief Executive Officer and Chairman of the Board, Srinivas Chennamaraja. Mr. Chennamaraja has always been sole owner and board member of Akira.  (February 9, 2018, Deposition of Srinivas Chennamaraja, 8:13-8:19, 9:2-9:3, 9:9-9:14) ("Chennamaraja Dep.").

2.      While Akira did not start as a federal contractor, it began to focus on the federal sector after securing an 8(a) certification in 2006, and in 2007, began performing subcontracting work. (Id. 17:6-17:16).

2

3.      In the summer 2011, Akira hired Eli Liang as a Chief Operating Officer. Mr. Liang was the second Akira employee hired after Mr. Chennamaraja. (February 6, 2018, Deposition of Eli Liang, 8:9-9:4, 11:10-11:13, 19:6-19:8) ("Liang Dep.").

4.      As the COO of Akira, Mr. Liang was in charge of the company's business development, which included reorganizing the company and structuring it for bidding on government business. (Liang Dep. 9:9-9:15,10:22-11:11).

5.      In 2011, when it hired Mr. Liang, Akira was still a very small 8(a), minority owned company, focused on partnering with other companies in a role of a subcontractor, and targeting small business set-aside contracts reserved by the federal agencies for qualifying businesses. (Chennamaraja Dep. 11:10-11:19, 13:10-14:5).

6.      Over the years, as Akira built its past performance, it hired business development people, including writers and capture managers, to go after other small business opportunities and competitive proposals. (Id. 12:6-13:6).

7.      A capture manager is an equivalent of a salesperson whose goal is to perform background work before the Request for Proposal from an agency comes out. A capture manager's duties in leading capture will include having a meeting with the customer to introduce the company, describe its capabilities, and see how the company can perform the job. (Id. 242:20-243:5).

8.      The majority of capture work is upfront work, meaning work done prior to the release of a Request for Proposals. Once a Request for Proposal is released, the person who is leading the capture will "hand it over to the proposal people to write the proposal." As a result, proposal writing is not part of the capture process, but rather part of the proposal development process. (Id. 241:21-242:4, 244:10-244:14, 245:4-245:5).

9.     In 2011, Akira won its first contract as a prime contractor to the federal government, the Business and Information Technology support contract for the U.S. Food and Drug Administration, Office of Regulatory Affairs ("FDA ORA BIT"). At times since then, over 50% of Akira's services employees have been stationed at the FDA. (Id. 18:4-18:18), (Liang Dep. 42:16-42:18).

10.    As part of its initial duties under the FDA ORA BIT contract, Akira was responsible for directly supporting the ORA's Information Technology architecture and infrastructure architecture, by performing programming support for the ORA, although once it started performing services for the ORA, there were other tasks it took care of. (Chennamaraja Dep. 19:19-20:17).

### *Akira Hires Josh Phipps*

11.    On September 26, 2011, Akira hired Joshua Phipps to dual positions as both Lead Systems Architect for the FDA ORA BIT support contract and as Director, Healthcare Technology at Akira. Akira hired Phipps because he was "a senior technology leader with 15+ years experience in enterprise solutions, enterprise technology management, and systems development for the health care, nonprofit, government, financial services and insurance industries" and had experience working as an enterprise, business and solutions architect. (Ex. 1, p.2), (Ex. 20, p.1).

12.    As Lead Systems Architect, Phipps worked with the ORA staff "to best help them implement their IT solutions." Phipps worked as a Lead Systems Architect for the ORA project until his resignation. (February 2, 2018, Deposition of Joshua Phipps, 12:18-12:20, 32:2-32:6) ("Phipps Dep.).

13.     In his capacity as Director, Healthcare Technology, Phipps was tasked with "helping to bring new ideas and potential opportunities to Akira in the healthcare field." It was Phipps' job to make the healthcare practice grow. (Id. 13:3-13:6) (Liang Dep. 46:5-46:9).

14.     Being a small company, Akira relied heavily on employees' finding and bringing business opportunities within the government sector, and while Akira did not specifically require any one employee to look for business opportunities, it created lucrative compensation provisions in the employment agreements of high-level employees in order to invite them to bring work. (Id. 44:15-45:8) (Ex. 1, p.3).

15.     Section 3, Compensation, of the Joshua Phipps' At-Will Employment Agreement contained the following terms:

> "The Employee shall be paid a sales bonus of 2.5% of total contract value of any contracts resulting from any prospective customer the Employee led capture for and a 1% bonus for contracts which the Employer wins as a result of the Employee's substantial involvement in the capture process although the Employee had not led capture (these bonuses will be paid out twice a year but based on contract value accrual to the Employer)."
> (Id.).

16.     Furthermore, Phipps was to be awarded a bonus for excellent work for a specific customer, based on that customer's feedback: "The Employee will be paid an annual performance bonus of $25,000 based on customer feedback solicited on the Employee's performance on the contracts to which the Employee is assigned." (Id.).

17.     As a result, Phipps was both expected to find new opportunities for Akira and incentivized to do so. (Id. 13:3-13:6) (Liang Dep. 44:16-44:17).

18.     As Director, Healthcare Technology, it was Phipps' job to decide whether Akira pursued or did not pursue a particular business opportunity, whether it was an opportunity Phipps had identified, or someone else within Akira had identified, and Akira's senior management

5

deferred to Phipps regarding whether Akira should pursue certain business opportunities. (Ex. 8, pp.2-4).

19.     During his employment with Akira and until his resignation, Phipps worked primarily for offices within the Food and Drug Administration, including the ORA, the Center for Biologics Evaluation and Research ("CBER") and the Center for Food Safety and Applied Nutrition ("CFSAN"). (December 18, 2017, Josh Phipps' Interrogatory Responses, pp.11-12) ("Phipps ROG Responses").

### *Akira Hires Andrey Mikhalchuk*

20.     On October 3, 2012, Akira hired Mikhalchuk as an SOA Architect (Chief Architect) to perform work on the Department of Commerce Census Bureau contract. Mikhalchuk was known to Mr. Liang, because Mr. Liang had assisted him personally in the past in finding jobs and in receiving an H-1B visa to the United States (Ex. 5, p.2), (Ex. 38, p.1), (Liang Dep. 198:4-198:21, 199:2-199:16).

21.     Chief Architect is the most senior technical position within Akira, and as part of his job duties, Mikhalchuk created software and hardware solutions to clients' problems. (February 1, 2018, Deposition of Andrey Mikhalchuk, 91:19-91:20) ("Mikhalchuk Dep.").

22.     Section 3, Compensation, of the Andrey Mikhalchuk's At-Will Employment Agreement contained the following terms:

> "The Employee shall be paid a sales bonus of 2.5% of total contract value of any contracts resulting from any prospective customer the Employee led capture for if this customer is not the Census or any organizational units within Census; and c. a 1% bonus for contracts which the Employer wins as a result of the Employee's substantial involvement in the capture process although the Employee had not led capture."
> (Id.).

23.     Furthermore, Mikhalchuk was to be rewarded for high quality work for customers based on customer feedback: "The Employee will be paid an annual performance bonus of $25,000 based on customer feedback solicited on the Employee's performance on the contracts to which the Employee is assigned." (Id.).

### *Akira Hires Lisa Houle*

24.     On October 13, 2011, Akira hired Houle as a Project Coordinator to perform work on the FDA ORA BIT support contract; including managing schedules, taking meeting minutes, and assisting with the administration of onboarding of new employees. (January 31, 2018, Deposition of Lisa Houle, 22:19-23:2), (Ex. 2, p.2).

25.     On November 10, 2012, in consideration for an increase in her compensation, Houle signed another compensation agreement, and on January 12, 2015, in consideration for an increase in her compensation, Houle signed another compensation agreement. (Ex. 3, p.2), (Ex. 4, p.2).

26.     Section 10, Noncompetition, of Houle's January 12, 2015, At-Will Employment Agreement reads: "Employees shall not, while employed full-time by Akira, acquire any financial interest in, or perform services for as employee, consultant, independent contractor, volunteer, principal or otherwise, any other entity or person doing work that is the same or similar to that of Akira." (Id.).

27.     During her employment with Akira, Houle worked primarily for offices within the Food and Drug Administration, including the ORA office and the CBER office. (December 18, 2017, Lisa Houle's Interrogatory Responses, pp.11-13) ("Houle ROG Responses").

*__Phipps, Houle, and Mikhalchuk Plan and Form A Series Of Government Contracting Businesses Specializing In Healthcare Technology__*

28.     Josh Phipps first expressed his desire to create his own business to Lisa Houle in September 2014, stating in a chat with her "i think it may be time to work with Mark S and get his 8a and we run our own company." (Ex. 24, p.1).

29.     His plan at that point appears to have been to (i) begin an 8(a) firm or some other small business firm with Michael Sieg, Akira's ISO 9000 consultant; (ii) solicit Akira's Contracting Officer's Representative at FDA, Yimam Kelemework; and (iii) have her direct an award of a contract to Phipps' new company. (Id. pp.1-2).

30.     Houle was concerned about the cost of starting up a new company, writing "...what a great idea, but it's so hard to startup a new company...just the seed money alone is a killer...." (Ex. 24, p.2).

31.     Phipps believed that seeking a directed award from Akira's client point of contact at FDA, Yimam Kelemework (known as "Kele") could alleviate the financial difficulty inherent in starting up a new company, writing in response to Houle's concerns: " i am hoping to get a directed award to get the start up...get Kele to give us something directly." (Id.).

32.     Phipps was keen to start his own company, and Houle was as well. Phipps wrote: "I'm tired of all these bozos where we are...We will have to see. But I'm opening up more options everyday. The more I hear the less entertained about where I am and where we are", and Houle responded: "Ditto! Take me with you...please! i want away from this madness!" (Id. p.3).

33.     At some point between that 2013 conversation and March, 2015, Phipps recruited Akira employees Shannon Munley, Andrey Mikhalchuk, and David Wood into his plan to form a new company. Phipps Dep., 252:4-252:13; Mikhalchuk Dep., 66:7-66:13.

34.     In March, 2015, Phipps and Mikhalchuk formed Chiron Solutions, Inc. with Shannon Munley and David Wood. Software products were its primary focus. Ex. 6, pp.2-3, Ex. 10, Mikhalchuk Dep., 66:19-67:3.

35.     Shannon Munley was an Akira employee at the time she was recruited, as were Mikhalchuk and David Wood. (Mikhalchuk Dep. 67:7-9, 67:10-12), (Ex. 5, p.2).

36.     Shortly after starting Chiron, Phipps sent a presentation of Chiron's capabilities to Akira's Contracting Officer's Representative at the FDA, Yimam Kelemework.  The presentation was for Ms. Kelemework to present to her boss at OIMT within the FDA, Corey (who's last name Phipps cannot remember). (Ex. 9, p.2), (Ex. 10), (Phipps Dep. 259:5-259:22).

37.     OIMT is an office within the FDA that was within Phipps' purview as Akira's Director, Healthcare IT. Phipps wrote in an April 2015 email regarding his business development efforts that "I can start walking the halls at oimt more for sure." (Ex. 17, p.1).

38.     OIMT was also the office within the FDA to which Phipps, Houle, and Mikhalchuk's later company Conceptant, delivered its services. (Ex. 40, p.1, box 11).

39.     The Chiron presentation to the FDA OIMT described a number of software solutions Chiron could offer to the FDA. (Ex. 10).

40.     Between March, 2015 and June, 2016, Chiron sought work from the U.S. Government customers and commercial customers but was unsuccessful. For example, in November 2015, Phipps communicated with the U.S. Customs and Border Patrol, an Akira client, seeking information on a CBP software program for Chiron to work on. Phipps forwarded the CBP's response to Andrey Mikhalchuk, who was a shareholder of Chiron, and also to Lisa Houle, who was not a member of Chiron. (Houle Dep., 154:1-156:13), (Ex. 7, pp.2-3).

***Phipps Discovers the FDA BAA and Phipps, Houle, and Mikhalchuk Decide To Pursue It***

9

41.     Sometime in 2016, Phipps came across an FDA Broad Agency Announcement ("BAA") number FDABAA-16-00122. (Ex. 12).

42.     The BAA Phipps had found anticipated multiple awards and solicited proposals in multiple areas, including the technology area "Harness Diverse Data through Information Sciences to Improve Health Outcomes" (Id.)

***Phipps Was Obligated to Bring the FDA BAA to Akira's Attention Rather Than Pursue it on His Own Account***

43.     Phipps through his position with Akira knew or should have known at the time he sought out the BAA that the FDA was Akira's largest client and that Akira performed the majority of its government contracting work for the FDA. (Phipps Dep. 13:3-13:6).

44.     Furthermore, Phipps understood that he had a specific duty to bring "potential opportunities to Akira in the healthcare field" and to make Akira's health practice grow. (Phipps Dep. 13:3-13:6), (Liang Dep. 46:5-46:9).

45.     Rather than share this opportunity with Akira and grow its healthcare practice, Phipps hid the BAA from his employer, shared it with Mikhalchuk and Houle – Conceptant shareholders, subsequently deciding that it would be a good idea for Conceptant to respond to the BAA, and moved forward with creating the BAA proposal. (Phipps Dep. 278:6-278:17).

46.     Akira treats BAAs just like any other contract by looking at the content of the solicitation and whether the company can respond. (Liang Dep. 160:19-161:3).

47.     In 2017, Akira submitted two BAAs for the Naval Air Command, and Akira had pursued BAAs in the past, where it had begun the proposal process, but ultimately did not decide to submit the proposal because "we didn't think we would win." (Id. 57:17-58:8, 58:19-58:21).

48.     Akira has always wanted to pursue BAAs for which it had the particular skills, "which were custom made for us." (Id. 64:8-64:20).

49.     In defense of his actions in not bringing the FDA BAA to Akira's attention, Phipps insists that it was not his responsibility to bring BAA opportunities to Akira because: (a) in 2012 he was told by Akira President, Mr. Liang, that "these take forever"; and (b) in 2013 when he brought one to Akira CEO, Mr. Chennamaraja, "nothing came of them, and they never came up anywhere else." (Phipps Dep. 243:9-244:3).

50.     In 2013, Akira employed "more than 10" but "less than 20" people, while in 2016, Akira employed "between 40 and 50" people. (Josh Phipps Dep. 249:22-250:9).

***In Spite of Their Obligation to Akira, Phipps, Houle, and Mikhalchuk Decide to Submit a Proposal on Behalf of Their New Company, Conceptant***

51.     The FDA BAA was not the only opportunity Phipps identified for Conceptant. On June 26, 2016, Phipps emailed Yimam Kelemework regarding possibilities for "KM" and "UMLS taxonomy," writing: "Here is the first of a few documents on KM. This is an approach to use UMLS taxonomy and tools…This is the approach I used for HHS ASPE last year." (Ex. 31, p. 1), (Ex. 30).

52.     The "approach I used for HHS ASPE last year" refers to a proposal Akira submitted and won for the Office of the Assistant Secretary for Planning and Evaluation ("ASPE") office within the U.S. Department of Health and Human Services ("HHS"). Akira proposed a specific approach to a search taxonomy within that proposal and marked that proposal confidential. Phipps' Conceptant's presentation, admittedly cribbed from Akira work, doesn't even bother to remove the reference to the ASPE organization, Akira's client, from the presentation (see, for example, page 3). (Ex. 30, p. 3), (Ex. 44).

53.     Akira marked it's USDA ASPE proposal confidential. (Ex. 44, p.1) (the "Confidential" markings at the top and the bottom of the pages are from production in this

litigation, the confidential indicator from Akira in the document is the block text below the signature line).

54.     In June, 2016, in rapid succession, Phipps, Mikhalchuk, and Houle met several times to plan to: (i) shut  down Chiron – or change Chiron's name; (ii) start up a new company, Conceptant; and (iii) start up a second new company, NuCognition, Inc. ("NuCognition"), which was partially owned by Conceptant and partially owned by an outside investor. (Ex. 11, pp.2-3).

55.     Phipps, Houle, and Mikhalchuk met several times to plan the new company, and prepared at least one detailed list of the company startup tasks. (Ex. 32), (Ex. 33), (Ex. 39), (Ex. 13).

56.     As part of the plan, and as a change of direction from the initial plan for Chiron, Phipps, Mikhalchuk, and Houle decided that the best point of entry into FDA work was through submitting a proposal in response to the BAA Phipps had found. (Ex. 11).

57.     Phipps reached out to Akira's proposal editor, Amy Grossman, to help edit Conceptant's BAA proposal; Ms. Grossman was not an employee of Akira but was a regular contractor to Akira. (Chennamaraja Dep. 153:4-155:20), (Houle Dep. 178:3-178:20).

58.     Phipps, Mikhalchuk, and Houle also recruited Akira's former accountant, Kristopher Garringer, to assist them with drafting the cost proposal for the BAA. (Houle Dep. 177:17-178:2).

59.     As part of Conceptant's FDA BAA proposal, the three conspirators were required to state what "past performance" Conceptant the company had, meaning what "references" in terms of contracts awarded and completed successfully, Conceptant could offer to demonstrate its ability to complete the FDA BAA work successfully. Conceptant the company had only been in existence at that point for a month and had no past performance. The conspirators, therefore,

inserted past performance that Phipps, Houle, and Mikhalchuk had gained from working on Akira projects into the Conceptant proposal. (Houle Dep., 142:11-143:8), (Ex. 37, p. 59-62).

60.     Perhaps realizing that asserting another company's past performance as their own was at best mildly deceptive, the conspirators alerted the Contracting Officer at the FDA to whom they submitted Conceptant's proposal that the claimed Conceptant past performance was in fact individual past performance of the employees, obtained while they were working for a company other than Conceptant (that company being Akira). (Ex. 34).

61.     In the proposal, Conceptant also claimed that Phipps was a Medical Doctor, having graduated with an M.D. from the University of Pittsburgh School of Medicine in 1995. Conceptant further claimed that Phipps, Conceptant's "main subject matter expert" has a "medical degree and has worked in the healthcare space for over 25 years." (Ex. 35, p. 46), (Ex. 36, pp.7, 55), (Ex. 37, pp.8, 69).

62.     Phipps is not a Medical Doctor. He did not graduate from the University of Pittsburgh School of Medicine, and had not received an M.D. Phipps applied to the University of Pittsburgh School of Medicine and was accepted, but chose not to attend. The highest degree Phipps obtained was a bachelor's degree. (Phipps Dep. 74:21-75:11, 76:12-77:3).

### *Akira Discovers the FDA BAA Draft Proposal*

63.     In July 2016, Mr. Chennamaraja came across an email from Any Grossman to Josh Phipps at Phipps' Akira email address, attaching a draft copy of the Conceptant BAA proposal. (Chennamaraja Dep. 153:18-153:22).

64.     After discovering the draft proposal, Mr. Chennamaraja met with each of Phipps, Mikhalchuk and Houle to discuss the issue. (Id. 164:20-168:10, 174:7-175:15).

65.     During the meeting with Josh Phipps, Phipps admitted that he worked on the proposal with the help of Amy Grossman, and said that in hindsight, he shouldn't have started this, blaming stress and personal issues, said that he did not submit the proposal, and promised that it will never happen again. (Id. 165:6-165:19).

66.     During their meeting regarding Conceptant, "Mr. Phipps committed to Mr. Chennamaraja that he was dedicated to growing Akira and continuing to drive the quality of the ORA project that he was full time dedicated to." Later in the conversation, "Mr. Chennamaraja reiterated that he wanted to grow Akira and the [sic] Mr. Phipps was a part of making that happen. Mr. Phipps agreed and reaffirmed that he would continue to grow Akira." (December 18, 2017, Joshua Phipps Interrogatory Responses, pp. 22, 23) ("Phipps Rog Responses").

67.     After having a face-to-face conversation with Mr. Chennamaraja, Eli Liang proposed that Phipps be immediately fired. (Liang Dep. 157:8-157:11).

68.     During the meeting with Andrey Mikhalchuk, Mikhalchuk acknowledged Conceptant, saying that he was also a part of the company, which is a small gig on the side, and that he also helped with architecture. Unknown to Mr. Chennamaraja, Mikhalchuk recorded the meeting. (Mikhalchuk Dep. 177:14-178:2, 181:9-181:11, 1812:12-182:13).

69.     Furthermore, Mikhalchuk acknowledged that the decision to submit the bid for the BAA opportunity was made before the conversation and also lied to Mr. Chennamaraja by saying that "I don't think this will go anywhere." (Id. 184:1-184:3, 193:20-193:22).

70.     During the conversation, Mr. Chennamaraja promised Mikhalchuk long term employment at Akira because he was a good engineer. (Chennamaraja Dep. 173:12-173:20).

71.     Mr. Chennamaraja followed-up the conversation with Mikhalchuk by sending him an email asking that he recuse himself from the proposal. (Id. 167:17-167:22).

72.     During the meeting with Lisa Houle, Houle did not see an issue going after the BAA proposal, having discussed her employment agreement with her husband, who advised her that she can "go after proposals all day long." (Id. 174:7-174:14).

73.     Houle told Mr. Chennamaraja that she looked at her contract and there was nothing prohibiting her in her contract from being able to do it, because it's in a completely different area, doing completely different work, and she felt that it was okay to do it. (Houle Dep. 207:18-208:4).

74.     Houle also told Mr. Chennamaraja that it is a BAA and Akira does not go after BAA's; there is no evidence that Mr. Chennamaraja and Houle ever discussed BAAs or anything in terms of the work Akira goes after prior to that statement by Houle. (Chennamaraja Dep. 175:7-175:15).

75.     It did not matter to Akira whether it was called a BAA or something else, if one of Akira's customers or one of the people that it knew brought it to Akira's attention and said how Akira could actually win it, the company would have submitted a proposal, regardless of the label. (Liang Dep. 167:7-167:13).

### *Phipps, Houle, and Mikhalchuk Do Not Withdraw the Conceptant FDA BAA Proposal and Are Awarded a Contract with the FDA*

76.     Phipps, Houle, and Mikhalchuk did not withdraw the FDA BAA Proposal. Conceptant's proposal was accepted, Conceptant was awarded a contract with the FDA for the work, and Phipps, Houle, and Mikhalchuk began work for the FDA in September 2016, while they were still employees of Akira working on Akira's FDA project. (Ex. 40, p.1), (Houle Dep. 16:9-16:11, 179:15-179:17), (Phipps Dep. 10:17-10:19, 293:15-293:19), (Mikhalchuk Dep. 57:11-57:12).

77.     In November 2016, Conceptant received its first payment from the FDA. (Ex. 41).

78.     Throughout their employment by Akira, Phipps and Houle carried on a series of written chat conversations and emails wherein they repeatedly disparaged Akira and Akira's senior management, and expressed their intense dislike for Akira and for its senior management, calling them among other things: "two faced," a "total nut job" "passive aggressive," "pussy whipped," "[not] worth shit," "a fucking Ass" and stating that Akira needed to, among other things "tell that little ass to fuckoff and treat me right," and that the way Akira treats Houle "frosts [her] ass." (Ex. 26), (Ex. 21), (Ex. 22), (Ex. 25), (Ex. 14), (Ex. 16), (Ex. 18), (Ex. 15).

79.     Nevertheless, Phipps, Houle, and Mikhalchuk continued to work for Akira until shortly after the FDA made its first payment to Conceptant, after which each of the them resigned from Akira in rapid succession. (Houle Dep. 16:9-16:11, 179:15-179:17), (Phipps Dep. 10:17-10:19, 293:15-293:19), (Mikhalchuk Dep. 57:11-57:12).

## STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure a grant of summary judgment is appropriate if the record shows that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(a)*; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Evans v. Techs. Apps. & Serv. Co.,* 80 F.3d 954, 958–59 (4th Cir.1996) (citations omitted). The party seeking summary judgment has the initial burden of showing the absence of a material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The "movant need not negate his opponent's case; he need only disclose the absence of evidence to support that case." *Otto Wolff Handelsgesellschaft, mbH v. Sheridan Transp*., 800 F. Supp. 1359, 1361 (E.D. Va. 1992) (citations omitted).

16

Once a motion for summary judgment is properly made and supported, the opposing party must come forward and show that a genuine dispute exists. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party opposing summary judgment may not rest upon mere allegations or denials. *E. W., LLC v. Rahman*, 896 F. Supp. 2d 488, 495-96 (E.D. Va. 2012). Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505 (quotation omitted). In deciding a summary judgment motion, the Court must view the record as a whole and in the light most favorable to the nonmovant. *Terry's Floor Fashions, Inc. v. Burlington Indus., Inc*., 763 F.2d 604, 610 (4th Cir. 1985).

Akira Technologies, Inc., is entitled to summary judgment as a matter of law on its claims, on its request for an award of punitive damages, and on Phipps' and Mikhalchuk's contract-based counterclaims. Therefore, Akira respectfully requests that the court grant this motion for summary judgment on all of the above enumerated items.

## ARGUMENT

Akira addresses each of its claims in turn: that Phipps, Mikhalchuk, and Houle owed it a duty of loyalty and breached that duty of loyalty; that Phipps, Mikhalchuk, and Houle conspired to cause each to breach their duty of loyalty to Akira, and that Phipps breached his compensation agreement (the "Phipps Agreement") with Akira and that Houle breached her compensation agreement (the "Houle Agreement") with Akira. Akira then addresses the appropriateness of punitive damages against the conspirators. Phipps and Mikhalchuk have in the matter filed certain counterclaims, and Akira addresses each of their counterclaims in turn.

### A.    Phipps, Mikhalchuk, and Houle Each Owed and Breached a Duty of Loyalty to Akira

Josh Phipps, Andrey Mikhalchuk, and Lisa Houle were each management employees of Akira Technologies during the time that the actions which give rise to Akira's claim took place. As employees and in particular as management employees, they each owed a duty of loyalty to Akira. Each of Phipps, Mikhalchuk, and Houle took actions which breached that duty of loyalty they owed Akira.

To establish a breach of a duty of loyalty, a plaintiff must show that the defendant: (i) owe the plaintiff a duty; (ii) breached that duty; and (iii) that the breach damaged the plaintiff. *Contract Assocs., Inc. v. Atalay*, No. 1:14-CV-882, 2015 WL 1649051, at *3 (E.D. Va. Apr. 10, 2015) (J. O'Grady) (*citing Cartensen v. Chrisland Corp.*, 442 S.E.2d 660 (Va. 1994)). In Virginia, an at-will employee owes his or her employer a fiduciary duty of loyalty during his or her employment. *Williams v. Dominion Tech. Partners, L.L.C.*, 576 S.E.2d 752, 757 (Va. 2003). "Subsumed within this general duty is the more specific duty that the employee not compete with his or her employer during the employment." *Id*.

While an employee has the right to make arrangements to compete with an employer, the right to make arrangements to compete is not absolute, meaning the acts that constitute "making arrangements" cannot rise to the level of actual competition. *Feddeman & Co., C.P.A., P.C. v. Langan Assocs., P.C.*, 530 S.E.2d 668, 672 (Va. 2000). Whether a specific act or set of acts rises to the level of a breach of the duty of loyalty must be analyzed on a case-by-case basis. *Id.* However, certain acts clearly constitute a breach of the duty of loyalty an employee owes an employer. These acts include, but are not limited to, soliciting the employer's other employees during employment, soliciting an employer's clients during employment, and misusing confidential information obtained during employment. *Id.*; *see also Appleton v. Bondurant & Appleton, P.C.*, 68 Va. Cir. 208, 19 (2005) (same); *Williams v. Dominion Tech. Partners, LLC*,

18

265 Va. 280, 291, 576 S.E.2d 752 (2003) (same); *Contract Assocs., Inc.*, 2015 WL 1649051, at *3 (same).

### 1.   Phipps, Mikhalchuk, and Houle Each Owed A Duty of Loyalty To Akira

Each of Phipps, Mikhalchuk, and Houle owed a duty of loyalty to Akira. Phipps was an at-will employee of Akira and held a series of senior management positions, including Chief Information Officer and Director, Healthcare Technology. (Phipps Dep. 12:18-12:20). As Director, Healthcare Technology, Phipps, in his own words was tasked with "helping to bring new ideas and potential opportunities to Akira in the healthcare field." (Id. 13:3-13:6). Phipps kept a running list of Akira opportunities for which he was responsible. (Ex. 8, pp.2-4). Mikhalchuk was an at-will employee of Akira and held a senior technical position, as Chief Architect, the highest technical position at Akira. (Mikhalchuk Dep. 91:19-91:20). Houle was an at-will employee of Akira and was the project manager for Akira's ORA BIT software development contract with the FDA when she left the company. (Houle Dep. 22:19-23:2).

As at-will employees of Akira, Phipps, Mikhalchuk, and Houle each owed a duty of loyalty to Akira. Phipps, as a senior manager at Akira, in charge of Akira's Healthcare IT business, was expressly charged with bringing "potential opportunities" as well as "new ideas" to Akira.

### 2.   Phipps, Mikhalchuk, and Houle Each Breached That Duty of Loyalty to Akira

Josh Phipps first expressed his desire to create his own business to Lisa Houle in November, 2013. Ex. 24, p.1 ("i think it may be time to work with Mark S and get his 8a and we run our own company"). His plan at that point appears to have been to (i) begin an 8(a) firm or some other small business firm with Michael Sieg, Akira's ISO 9000 consultant; (ii) solicit Akira's Contracting Officer's Representative at FDA, Yimam Kelemework; and (iii) have her direct an award of a contract to Phipps' new company. (Id. pp.1-2).

19

Houle was concerned about the cost of starting up a new company. Ex. 24, p.2 (Houle:"…what a great idea, but it's so hard to startup a new company…just the seed money alone is a killer…I just don't see where the startup money would come from…I don't have it…we're still digging out of debt…not sure about your situation, but I don't think you're rolling in money…that's the only obstacle that I can see."). Phipps believed that seeking a directed award from Akira's client at FDA, Yimam Kelemework (known as "Kele") could alleviate the financial difficulty inherent in starting up a new company. Id (Phipps: " i am hoping to get a directed award to get the start up…get Kele to give us something directly"). Phipps was keen to start his own company, and Houle was as well. *Id.* , p.3 (Phipps: "I'm tired of all these bozos where we are…We will have to see. But I'm opening up more options everyday. The more I hear the less entertained about where I am and where we are." Houle: "Ditto! Take me with you…please! i want away from this madness!").

At some point between that 2013 conversation and March, 2015, Phipps recruited Akira employees Shannon Munley, Mikhalchuk, and David Wood into his plan to form a new company. (Phipps Dep., 252:4-252:13); (Mikhalchuk Dep., 66:7-66:13). Shannon Munley was an Akira employee at the time she began with Chiron. (Mikhalchuk Dep. 67:10-12). Andrey Mikhalchuk was an Akira employee, he worked for Akira as a Chief Architect. (Ex. 5, p.2). David Wood was an Akira employee. (Mikhalchuk Dep. 67:7-9).

In March, 2015, Phipps and Mikhalchuk formed Chiron with Shannon Munley and David Wood. (Ex. 6, pp.2-3). Software products were the primary focus of Chiron. (Mikhalchuk Dep. 66:19-67:3). Shortly thereafter, Phipps sent a presentation of Chiron's capabilities to Akira's Contracting Officer's Representative at the FDA, Yimam Kelemework. (Ex. 9, p. 2), (Ex. 10). The presentation was for Ms. Kelemework to present to her boss at OIMT within the FDA, Corey

(who's last name was Phipps cannot remember). (Phipps Dep. 259:5-259:22). OIMT is an office within the FDA that was within Phipps' purview as Akira's Director, Healthcare IT. (Ex. 17, p.1) ("I can start walking the halls at oimt more for sure."). It was also the office to which the later company Conceptant delivered its services. (Ex. 40, p.1, box 11) ("Ship to…FDA/OO/**OIMT**/OIM") (emphasis added). The presentation described a host of software solutions Chiron would offer to the FDA. (Ex. 10).  Phipps sought a meeting with Yimam Kelemework's boss, at the Office of Innovation Management and Technology within the FDA. (Phipps Dep. 259:5-259:22).

Between March 2015 and June 2016, Chiron sought work from U.S. Government customers and commercial customers, but was unsuccessful. (Houle Dep. 154:1-156:13). For example, in November 2015, Phipps communicated with the U.S. Customs and Border Patrol, an Akira client, seeking information on a CBP software program for Chiron to work on. (Ex. 7, pp.2-3). Phipps forwarded the CBP's response to Andrey Mikhalchuk, who was a shareholder of Chiron, and also to Lisa Houle, who was not a member of Chiron. (Id. p.2).

In June 2016, in rapid succession, Phipps, Mikhalchuk, and Houle met several times to plan to: (i) shut down Chiron – or change Chiron's name; (ii) start up a new company, Conceptant; and (iii) start up a second new company, NuCognition, which was to partially owned by Conceptant, and partially owned by an outside investor. (Ex. 11, pp.2-3). As part of the plan, and as a change of direction from the initial plan for Chiron, Phipps, Mikhalchuk, and Houle decided that the best point of entry into FDA work was through submitting a proposal in response to a Broad Agency Announcement, a "BAA." (Ex. 11).

As part of that proposal, the three conspirators were required to state what "past performance" Conceptant the company had, meaning what "references" in terms of contracts

awarded and completed successfully, Conceptant could offer to demonstrate its ability to complete the FDA BAA work successfully. (Houle Dep., 142:12-142:15). Conceptant the company had only been in existence at that point for a month and had no past performance. (Id. 145:11-145:14). The conspirators therefore inserted past performance that Phipps, Houle, and Mikhalchuk had gained from working on Akira projects into the Conceptant proposal. (Houle Dep. 142:16-143:8), (Ex. 37, p. 59-62).

Perhaps realizing that asserting another company's past performance as their own was at best mildly deceptive, the conspirators alerted the Contracting Officer at the FDA to whom they submitted Conceptant's proposal that the claimed Conceptant past performance was in fact individual past performance of the employees, obtained while they were working for a company other than Conceptant (that company being Akira). (Ex. 34).

Oddly, in correcting the improper past-performance submission, Conceptant failed to correct another at best mildly deceptive part of its proposal. In the proposal, Conceptant claimed that Phipps was a Medical Doctor, having graduated with an M.D. from the University of Pittsburgh School of Medicine in 1995. (Ex. 36, p.55), (Ex. 37, p.69), (Ex. 35, p.46). Conceptant further claimed that Phipps, Conceptant's "main subject matter expert" has a "medical degree and has worked in the healthcare space for over 25 years." (Ex. 36, p.7), (Ex. 37, p.8). Phipps is not a Medical Doctor. In fact, Phipps did not graduate from the University of Pittsburgh School of Medicine and had not received an M.D. (Phipps Dep. 74:21-75:11). Phipps applied to the University of Pittsburgh School of Medicine, and was accepted, but chose not to attend. (Id. 76:12-77:3). The highest degree Phipps obtained was a bachelor's. (Id. 74:21-75:1).

Nevertheless, Conceptant's proposal was accepted, and Phipps, Houle, and Mikhalchuk began work for the FDA in September 2016. (Ex.40, p.1), (Houle Dep. 179:15-179:17), (Phipps

Dep., 293:15-293:19). Simultaneously, Phipps, Houle, and Mikhalchuk continued to be employed at, and paid by Akira. (Houle Dep. 16:9-16:11), (Mikhalchuk Dep. 57:11-57:12), (Phipps Dep. 10:17-10:19).

In November, Conceptant received its first payment from the FDA, which alleviated Houle's and Phipps' concerns first expressed in 2013 that starting up a new company would be difficult given their finances. (Ex. 41). Shortly thereafter, each of the three conspirators quit Akira. (Houle Dep. 16:9-16:11, 179:15-179:17), (Phipps Dep. 10:17-10:19, 293:15-293:19), (Mikhalchuk Dep. 57:11-57:12).

During the entirety of their execution of this plan, Phipps, Houle, and Mikhalchuk remained Akira at-will employees and subject to a duty of loyalty to Akira. In breach of this duty, Phipps, Houle, and Mikhalchuk solicited Akira employees to join their competing business – Phipps solicited Mikhalchuk and Houle, and some combination of Phipps and Mikhalchuk solicited Munley and Wood.  Phipps, Houle, and Mikhalchuk solicited Akira customers – through Chiron they solicited Akira's FDA and CBP customer, and through Conceptant they solicited Akira's FDA customer. Phipps, Mikhalchuk, and Houle each breached their duty of loyalty to Akira.

### 3. Akira Was Damaged By Phipps', Houle's, and Mikhalchuk's Breach of Their Duties of Loyalty

To receive an award of compensatory damages, a plaintiff must prove two factors. First, "a plaintiff must show a causal connection between the defendant's wrongful conduct and the damages asserted." *Saks Fifth Avenue, Inc. v. James, Ltd.*, 272 Va. 177, 189, 630 S.E.2d 304, 311 (2006). Second, "a plaintiff must prove the amount of those damages by using a proper method and factual foundation for calculating damages." Id.

Conceptant's successful bid for the FDA work was written by Akira employees Phipps, Houle, and Mikhalchuk. It was submitted to the FDA, Akira's client. The key employees listed in the bid were Akira employees Phipps, Houle, and Mikhalchuk. (Ex. 36, pp. 51-59). The bid proposed Akira's past performance as the past performance of the key personnel - past performance which Conceptant as a brand new company did not have. (Houle Dep.142:16-143:8), (Ex. 37, p. 59-62). Akira, therefore, lost the profit it would have made from the FDA BAA contract, whether such profit is calculated at Conceptant's profit rate in the form of a constructive trust, or at Akira's profit rate for services.

Additionally, the Defendants' breach of their duty of loyalty damaged Akira because Akira continued to employee each of Phipps, Houle, and Mikhalchuk, and pay them a salary during the entirety of the time they created Chiron, attempted to find work for Chiron, created Conceptant, attempted to find work for Conceptant, bid on the FDA BAA, were awarded the FDA Contract, and worked on the FDA Contract. (Houle Dep. 16:9-16:11), (Mikhalchuk Dep. 57:11-57:12), (Phipps Dep. 10:17-10:19).

Akira's loss of the business opportunity is a direct result of Phipps', Houle's and Mikhalchuk's breach of their duty of loyalty, as is Akira's payment of compensation during a time when Phipps, Houle, and Mikhalchuk were not working entirely on Akira's behalf.

Akira also seeks punitive damages the award of which, given the facts of the matter, is appropriate. Akira's argument related to the appropriateness of punitive damages is below. As regards the quantum of damages to which Akira is entitled, Akira does not seek a ruling on that issue in this motion, but rather defers argument.

**B.** **Phipps, Mikhalchuk, and Houle Conspired to Breach Their Duty of Loyalty to Akira**

Akira has established that Defendants Phipps, Houle and Mikhalchuk, breached their duty of loyalty to Plaintiff, therefore the analysis turns to the conspiracy by which they did so. Akira has pled a cause of action against the defendants under both common law conspiracy and statutory conspiracy as codified in Va. Code Ann. §18.2-499–500. Under both of those causes of action, Phipps, Houle, and Mikhalchuk, conspired together to breach each of their individual duties of loyalty to Akira.

A plaintiff claiming the existence of statutory conspiracy under Va. Code Ann. §§ 18.2-499 and 500 must prove that (i) a combination of two or more persons; (ii) for the purpose of willfully and maliciously injuring the plaintiff in reputation, trade, business or profession; (iii) resulted in damage to the plaintiff therefrom. *CVLR Performance Horses, Inc. v. Wynne*, 977 F. Supp. 2d 598, 604 (W.D. Va. 2013) (quoting *Simmons v. Miller*, 544 S.E.2d 666, 677 (Va. 2001)).

As to the second element, it is not necessary for a plaintiff to prove that the defendant conspirators acted with actual malice, i.e., ill-will, hatred, or spite directed toward the plaintiff. *Commercial Bus. Sys., Inc. v. BellSouth Servs.*, 453 S.E.2d 261, 266–67 (Va. 1995). Rather, a plaintiff need only establish that the conspirators acted with legal malice, i.e., "intentionally, purposely, and without lawful justification." *Id.* at 267; *accord Northern Va. Real Estate v. Martins*, 720 S.E.2d 121, 133 (Va. 2012); *Williams v. Dominion Tech. Partners, L.L.C.*, 576 S.E.2d 752, 757 (Va. 2003); *Simmons v. Miller*, 544 S.E.2d 666, 677 (Va. 2001); *Dunlap v. Cottman Transmission Sys.*, LLC, 754 S.E.2d 313, 317 (Va. 2014).

### i. The Elements of Virginia Common Law Civil Conspiracy

Virginia recognizes "a common law claim of civil conspiracy," the standards of which are similar to the elements of a statutory conspiracy: "Under Virginia law, the elements of a common law civil conspiracy are (i) an agreement between two or more persons (ii) to accomplish an

unlawful purpose or to accomplish a lawful purpose by unlawful means, which (iii) results in damage to plaintiff." *William v. AES Corp.*, 28 F. Supp. 3d 553, 574 (E.D. Va. 2014).

The primary difference between statutory conspiracy and common law conspiracy is that a plaintiff is not required to make a showing of legal malice at common law, instead, the underlying tort or contractual breach serves as the "unlawful" basis by which a claim for common law civil conspiracy is sustained. *Almy v. Grisham*, 639 S.E.2d 182, 188 (Va. 2007) ("[I]n Virginia, a common law claim of civil conspiracy generally requires proof that the underlying tort was committed." (citing *Commercial Bus. Sys. v. Halifax Corp.,* 484 S.E.2d 892, 896 (Va. 1997))); *CaterCorp, Inc. v. Catering Concepts, Inc.*, 431 S.E.2d 277, 281–82 (Va. 1993) ("The common law recognizes a cause of action against those who conspire to induce the breach of a contract, even when one of the alleged conspirators is a party to the contract." (citing *Worrie v. Boze*, 95 S.E.2d 192, 198–99 (Va. 1956))).  Because of the similarity of the causes of action, Akira analyses both together, breaking out the common law requirement for an "unlawful basis" – proven by the proof of the underlying tort – from the statutory requirement for legal malice.

### 1. There Existed a Combination of Two or More Persons Acting in Concert

In making a prima facie showing on summary judgment that Defendants entered into an agreement to accomplish an unlawful purpose, courts have looked to documents in the record, including such things as e-mails between the conspirators and records of teleconference meetings. *See Shirvinski v. U.S. Coast Guard*, No. 1:09-CV-896 AJT TRJ, 2010 WL 4279254, at *5 (E.D. Va. Oct. 25, 2010), aff'd, 673 F.3d 308 (4th Cir. 2012).  Virginia courts have looked to similar evidence in established concerted action. *See Lesner Pointe Condo. Ass'n, Inc. v. Harbour Point Bldg. Corp.*, 61 Va. Cir. 609 (2002); *Commercial Bus. Sys., Inc.,* 453 S.E.2d at 267.

Phipps, Houle and Mikhalchuk planned together for several years to start their own business in competition with Akira. They discussed in writing hiring a current Akira employee (Mikhalchuk) for their own work. (Ex. 27, p.2) ("when we get some development gigs we can hire him if he wants our stuff may be too boring for him ;)"). They discussed deceiving Chennamaraja into increasing his R&D budget to allow them to work on a product that they could then steal and market themselves. (Ex. 27, pp. 2, 3) (Phipps: "kewl and even if we don't get this one I am going to try and get Srini to allow me to build it anyway so we have a "product" i can market…by then i plan to suck an R&D budget out of Srini (whether he like it or not :)) so if we didn't get any of these gig we can plan on a skunk works project", Houle: "that will help us break out and build more momentum…we'll have something to sell", Phipps: "absolutely so in responding we have the solution not some vaporware").

In furtherance of that plan, they met on June 9, 2016, June 11, 2016, and June 18, 2016 and made detailed plans to pursue a competing business to Akira's. (Ex. 32), (Ex. 33), (Ex. 13). They prepared at least one detailed task list for pursuing the plan and marked off tasks on the list as they were completed. (Ex. 39). They formed Chiron. (Ex. 6, pp.2-3). They formed Conceptant. (Ex. 45). They made written plans to organize their business operations. (Ex. 46). They prepared together and submitted a proposal to FDA for the BAA. (Ex. 35), (Ex. 36), (Ex. 37, p.1), (Houle Dep. 179:15-179:17), (Phipps Dep. 293:15-293:19). They received an award from that proposal, and performed work on the resultant contract, while employed at Akira. (Id.).

Phipps, Houle, and Mikhalchuk, acted in concert with each other to assist each of them to breach their individual duty of loyalty to Akira.

> **2.  The Conspirators Acted Unlawfully As That Term is Used in the Common Law and With Legal Malice As That Term Is Applied to A Statutory Conspiracy**

### i. The Defendants' Legal Malice Under the Virginia Conspiracy Statute

In order to sustain a claim for this statutory business conspiracy, the plaintiff must prove by clear and convincing evidence that the defendants acted with legal malice, that is, proof that the defendants acted intentionally, purposefully, and without lawful justification, and that such actions injured the plaintiff's business. *Williams v. Dominion Tech. Partners, L.L.C.*, 265 Va. 280, 290, 576 S.E.2d 752, 757 (2003) (citing Feddeman & Co., 260 Va. at 44, 530 S.E.2d at 673-74). In the context of statutory business conspiracy, "clear and convincing evidence" meaning that the conspirators committed an intentional act "that is itself wrongful or tortious." *Contract Assocs.* at *7 (citing Dunlap, 287 Va. At 207, 215; Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 108 F. 3d 522, 526 (4th Cir. 1997)). Therefore, a conclusion that the defendants' actions constituted a breach of their fiduciary duties will satisfy the requirement for legal malice. *Id.* (citing Dunlap, 287 Va. At 218-219).

Akira has submitted evidence sufficient to prove that each of the three individual defendants breached their duty of loyalty to Akira, a tortious act. This proof is imputed to a claim for statutory civil conspiracy and is sufficient to show that the defendants acted with legal malice.

### ii. The Defendant's Unlawful Acts Under the Virginia Common Law

At common law, a "plaintiff must prove that someone in the conspiracy committed a tortious act that proximately caused his injury; the plaintiff can then hold other members of the conspiracy liable for that injury." *Gelber v. Glock*, 293 Va. 497, 534, 800 S.E.2d 800, 821 (2017) (quoting *Beck v. Prupis*, 162 F.3d 1090, 1099 n.18 (11th Cir. 1998)); *see also Stradtman v. Republic Servs.*, Inc., No. 1:14CV1289 JCC/JFA, 2014 WL 6698946, at *6 (E.D. Va. Nov. 25, 2014) ("[A] common law claim of civil conspiracy generally requires proof that the underlying tort was committed.").

28

Akira has submitted evidence sufficient to prove that each of the three individual defendants breached their duty of loyalty to Akira, a tortious act. This proof is imputed to a claim for common law civil conspiracy and is sufficient to show that the purpose of the conspiracy was unlawful.

### 3.   Akira Sustained Damages as A Result of the Conspiracy

To receive an award of compensatory damages, a plaintiff must prove two factors. First, "a plaintiff must show a causal connection between the defendant's wrongful conduct and the damages asserted." *Saks Fifth Avenue, Inc. v. James, Ltd.*, 272 Va. 177, 189, 630 S.E.2d 304, 311 (2006). Second, "a plaintiff must prove the amount of those damages by using a proper method and factual foundation for calculating damages." *Id*.

Akira lost a business opportunity, as described above regarding the defendants' breach of their duty of loyalty, and the loss is a direct result of Phipps', Houle's and Mikhalchuk's conspiracy to have each of them breach their duty of loyalty, as is Akira's payment of compensation during a time when Phipps, Houle and Mikhalchuk were not working entirely on Akira's behalf.

Akira also seeks punitive damages the award of which, given the facts of the matter, is appropriate. Akira's argument related to the appropriateness of punitive damages is below. Separately from punitive damages, Virginia's conspiracy statute allows for the award of treble damages to an aggrieved plaintiff on a business conspiracy claim, which Akira seek. Finally, Akira seeks its attorney's fees and interest, both of which are allowed under the Virginia business conspiracy statute. As regards the issue of the quantum of damages to which Akira is entitled, Akira defers argument.

### C.   Josh Phipps and Lisa Houle Breached their Contracts with Akira

Both Josh Phipps and Lisa Houle had written compensation agreements with Akira and breached those agreements when they formed Conceptant to compete with Akira and when they worked for Conceptant while working for Akira.

In Virginia, the elements of a breach of contract action are "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Zaklit v. Glob. Linguist Sols., LLC*, 53 F. Supp. 3d 835, 853 (E.D. Va. 2014) (citing *Filak v. George*, 267 Va. 612, 594 S.E.2d 610, 614 (2004)).

**1.      Josh Phipps Breached His Compensation Agreement with Akira**

The Phipps Agreement contains the following relevant clause:

"The Employee agrees to keep any and all of the Confidential Information from being made known or disclosed to any person or entity, except for the exclusive use and benefit of the Employer…"
(Ex. 1, p. 2).

Confidential Information was defined in the Phipps Agreement as "…certain proprietary, confidential information and trade secrets of the Employer…labeled or identified by the Employer as proprietary, confidential information." (Id. p. 2). Confidential Information included not only "trade secrets" of the employer, but also non-trade secret information if such information was "labeled or identified by the Employer as proprietary, confidential information." It is important to note that this claim is not based on the allegation that the Confidential Information was a trade secret. Akira determined through discovery that there was no evidence that Ms. Phipps had taken "trade secret" information as that information is defined in the relevant Federal and State statutes. Rather, this claim is based on a contractual relationship between the parties whereby certain items are deemed Confidential Information, and whereby Phipps was expressly prohibited from sharing

30

Confidential Information – as defined in the contract – except for "the exclusive use and benefit of the Employer."

Phipps disclosed Confidential Information of Akira to Yimam Kelemework for his own purposes and not for the exclusive benefit of Akira. Specifically, he disclosed Akira's "taxonomy development approach" which Akira submitted to the U.S. Department of Agriculture ASPE project to promote Conceptant to Kele. (Ex. 31, p. 1) ("Here is the first of a few documents on KM. This is an approach to use UMLS taxonomy and tools…This is the approach I used for HHS ASPE last year."), (Ex. 30).  The "approach I used for HHS ASPE last year" refers to a proposal Akira submitted and won for the ASPE project within the U.S. Department of Health and Human Services ("HHS"). Akira proposed a specific approach to a search taxonomy within that proposal and marked that proposal confidential. (Ex. 44).

Phipps disclosed Akira's confidential search taxonomy to Akira's client contact at FDA, Yimam Kelemework, for the purpose of gaining work for Conceptant.

### 2.      Lisa Houle Breached Her Compensation Agreement with Akira

The Houle Compensation Agreement contained the following clause requiring Houle to give her exclusive efforts to Akira:

> "Employee agrees to devote all of his [sic] professional time, attention, and efforts to promote and further the business of Akira. Employee shall not, while employed full time by Akira, acquire any financial interest in or perform services for, as employee, consultant, independent contractor, volunteer, principal, or otherwise, any other entity or person doing work that is the same or similar to that of Akira."

(Ex. 16, p. 4).

While an employee of Akira, Houle acquired a financial interest in Conceptant, Inc and served as the CEO of Conceptant. (Houle Dep. 7:16-8:11, 159:11-159:19).

Akira has performed software development services for the FDA since 2011. (Chennamaraja Dep. 19:19-20:17). Conceptant performs software development services for the

FDA. (Phipps Dep. 294:13-294:10) ("Q. Does this contract anticipate that Conceptant will develop software? A. Yes.").

While employed at Akira, Houle acquired a financial interest in and performed services for Conceptant, an entity doing work that is the same as Akira. In so doing, Houle breached her contract with Akira.

**D.     An Award of Punitive Damages Against Phipps, Mikhalchuk, or Houle is Appropriate**

Each of Phipps, Mikhalchuk's, and Houle's conduct individually and collectively rises to the level of actual malice such that an award of punitive damages is appropriate.

The question of whether an award for punitive damages should issue is an appropriate question on summary judgment. *Nat'l Org. for Marriage, Inc. v. United States*, 24 F. Supp. 3d 518, 526 (E.D. Va. 2014) ("[S]ummary judgment is appropriate on a claim for punitive damages where . . . only one conclusion is possible from the record."); *see also Def. Indus., Inc. v. Nw. Mut. Life Ins. Co.*, 938 F.2d 502, 507 (4th Cir. 1991).

The purpose of punitive damages is to punish a wrongdoer and warn others of the consequences of taking action such as those taken by the wrongdoer. *See Blakely v. Austin-Weston Ctr. for Cosmetic Surgery L.L.C.,* 348 F. Supp. 2d 673, 678 (E.D. Va. 2004). As such, punitive damages are appropriate if the alleged wrongdoer has acted either with actual malice or with such reckless or wanton negligence as to evince a conscious disregard for the rights of another. *Id.*.

Actual malice in the context of punitive damages is defined as "'ill will, malevolence, grudge, spite, wicked intention, or a conscious disregard for the rights of another." *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 491 (E.D. Va. 2002) (quoting *Lee v. Southland Corp.*, 244 S.E.2d 756, 759 (Va. 1978)). "Secretive, concealed, and dishonest conduct" can also

be a predicate for an award of punitive damages. *Flippo v. CSC Assocs., III, L.L.C.*, 547 S.E.2d 216, 223 (Va. 2001)

Here, the evidence demonstrates that their actions were motivated by ill-will and spite against Akira and their managers, and that in carrying out their conspiracy, they acted secretively and dishonestly, and concealed their actions and their motives. The evidence is overwhelming that Lisa Houle acted with ill-will and spite towards Akira and its executives. As far back as 2014, two years before she left the company, Houle wrote with ill-will about her situation in the company, about Srinivas Chennamaraja, CEO and founder of the company, about Craig Fitzpatrick, an executive at Akira and about Bill Lloyd, a senior manager at Akira:

- "Craig and Srini are two faced!" (Ex. 21, p.1) (November, 2014).

- "I don't trust Srini or Craig.... They lie more than they tell the truth. They never think about what is right and honorable!" (Ex. 21, p.3) (November, 2014).

- Craig is a "total nut job!" (Ex. 22, p.3) (October, 2014).

- Craig is "Direct/blunt, bully or passive aggressive...yup! that describes him to a T! :)" (Ex. 23) (September, 2014).

- Craig: "Is this man ever happy. God, I feel sorry for his wife! Unless, he's pussy whipped at home and takes out his impotency on us! Lol! :)" (Ex. 15) (July, 2014).

- Srini: "You know srini's word isn't worth shit!!!" (Ex. 21, p.2) (November, 2014).

- Srini: "Is Srini pulling a fast one on us again???!!! Ugh!" (Ex. 29) (March, 2015).

- Bill Lloyd: "I'm done with Bill and his bullshit!" (Ex. 26, p.1) (May, 2014).

- Bill Lloyd: "I'm done with Bill and I mean it! He is a fucking Ass and he treats me like shit!" (Ex. 26, p.2) (May, 2014).

- Bill Lloyd: "I can't go back to ORA with Bill there. It's going to be too toxic and my COO and CEO aren't going to tell that little ass to fuckoff and treat me right or he doesn't get any further business." (Ex. 26, p.3) (May, 2014).

Houle made a large number of similarly disparaging comments about her work situation, including:

"I'm just something that gets used over and over again..."; "Same old shit ... They'll pay a stranger those fees but not me!!! I'm a fucking employee and I deliver over and over again! I'm tired of being fucked over like I'm some piece of shit!!! They don't appreciate me or what I do...they only appreciate what they can get for free out of me. I'm done with giving!!!! They want something then they be ready to pay!!!";  "it just frosts my ass the way they won't pay me like that but will an outsider... they say they value me and my efforts... well talk is doesn't mean anything... only actions mean anything... I'm going to give them one more chance...if they don't come around I'm on full job hunting mode....this is just not fair!"; "it really frosts my ass when they will pay an outside recruiter, but they won't pay me." "Did you get an email about the vacation time like Josh and I? … I'm so angry right now I could spit bullets. I'm going to see if they are going to be fair about this (hahaha, fat chance) on Friday. I believe I already know the answer. I'm already looking and starting to pursue opportunities. I've had enough of this!" (Ex. 21, p.2), (Ex. 21, p.1), (Ex. 25, p.2), (Ex. 14, p.1), (Ex. 16).

Also: "Dave told me that he got his bonus, which tells me that Srini doesn't give two shits about me anymore because I'm not giving him any free time…."; and "I meant what I said....I'm done! As soon as this is put the rest they can go find some other lacky to do their shit work for no pay." (Ex. 18), (Ex. 26, p.2).

Josh Phipps also attacked Akira and its executives, in particular Bill Lloyd and Craig Fitzpatrick, saying: "Akira is all about taking and not giving an inch" Ex. 26, p.2, about Bill Lloyd

- "he treats everyone like shite", "he is a dick", "fuck him" Ex. 26, p.2; and about Craig Fitzpatrick, "he is a nut" (Ex. 22, p.3).

The conspirators acted secretively and dishonestly, concealing their actions and motives. In July 2016, Mr. Chennamaraja discovered that they had formed Conceptant and that they had prepared a draft bid for an FDA project. (Chennamaraja Dep., 153:4 - 181:14) (this excerpt is a long description of how, Mr. Chennamaraja discovered the Conceptant proposal, and what followed from that). He called each of them in to an individual meeting to discuss the matter, and in those meetings they stated that they would not pursue the Conceptant proposal, Phipps specifically committed to Mr. Chennamaraja that he was dedicated to growing Akira. (Id.), (Phipps Rog Responses, pp. 22-23). Mikhalchuk in his meeting stated that he didn't think Conceptant was going anywhere. (Mikhalchuk Dep. 184:1-184:3, 193:20-193:22). As the facts have borne out, they were lying to Mr. Chennamaraja when they said that.

Phipps, Houle, and Mikhalchuk acted out of ill-will and spite towards Akira and its executives, and acted deceptively and secretively in carrying out their illicit plan. The motive informing their behavior as expressed in their communications and actions, rises to the level of actual malice such that punitive damages are appropriate.

### E. Summary Judgment Is Appropriate in Akira's Favor on Defendants' Counter-Claims

In Virginia, the elements of a breach of contract action are "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Zaklit v. Glob. Linguist Sols., LLC*, 53 F. Supp. 3d 835, 853 (E.D. Va. 2014) (*citing Filak v. George*, 267 Va. 612, 594 S.E.2d 610, 614 (2004)).

### 1. Akira did not breach the Phipps Agreement by Declining to Pay Phipps A Sales Bonus

The Phipps Agreement contained the following clause describing a potential bonus for bringing new clients to Akira:

> "The Employee shall be paid a sales bonus of 2.5% of total contract value of any contracts resulting from any prospective customer the Employee led capture for and a 1% bonus for contracts which the Employer wins as a result of the Employee's substantial involvement in the capture process although the Employee had not led capture (these bonuses will be paid out twice a year but based on contract value accrual to the Employer)."

(Ex. 1, p. 2).

In his Counterclaim, Phipps alleges that he "led capture" on many contracts while at Akira identifying seven such (7) Akira "contracts." Akira addresses each in turn:.

**ORA 1 extension**: The "ORA 1 extension" is not a separate contract, it was an extension of Akira's ORA BIT contract for an additional six months. (Chennamaraja Dep. 254:17-255:2). Because the ORA 1 extension is not a contract, but an extension of an existing contract, Phipps would not be eligible for a "led capture" award on this contract, even if he did "lead capture" of the new work.

**CMS Facts**: The "CMS Facts" contract was not with a "prospective customer," it was with the same customer as Akira's FDA ORA BITS contract, just with the added scope – CMS consolidation. (Id. 261:18-262:22).

**ORA Roadmaps**: In 2013, Akira was informed by Robin Crist, the head of the ORA, that the agency no longer had the budget and that its $4 million dollar existing contract would be reduced to $250,000, for small roadmap project for which the agency only needed one person. (Id. 265:9-266:17). The agency requested that one of Akira's subcontractors, Bill Lloyd, be assigned to the project. (Chennamaraja Dep. 265:9-266:7). "Bill Lloyd was the one that worked that particular contract" and was the one who captured it. (Liang Dep. 221:4-221:12, 221:22-222:7).

**ORA 2, 3, 4**: There was not a significant capture effort involved in the ORA 2, 3, or 4 contracts. (Chennamaraja Dep. 269:1-269:8). The statement of work for the ORA2, ORA3, and ORA4 contracts reflect that it is the same people performing the same work as Akira had been performing since the inception of its ORA contract. (Id. 270:1-270:9). The ORA work was just "year-over-year contract extension as the funding becomes available." (Id. 270:19-270:21). The customer for the ORA work was not a "prospective customer," it was the identical customer, continuing the identical work into a new year. As a sole source contract, it was "almost preordained" that Akira would win each of the ORA2, ORA3, and ORA4 contracts. (Liang Dep. 228:11-228:14).

**CBER**: Eli Liang found the opportunity on the FBO website as a HUBZone set-aside contract and suggested that Akira go after it. (Chennamaraja Dep. 279:10-279:21). Mr. Liang subsequently put a proposal outline and the pricing templates together, and together with Mr. Chennamaraja assigned who is going to write the content of the proposal. (Id. 280:3-280:10). Contrary to the allegation by Phipps in his Counterclaim that he "led the presentation that led to Akira receiving the contract", there was no pre-award presentation, but rather the kick-off after the contract was already awarded to Akira. (Id., 281:11-281:18).

**CFSAN FAT**: Bill Lloyd, one of Akira subcontractors, had a conversation with George Brinza, who at the time was in charge of the CFSAN branch of the FDA, where Mr. Brinza asked for Akira to put together a white paper that included a level of effort and the pricing of what it would take for Akira to build the FSMA (Food Safety Modernization Act) tool for CFSAN. (Id. 284:10-284:18, 286:16-286:20). At the time, Akira was performing similar work for the ORA, building a FSMA tool called "intelligent questionnaires" and anticipated that the CFSAN work was "going to be folded into ORA current work." (Chennamaraja Dep. 286:21-287:16). CFSAN,

however, decided to keep the contract separate. (Id). Because it was for the same customer, not a new "prospective customer," there was no "capture" to lead.

CTP: Mr. Chennamaraja led the capture of this opportunity by directly speaking to the contract specialist and presenting Akira's capabilities to the CTP. (Id. 289:13-289:14). The contract specialist, subsequently, directly sent Mr. Chennamaraja an RFP to respond to. (Id. 289:19-289:20). Finally, this particular contract was brought to Akira's attention by a former program manager, whose wife was the contracting officer for CTP and she was looking for a company that could perform certain work. (Id.  236:16-237:6).

## 2. Akira did not breach the Phipps Agreement By Failing To Pay Him A Performance Bonus

Relevant to Phipps' counter-claim, the Phipps Agreement contained the following clause describing a potential bonus for employee performance:

> "The Employee will be paid an annual performance bonus of $25,000 based on customer feedback solicited on the Employee's performance on the contracts to which the Employee is assigned"
> (Ex. 1, p. 2).

There exists no evidence that Phipps sought out customer feedback or that Akira received any customer feedback. As Director of Healthcare IT and therefore as the senior Akira manager directly responsible for the FDA ORA BIT project and the CBER project which Phipps worked on, it was Phipps' own responsibility to solicit customer feedback on his performance. The requirement for customer feedback, and the additional implicit requirement that the customer feedback be at a minimum some level above neutral, is a condition precedent to Akira's obligation to pay Phipps a bonus. There is no evidence that any customer feedback on Phipps's performance exists, and therefore Akira's obligation to pay Phipps the contractual performance bonus did not arise.

### 3. Akira did not breach the Mikhalchuk Agreement by Failing To Pay Him A Sales Bonus

The Mikhalchuk Agreement contained the following clause describing a potential bonus for bringing new clients to Akira:

> "A sales bonus of 2.5% of total contract value of any contracts resulting from any prospective customer the Employee led capture for if this customer is not the Census or any organizational units within Census; and A 1.0% bonus for contracts which the Employer wins as a result of the Employee's substantial involvement in the capture process although the Employee had not led capture. [This] bonus…shall be…calculated based on the actual contract value, which the Employer accrued (through payments) from the specific contract(s) in question during the preceding semi-annual period."
> (Ex. 38, p. 4) (formatting removed for brevity and clarity).

Mikhalchuk identifies three Akira contracts wherein he alleged he participated substantially in capture. One of the three contracts, the DLA Web Services contract, resulted in no revenue for Akira, and therefore no obligation to pay a sales bonus. (Chennamaraja Dep. Id., 236:10-236:11, 236:11-236:22). Therefore, a sales bonus was not available.

### 4. Akira did not breach the Mikhalchuk Agreement by failing to pay a purported performance bonus

The Mikhalchuk Agreement contained the following clause describing a potential bonus for good performance on a specific client contract:

> "The Employee shall be paid an annual performance bonus of twenty-five thousand U.S. dollars ($25,000) based on customer feedback solicited on the Employee's performance on the contract to which the Employee is assigned (this bonus shall be paid within a month of the anniversary of the Employee's start date)"

(Ex. 38, p. 2).

There exists no evidence that Mikhalchuk sought out customer feedback or that Akira received any customer feedback on the contract to which Mikhalchuk was assigned. Therefore, as a matter of law, Mikhalchuk's claim that Akira is obligated to pay him an annual performance bonus fails. The requirement for customer feedback, and the additional implicit requirement that the customer feedback be at a minimum some level above neutral, is a condition precedent to

39

Akira's obligation to pay Mikhalchuk a bonus. Finally, for a good portion of the time he worked at Akira, Mikhalchuk was not assigned to a contract. There is no evidence that any customer feedback on Mikhalchuk's performance exists, and therefore Akira's obligation to pay Mikhalchuk the contractual performance bonus did not arise.

## CONCLUSION

Akira has requested summary judgment on all of its claims and on some of Phipps' and Mikhalchuk's counter-claims. Akira is entitled to summary judgment as a matter of law on each of the above items, and there are no material facts in dispute. The Defendants, rather than either finding new jobs or confronting their employers at Akira about their dis-satisfaction with Akira, or as Mr. Chennamaraja suggested, presenting the Conceptant plan to Akira openly, chose to deceive Akira, to sneak around it, and to appropriate an opportunity to themselves that as employees of Akira they had a duty not to appropriate. For those reasons, summary judgment in Akira's favor is appropriate, and Akira respectfully requests that the court grant the motion.

Respectfully Submitted,

AKIRA TECHNOLOGIES, INC.

Dated: March 9, 2018                     By:__/s/_____

Christopher R. Shiplett
Virginia Bar No. 74210
Nishat Azam
Virginia Bar No. 89912
Michael G. Snytkin
*Pro hac vice*
RANDOLPH LAW, PLLC
252 N Washington St
Falls Church, VA 22046
(p) 703-652-3039
(f) 703-852-3976
(e) chris.shiplett@randolphlaw.com

*Counsel for the Plaintiff / Counter-Defendant*
*AKIRA Technologies, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing document by filing it with the CM/ECF

system, which then sent notice and the document to counsel for defendant at the addresses

below:

Elaine Charlson Bredehoft
Virginia Bar No. 23766
ecb@cbcblaw.com

Peter C. Cohen
Virginia Bar No. 66346
pcohen@cbcblaw.com

CHARLSON BREDEHOFT
COHEN & BROWN, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
(703) 318-6808 Facsimile

*Counsel for Defendant*
*Lisa Houle, and Defendants / Counter-Plaintiffs Joshua Phipps*
*and Andrey Mikhalchuk.*

Dated March 9, 2018

        ___/s/_____

        Christopher R. Shiplett
        Virginia Bar No. 74210
        RANDOLPH LAW, PLLC
        252 N Washington St
        Falls Church, VA 22046
        (p) 703-652-3039
        (f) 703-852-3976
        (e) chris.shiplett@randolphlaw.com

        *Counsel for the Plaintiff / Counter-Defendant*
        *AKIRA Technologies, Inc.*