**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | |
|---|---|
| AKIRA TECHNOLOGIES, INC. )<br><br>Plaintiff, )<br><br>v. )<br><br>CONCEPTANT, INC., *et al.* )<br><br>Defendants. ) | Civil Action No. 1:17cv00412 (LO/IDD) |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFF/COUNTER-DEFENDANT AKIRA TECHNOLOGIES,
INC.'S MOTION FOR SUMMARY JUDGMENT ON COUNTS 4-8 OF
THE FIRST AMENDED COMPLAINT AND PARTIAL SUMMARY
JUDGMENT ON THE COUNTERCLAIMS**

March 23, 2018

Elaine Charlson Bredehoft
Virginia Bar No. 23766
ecb@cbcblaw.com
Peter C. Cohen
Virginia Bar No. 66346
pcohen@cbcblaw.com
CHARLSON BREDEHOFT
 COHEN & BROWN, P.C.

# TABLE OF CONTENTS

LEGAL ARGUMENT .......................................................................................................... 2

I.  SUMMARY JUDGMENT ON COUNT 4 SHOULD BE DENIED TO AKIRA
    AND GRANTED TO DEFENDANTS ..................................................................... 2

    A.  Akira Admits There Was No "Actual Competition" Between Itself and
        Defendants, and in the Absence of Actual Competition, There Is No
        Breach of Duty ............................................................................................... 2

    B.  Akira Further Admits It Has Not Been Damaged In This Case and Was
        Not Deprived Of Any Business Opportunity ............................................... 6

II.  SUMMARY JUDGMENT ON COUNTS 5-6 SHOULD BE DENIED TO AKIRA
     AND GRANTED TO DEFENDANTS ................................................................... 8

III.  SUMMARY JUDGMENT ON COUNT 7 SHOULD BE DENIED TO AKIRA
      AND GRANTED TO DEFENDANT PHIPPS ..................................................... 10

IV.  SUMMARY JUDGMENT ON COUNT 8 SHOULD BE DENIED TO AKIRA
     AND GRANTED TO DEFENDANT HOULE ..................................................... 13

V.  SUMMARY JUDGMENT SHOULD BE DENIED TO AKIRA ON THE
    COUNTERCLAIMS ............................................................................................ 15

    A.  Summary Judgment Should Be Denied To Akira on Mr. Phipps'
        Counterclaims ............................................................................... ...... 15

    B.  Summary Judgment Should Be Denied To Akira on Mr. Mikhalchuk's
        Counterclaims ............................................................................................ 19

VI.  DEFENDANTS' LOCAL RULE 56 RESPONSE TO AKIRA'S "STATEMENT
     OF MATERIAL FACTS"................................................................................... 20

CONCLUSION ............................................................................................................. 40

This Memorandum is submitted on behalf of Defendants Joshua Phipps ("Phipps"), Lisa Houle ("Houle"), and Andrey Mikhalchuk ("Mikhalchuk") (collectively "Defendants"), in opposition to the Motion for Summary Judgment filed by Plaintiff Akira Technologies, Inc. ("Akira") on Counts 4-8 of the First Amended Complaint ("FAC") and the counterclaims filed by Defendants Phipps and Mikhalchuk [Docket 66, 71].

On March 9, 2018, Defendants moved for summary judgment on all eight Counts in the FAC [Docket 52].  In their supporting Memorandum [Docket 53] ("Defendants' Summary Judgment Memorandum"), Defendants set out dozens of material admissions that Akira and its senior officers made that dispose of all Counts in the FAC as a matter of law, without need of the Court immersing itself in the factual minutiae of the case.  Accordingly, this opposition begins, not by diving into the minutiae, but by narrowing in on the dispositive admissions Akira has made and how those admissions dispose of Counts 4-8 as a matter of law.  The factual minutiae focused on by Akira are addressed in a later section (per the local rule).

After addressing Counts 4-8, this opposition addresses Akira's motion for summary judgment on the counterclaims that seek bonuses that Akira failed to pay Defendants Phipps and Mikhalchuk.  As shown below, the counterclaims hinge on factual determinations of whether Mr. Phipps "led capture" or was "substantially involved" in the capturing of certain contracts for Akira.  In its motion, Akira provided its account of why Mr. Phipps is not entitled to the bonuses, and below, Mr. Phipps provides his account (and the facts) as to why he is entitled to the bonuses.  Ultimately, a trial will be needed to decide all of the counterclaims.

Accordingly, for the reasons stated below and in Defendants' Summary Judgment Memorandum [Docket 53], summary judgment on Counts 4-8 should be denied to Akira and granted to Defendants.  In addition, summary judgment should be denied on the counterclaims.

**LEGAL ARGUMENT**

**I.     SUMMARY JUDGMENT ON COUNT 4 SHOULD BE DENIED TO
       AKIRA AND GRANTED TO DEFENDANTS**

Count 4 alleges that Defendants Phipps, Houle, and Mikhalchuk breached a fiduciary

duty of loyalty by competing with Akira while they were employed by Akira.  FAC ¶¶ 203-14.

To establish a breach of the duty of loyalty, a plaintiff must show that the defendant (1) owes the

plaintiff a duty; (2) breached the duty; and (3) the breach damaged the plaintiff.  Contract

Assocs. v. Atalay, 2015 U.S. Dist. LEXIS 48129, at *7 (E.D. Va. Apr. 10, 2015).  For the

reasons that follow, summary judgment should be denied to Akira and granted to Defendants on

the second and third elements of the claim.

**A.     Akira Admits There Was No "Actual Competition"
        Between Itself and Defendants, and in the Absence
        of Actual Competition, There Is No Breach of Duty**

Akira acknowledges that the Defendants' formation of Chiron Solutions and Conceptant,

in itself, did not constitute a breach of the duty of loyalty.  Akira Br. at 18;[1] see Williams v.

Dominion Tech. Partners, LLC, 265 Va. 280, 289 (2002); Feddeman & Co. v. Langan Assocs.,

P.C., 260 Va. 35, 42 (2000).  To establish a breach of the duty of loyalty, Akira acknowledges

that it must show Defendants took steps that resulted in "actual competition" with Akira.  Akira

Br. at 18 (acknowledging its burden of showing that Defendants' actions "rise to the level of

*actual competition*") (citing Feddeman, supra) (emphasis added).

Indeed, "actual competition" is the law of Virginia.  See Home Paramount Pest Control

Cos. v. Shaffer, 282 Va. 412, 416, 418 (Va. 2011) (for it to be truly competitive, the defendant's

conduct must consist of "activity [ ] of the same type as that *actually engaged in* by the [ ]

employer") (holding that the concept of "competition" must be "confine[d] … to those activities

_____

[1] "Akira Br." refers to the brief Akira filed in support of its motion for summary judgment [Docket 71].

[the plaintiff] actually engaged in") (emphasis added).  In <u>Home Paramount</u>, the Virginia

Supreme Court cited two cases – <u>Motion Control Sys. v. East</u>, 262 Va. 33, 37-38 (Va. 2001)

(holding there is no competition when the defendant engages in activities that are "unrelated to

the [actual] business of [the plaintiff]," which in <u>Motion Control</u> was limited to promoting a

certain brand of products); and <u>Simmons v. Miller</u>, 261 Va. 561, 580-81 (Va. 2001) (holding

there was no competition when the plaintiff's actual business was the importation of a particular

brand of product, and the defendant engaged in the importation of products unrelated to that

brand).  <u>See</u> <u>also</u> <u>Richardson v. Paxton Co.</u>, 203 Va. 790, 795 (Va. 1962) (there is no competition

when the defendant's conduct "encompasses activities in which [the plaintiff] is not engaged").

Akira has admitted that the Defendants' actions in the instant case did not result in any

actual competition with Akira.  These admissions were documented (with citations to the record)

in Defendants' Summary Judgment Memorandum ([Docket 53 at 18-20] and are summarized

here:

- <u>See</u> Material Facts [in Defendants' Summary Judgment Memorandum] ¶ 75 (Akira admits there is no evidence that the enterprises Defendants formed competed with Akira in any way, including specific projects where Akira and any of the Defendants were in competition and bidding on the same project) (citations to the record);

- <u>See</u> <u>id</u>. (Akira verifies it "is currently unaware of any specific projects where it was in competition with Defendants and bidding on the same project") (citations to the record);

- <u>See</u> <u>id</u>. (Akira admits it cannot identify any specific business opportunity that it was considering that Defendants competed or interfered with) (citations to the record);

- <u>See</u> <u>id</u>. ¶ 87 (Akira admits it has no evidence that Defendant Houle competed with Akira) (citations to the record);

- <u>See</u> <u>id</u>. ¶ 78 (Akira admits it has no knowledge or evidence of Chiron Solutions competing with it or of it interfering with any business opportunity that Akira was considering) (citations to the record);

3

- See id. ¶ 79 (Akira admits it has no knowledge or evidence of Chiron Solutions offering its services to the U.S. Customs and Border Protection, including providing develop software for the U.S. Customs and Border Protection) (citations to the record);

- See id. ¶¶ 81-82 (Akira admits it has no knowledge or evidence of NuCognition competing with it or of it interfering with any business opportunity that Akira was considering) (citations to the record);

- See id. ¶ 76 (Akira admits it has no knowledge or evidence that any Defendant, at any time during their employment with Akira, ever competed for or interfered with Akira's major revenue-producing contract to support the FDA's Office of Regulatory Affairs (citations to the record); and

- See id. ¶¶ 85-86 (Akira admits it has no business dealings with the FDA's Office of the Chief Scientist, for whom Conceptant provides its BAA services, and failed (when asked) to proffer evidence that it ever solicited work or a contract from the Office of Chief Scientist (citations to the record).

Moreover, given Akira's admissions, no rational trier of fact could find that Conceptant's pursuit of the 2016 BAA[2] placed it or Defendants Phipps, Houle, or Mikhalchuk in "actual competition" with Akira. The record is crystal clear that from its inception as a company (in 2003) up to and through the time of the 2016 BAA, Akira had no interest whatsoever in BAAs; did not operate in the BAA space; BAAs had no place in Akira's business development efforts or strategy; and pursuing BAAs was not part of Akira's business model. These admissions were documented in Defendants' Summary Judgment Memorandum [Docket 53 at 4-8] and are summarized here:

- See Material Facts ¶ 8 (Akira admits that between 2003 (when Akira was formed) and 2016, it did not submit a single bid in response to a BAA) (citations to the record);

- See id. (Akira admits that out of hundreds of proposals it submitted between 2011 and 2016 (the time period of this case), none were in response to a BAA) (citations to the record);

---

[2] The "2016 BAA" is the Broad Agency Announcement issued by the Food and Drug Administration ("FDA") that is at issue in the case, and the only identifiable opportunity that Akira claims it "lost" because of Defendants.

- See id. (Akira admits that between 2011 and 2016, it did not submit a single bid in response to another research and development vehicle called a SBIR (Small Business Innovation Research) (citations to the record);

- See id. (Akira admits that in its 15-year history (2003-2018), it bid (and lost) on only one BAA, which came *after* Defendants left Akira) (citations to the record);

- See id. ¶ 9 (Akira admits that, during Defendants' employment with Akira, not a single BAA issued by the Federal Government was identified or tracked by any Akira personnel as a potential opportunity in any of its business development documents (i.e., not in Akira's "Pipeline Reports" (FAC ¶ 65), "Total Contract Value Reports" (FAC ¶ 66), "sales, business development and business strategy documents" (FAC ¶ 64), or in Akira's "ad-hoc sales documents" including "sales presentations, sales spreadsheets, client data and potential client data documents, and sales status memos or briefings" (FAC ¶ 72)) (citations to the record);

- See id. ¶ 12 (Akira admits Tom Peters and Tom Boyce (Akira personnel in charge of seeking health-related opportunities from the FDA) never presented Mr. Chennamaraja (Akira CEO and owner) with a BAA opportunity; admits Eli Liang (Akira's President in charge of overall business development) never presented Mr. Chennamaraja with a BAA opportunity; admits Craig Fitzpatrick (in charge of seeking defense-related opportunities) mentioned only "very, very few" BAA opportunities; and admits Mr. Chennamaraja himself only mentioned BAAs "in passing") (citations to the record);

- See id. (Mr. Chennamaraja confirms he cannot recall any concrete BAA opportunity ever being brought to his attention during the time period of this case (2011-2016)) (citations to the record);

- See id. ¶ 9 (Akira admits that between 2014 (when formal business development meetings began at Akira) and 2016 (time period of this case), there were no discussions of BAAs during the meetings) (citations to the record);

- See id. ¶¶ 13-22 (Akira admits it passed up specific BAA opportunities, including one with the University of Michigan in 2012, and the FDA's BAAs issued in 2013, 2014, 2015, 2016, and 2017) (citations to the record);

- See id. ¶¶ 7, 13 (Akira admits why BAAs were never a part of its business development efforts or model, namely: BAAs "have longer cycles [that] can stay for a long time" in which "[y]ou never know when they're going to make a decision;" the "BAA process can take FOREVER;" "BAAs have

a lower win probability;" and "BAAs were not a high probability kind of activity") (citations to the record).

As Mr. Chennamaraja readily and succinctly stated at his deposition:

> [W]e didn't go after the BAAs.

Id.

The evidentiary record solidly backs Mr. Chennamaraja up.  Based on this record, and in line with Virginia Supreme Court decisions, and the Fourth Circuit, it is submitted that no rational trier of fact can conclude that Defendants, by pursuing the 2016 BAA, were in "actual competition" with Akira, and can only conclude, based on Akira's admissions, that pursuit of the 2016 BAA was "in a portion of the world [BAAs] in which [Akira] does not operate."  See Lampman v. DeWolff Boberg & Assocs., 319 Fed. Appx. 293, 302 (4th Cir. 2009) (there can be no finding of competition when the defendant conducts itself "in portions of the world in which [the plaintiff] does not operate").

Accordingly, for the reasons stated here and in Defendants' Summary Judgment Memorandum, summary judgment should be denied to Akira and granted to Defendants on the second element of Count 4.[3]

**B.      Akira Further Admits It Has Not Been Damaged In This Case and Was Not Deprived Of Any Business Opportunity**

The *only* business opportunity Akira claims it actually "lost" as a consequence of Defendants' alleged breach of the duty of loyalty was the 2016 BAA.  See Defendants' Summary Judgment Memorandum [Docket 53], Material Facts ¶¶ 74-82 (Akira admitting it is unaware of and has no evidence of losing any of its current contracts, future business opportunities, specific

---

[3] Because Akira's admissions dispose of Count 4 as a matter of law, there is no need to become immersed in the minutiae that appears on pages 19-23 of Akira's brief.  The bottom line, as Akira admits, is none of what it described  resulted in any actual competition with Akira by any of the entities Defendants created, or resulted in any actual loss to Akira of a business opportunity that it was considering.

projects, or other specific business opportunities, including by entities formed by Defendants). However, as conclusively shown in Defendants' Summary Judgment Memorandum, regardless of any alleged breach, Akira CEO and owner, Mr. Chennamaraja, independently learned of the 2016 BAA in July 2016, and he deliberately chose not to respond to it.  See Docket #53 at 23 (citing Material Facts ¶¶ 64-65, in turn citing Mr. Chennamaraja's testimony in Exhibit 1 thereto at 182:16-183:2, 184:6-185:2-21, 200:13-21).  Akira further admits that even if it had responded to the 2016 BAA, its proposal would not have been identical to Conceptant's proposal, and there was no certainty in any event that Akira would ever have received the contract.  Id. at 24-25 (citing Material Facts ¶¶ 5, 67-68, 70, 72-73) (and citations to the evidentiary record therein).

Thus, not only does the record conclusively show that there was no actual competition with Akira, it conclusively establishes that Akira "lost" the 2016 BAA opportunity, not because of anything the Defendants did or did not do, but because Akira's CEO and owner, after learning of the opportunity in July 2016, chose not pursue it.  Indeed, the alleged "loss" of the 2016 BAA was the gravamen of Count 3 in the FAC (tortious interference with a business expectancy), which Akira seeks to dismiss because "evidence does not exist to support the claim."  See Docket 59 at 2.  This is a further admission by Akira that it cannot satisfy the third element of its breach of fiduciary duty claim (Count 4).[4]

For the reasons stated here and in Defendants' Summary Judgment Memorandum [Docket 53 at 26-29], summary judgment on Count 4 should be denied to Akira and granted to Defendants.

---

[4] By virtue of Mr. Chennamaraja's admission, and Akira's admission that "evidence does not exist to support" Count 3 of the FAC, Akira can no longer continue to claim that it "lost" the 2016 BAA because of anything the Defendants did or did not do in this case.

## II.   SUMMARY JUDGMENT ON COUNTS 5-6 SHOULD BE DENIED TO AKIRA AND GRANTED TO DEFENDANTS

Counts 5 and 6 allege that Defendants Phipps, Houle, and Mikhalchuk conspired with each other and with former Defendant Conceptant to harm Akira.  Defendants Phipps, Houle, and Mikhalchuk are owners, directors, and/or officers of Conceptant.  FAC ¶¶ 105-08, 110-13. As was pointed out in Defendants' Summary Judgment Memorandum, it is black letter law that owners, directors, and officers of a corporation cannot legally conspire with each other or with the corporations they serve.  Phoenix Renovation Corp. v. Rodriguez, 258 Fed. Appx. 526, 539 (4th Cir. 2007) ("Under Virginia law, a corporation cannot conspire with its agents, nor can agents of a corporation, acting within the scope of their agency, conspire together.  Such a 'conspiracy' is a legal impossibility because the actors are not separate persons for purposes of the conspiracy statute, but rather form part of a single entity, the corporation, which cannot conspire with itself") (citing Charles E. Brauer Co. v. NationsBank of Va., N.A., 251 Va. 28, 36 (Va. 1996)); see also Fox v. Deese, 234 Va. 412, 428 (1987).

Because a conspiracy of the kind alleged in Counts 5 and 6 was not legally possible, summary judgment should be denied to Akira and granted to Defendants.  See Rodriguez, 258 Fed. Appx. at 539 (affirming summary judgment on statutory business conspiracy claim because the alleged conspiracy was not legally possible); Am. Chiropractic v. Trigon Healthcare, 367 F.3d 212, 223-25 (4th Cir. 2004) (affirming summary judgment on conspiracy claims on the same ground); Vollette v. Watson, 937 F. Supp. 2d 706, 727-29 (E.D. Va. 2013) (granting summary judgment on common law conspiracy claim on the same ground); see Cole v. Daoud, 2016 U.S. Dist. LEXIS 39749, at *42 (E.D. Va. Feb. 17, 2016) (since "all of the defendants were integrally involved in Viridia … they cannot conspire with it or with each other in matters related to it").

Moreover, the *sole* predicate act that Akira now claims formed the basis of the conspiracy in Counts 5 and 6 was Defendants' alleged breach of the duty of loyalty.  Akira Br. at 25.[5] However, as shown above, given the record of admissions by Akira, no rational trier of fact can conclude that Defendants breached the duty of loyalty by engaging in conduct that resulted in any actual competition with Akira, let alone competition that resulted in any actual damage or "loss" to Akira.  With no predicate act, there can be no conspiracy.  See Akira Br. at 26 (acknowledging that a conspiracy claim requires proof that an underlying tort was committed, and without it, there is no claim); Taylor v. CNA Corp., 782 F. Supp. 2d 182, 205 (E.D. Va. 2010) (granting summary judgment on conspiracy claim because "none of the substantive torts [underlying the conspiracy] alleged by [the plaintiff] survive summary judgment"); Johnson v. D & D Home Loans Corp., 2008 U.S. Dist. LEXIS 24114, at *17 (E.D. Va. Jan. 23, 2008) (granting summary judgment on conspiracy count due to no evidence of underlying unlawful acts or purpose); Busch v. Christian Broad. Network, 2007 U.S. Dist. LEXIS 27171, at *17-18 (E.D. Va. Apr. 12, 2007) (granting summary judgment for the same reason).

Akira's description of alleged "conspiratorial" acts on page 27 of its brief is immaterial. None of it, Akira admits, resulted in any actual competition with Akira, or the loss of any actual business opportunity for Akira.  While Akira continues to erroneously claim on page 27 that it "lost a business opportunity" as a result of the alleged conspiracy, the only conceivable opportunity it can be referring to is the 2016 BAA.  But as Mr. Chennamaraja admits, he learned of that opportunity in July 2016, and consistent with Akira's 13-year history between 2003 and 2016 of not pursuing or tracking a single BAA, he decided against pursuing it.  It was indisputably *Mr. Chennamaraja* who deprived Akira of the 2016 BAA, *not* Defendants.

---

[5] Originally, Akira had alleged a variety of predicate acts, see FAC ¶¶ 216, 219, 227, 230, 232, 239, all of which have been abandoned.

For the reasons stated here and in Defendants' Summary Judgment Memorandum [Docket 53 at 23-32], summary judgment on Counts 5-6 should be denied to Akira and granted to Defendants.

## III. SUMMARY JUDGMENT ON COUNT 7 SHOULD BE DENIED TO AKIRA AND GRANTED TO DEFENDANT PHIPPS

Count 7 had alleged that Defendant Phipps breached his employment agreement in four ways: first, "when he assisted in writing a proposal for Conceptant wherein Akira Confidential Information was disclosed to the FDA for Conceptant's benefit" (FAC ¶ 243); second, by "disclos[ing] … Akira's software prototypes and Akira's plans for using those software prototypes to NuCognition" (FAC ¶ 244); third, by "depriv[ing] Akira of at least one and likely more opportunities to contract with FDA and other federal agencies, opportunities that went to Conceptant instead" (FAC ¶ 245); and fourth, by "depriv[ing] Akira of opportunities which have gone to NuCognition as a result of NuCognition's advertising of Akira's software prototypes on its website" (FAC ¶ 246).

Mr. Phipps addressed and disposed of each of these theories as a matter of law in Defendants' Summary Judgment Memorandum. Docket 53 at 31-34. Akira tacitly admits this, given that in its summary judgment brief, it abandons all four theories that it pled in Count 7. Akira's Br. at 30-31. Instead, Akira asserts a new theory of breach of contract, not pled in Count 7, that Mr. Phipps disclosed an Akira presentation to a contracting officer (Ms. Kelemework) whom he knew for his own purposes. Id. at 31. Akira, however, cannot seek summary judgment on a theory of liability that was not pled in the FAC without having amended its pleading. See Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 617 (4th Cir. 2009) ("[A] plaintiff may not raise new claims after discovery has begun without amending his complaint"); Integrated Direct Mktg., LLC v. May, 129 F. Supp. 3d 336, 369 (E.D. Va. 2015) (granting summary

judgment to defendant on plaintiff's breach of fiduciary duty claim because it was not raised in the complaint and "[plaintiff] has not sought to amend the complaint to add such a claim based on any evidence it received during or after discovery").  For this reason, summary judgment on Count 7 should be denied to Akira and granted to Mr. Phipps.

Beyond this, Akira acknowledges that it can only pursue its new theory of breach of contract if the presentation in question (Ex. 44 to Akira's summary judgment brief) was "labeled or identified" by Akira as "proprietary confidential information."  See Mr. Phipps' employment agreement, Ex. 31 to Defendants' Summary Judgment Memorandum [Docket 53] at 2, ¶ 6(a) (requiring such designation to qualify as "Confidential Information").  Akira acknowledges that the "Confidential" markings that appear at the top and bottom of the pages of the presentation were put there during the course of this litigation.  Akira's Br. at 11-12, ¶ 53.  Instead, Akira points to the verbiage that appears at the bottom of the first page of the presentation:

> Akira Technologies, Inc. fully agrees with all terms, conditions, and provisions included in the solicitation and agrees to furnish any or all items upon which prices are offered at the price set opposite each item. This proposal includes data that shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed—in whole or in part—for any purpose other than to evaluate this proposal. If, however, a contract is awarded to this offeror as a result of—or in connection with—the submission of this data, the Government shall have the right to duplicate, use, or disclose the data to the extent provided in the resulting contract. This restriction does not limit the Government's right to use information contained in this data if it is obtained from another source without restriction. The data subject to this restriction are contained in all sheets. **FOR OFFICIAL USE ONLY -- SOURCE SELECTION INFORMATION -- SEE FAR 2.101 AND FAR 3.104.**

Contrary to Akira's claim, the verbiage above does not label or identify the information contained in the presentation as "proprietary confidential information."  Rather, it restricts disclosure of the information to the Federal Government by stating it "shall not be disclosed outside the Government."  Moreover, the verbiage directs, not Mr. Phipps, but the Federal

Government not to disclose the information to the public. The verbiage was lifted from 48 C.F.R. 15.609, which imposes restrictions on the Federal Government's use of the information. Because the terms of Mr. Phipps' employment agreement expressly require a specific labeling of information as "propriety confidential information," and because that labeling does not appear in the proposal at issue, Mr. Phipps did not breach the agreement when he forwarded the presentation to Ms. Kelemework.

In addition, Mr. Phipps' employment agreement stated that information is not "Confidential" if Akira authorizes its release to the public. Docket 53 at 2, ¶ 6(a)(i). As Mr. Phipps describes, before he sent the presentation to Ms. Kelemework, Akira had authorized him to provide a copy of it to the Open Source Electronic Health Record Alliance ("OSEHRA") as part of its annual conference, after which the OSEHRA posted the presentation on its website. Dfs. Opp. Ex. 3, ¶ 7. On June 29, 2016, just three days after he forwarded the presentation to Ms. Kelemework, and with Akira's full knowledge and consent, Mr. Phipps, on Akira's behalf, personally gave the presentation at the OSEHRA conference. Id. Accordingly, because the information contained in the presentation had already been made public with Akira's permission prior to the time Mr. Phipps forwarded it to Ms. Kelemework, the information was not "Confidential" under the employment agreement, and his sending it to her was not a breach.

Lastly, it is an element of all breach of contract claims for the plaintiff to proffer evidence of how the purported breach has actually damaged the plaintiff. Integrated Direct, 129 F. Supp. 3d at 341 (granting summary judgment on breach of contract claim because "[plaintiff] failed to provide any evidence of actual damages resulting from [defendant]'s alleged breach") (citing Sunrise Continuing Care LLC v. Wright, 277 Va. 148, 156 (Va. 2009) ("Proof of damages is an essential element of a breach of contract claim, and failure to prove that element warrants

dismissal of the claim")).  Even if it were assumed that Mr. Phipps committed a breach, Akira has proffered no evidence of how the breach actually damaged it or resulted in any actual gain for Mr. Phipps at Akira's expense.  In this regard, it is noted that Akira's Ex. 44 begins with an email from its president, Mr. Liang, to the Federal Government showing that Akira had already disclosed the exact same presentation to the Government two years earlier, in August 2014. Absolutely nothing came from Mr. Phipps' forwarding of the presentation, and Akira cannot show that anything did.

For the reasons stated here and in Defendant' Summary Judgment Memorandum [Docket 53 at 31-34], summary judgment on Akira's new un-pled theory of Count 7 should be denied to Akira and granted to Mr. Phipps.

## IV.    SUMMARY JUDGMENT ON COUNT 8 SHOULD BE DENIED TO AKIRA AND GRANTED TO DEFENDANT HOULE

Count 8 had alleged that Defendant Houle breached her employment agreement in four ways: first, "when she forwarded the ISO 9001 information to her personal email account for use by Conceptant and NuCognition" (FAC ¶ 252); second, "when she wrote a proposal for Conceptant wherein Akira Confidential Information was disclosed to the FDA for Conceptant's benefit" (FAC ¶ 253); third, "when she formed Conceptant, and through Conceptant competed with Akira for work at the FDA" (FAC ¶ 254); and fourth, by "depriv[ing] Akira of at least one and likely more opportunities to contract with FDA and other federal agencies, opportunities that went to Conceptant instead" (FAC ¶ 255).

Ms. Houle addressed and disposed of each of these theories as a matter of law in Defendants' Summary Judgment Memorandum.  Docket 53 at 34-37.  Akira tacitly admits this, given that in its summary judgment brief, it abandons all four theories that it pled in Count 8. Akira's brief at 31-32.  Instead, Akira asserts a new theory of breach of contract, not pled in

13

Count 8, that Ms. Houle did "work that is the same or similar to that of Akira" for another while employed at Akira (referring to Conceptant).  Id.  Since this theory was not pled in Count 8, Akira cannot seek summary on the basis of it.  Integrated Direct, 129 F. Supp. 3d at 369.  For this reason, summary judgment on Count 8 should be denied to Akira and granted to Ms. Houle.

Beyond this, as shown above and in Defendants' Summary Judgment Memorandum [Docket 53], no rational trier of fact can conclude that Conceptant "does work that is the same or similar to that of Akira."  There is no dispute that Conceptant's *sole* work is on the one BAA. The record overwhelmingly and conclusively shows that BAAs were of no interest whatsoever to Akira, and played no role at all in its business development efforts, from its inception as a company (2003) through and including the time of Ms. Houle's employment with Akira (which ended in late 2016).  See Section I(A) supra; see also Defendants' Summary Judgment Memorandum [Docket 53], Material Facts ¶¶ 6-22 (and the citations therein).  Given the evidentiary record, no rational trier of fact can agree with Akira that "Conceptant [is] an entity doing work that is the same as Akira."  Akira Br. at 32.

Moreover, Akira's record of admissions conclusively establishes that Ms. Houle and Conceptant did not engage in any actual competition with Akira, and that nothing Ms. Houle or Conceptant did in this case resulted in Akira losing out on a single business opportunity – including the 2016 BAA.  Mr. Chennamaraja admits he was aware of that opportunity and deliberately chose not to pursue it.  Docket 53, Material Facts ¶¶ 63-87 (citations therein).

It is because Conceptant is not "an entity doing work that is the same as Akira" that Akira voluntarily dismissed Conceptant as a defendant in this case, acknowledging "that evidence does not exist to support the claims against … Conceptant, Inc."  Docket 50-51.  Akira's dismissal of Conceptant from this lawsuit should be viewed as one more undisputed admission by Akira that

Conceptant does not do the same work as Akira, and that no rational trier of fact could conclude this (which explains the dismissal).

For the reasons stated here and in Defendants' Summary Judgment Memorandum [Docket 53 at 34-37], summary judgment on Akira's new un-pled theory of Count 8 should be denied to Akira and granted to Ms Houle.[6]

## V.   SUMMARY JUDGMENT SHOULD BE DENIED TO AKIRA ON THE COUNTERCLAIMS

It is noted at the outset that Akira did not follow the Court's rules for seeking summary judgment on Mr. Phipps' and Mr. Mikhalchuk's counterclaims, as it failed to "include a specifically captioned section listing all material facts as to which [it] contends there is no genuine issue" relating to the counterclaims.  See Local Civil Rule 56(B).  Beyond this, Akira's motion should be denied because the counterclaims should be decided by a jury.

### A.   Summary Judgment Should Be Denied To Akira on Mr. Phipps' Counterclaims

Mr. Phipps' employment agreement with Akira entitled him to "a sales bonus of 2.5% of total contract value of any contracts resulting from any prospective customer [he] led capture for and 1% bonus for contracts which [Akira] wins as a result of [his] substantial involvement in the capture process although [he] had not led capture …."  See Ex. 31 to Defendants' Summary Judgment Memorandum [Docket 53] at 2, ¶ 3(d)(v).  Whether Mr. Phipps "led capture," was "substantially involved in the capture process," and is entitled to bonuses for each of the deals that are the subject of his counterclaims, are factual questions that only a jury can answer.

Before addressing each of the contracts at issue, Akira's general position that Mr. Phipps did not lead the capture of any of the FDA contracts is completely at odds with contemporaneous statements made by its CEO and owner (Mr. Chennamaraja) and President (Mr. Liang) that Mr.

---

[6] It is submitted that Akira's discussion of punitive damages is immaterial.  Akira Br. at 32-35.

Phipps did in fact lead the capture of the FDA contracts for Akira.  See Dfs. Opp. Ex. 1-2[7] (Mr. Liang stating in February 2014, "I've passed your list on to Josh [Phipps] *who is leading capture on FDA stuff for us*, and he will be touching base with you on this stuff," and Mr. Chennamaraja stating in August 2013, "I am also copying Josh Phipps, who is out [sic] CIO *and leading our efforts at FDA*") (emphasis added).

**ORA 1 extension (2012)**.  In his Declaration (Dfs. Opp. Ex. 3), Mr. Phipps describes how he led the capture to win the new ORA 1 extension (2012) contract for Akira.  Id. ¶¶ 10-12. In its summary judgment brief, Akira does not take issue with the fact that Mr. Phipps led the capture for this new work.  Akira Br. at 36.  Instead, it claims an extension of an existing contract "is not a separate contract."  Id.  But as Mr. Phipps describes, the existing contract was coming to a close, and if efforts were not made to secure the extension via a new contract, there would be no new work for Akira to perform.  Dfs. Opp. Ex. 3, ¶¶ 10-12.  Had it not been for Mr. Phipps' significant capture efforts, the new work would not have been won.  Id.  Akira is also incorrect.  A new contract was issued and signed to secure the new work.  Id; Dfs. Opp. Ex. 4.  A jury should decide if Mr. Phipps is entitled to a bonus for the ORA 1 extension contract (2012).

**CMS – Facts**.  In his Declaration, Mr. Phipps describes how he led the capture to win the CMS – Facts contract for Akira.  Dfs. Opp. Ex. 3, ¶¶ 13-17.  Akira does not take issue with the fact that Mr. Phipps won the CMS – Facts work for Akira.  Akira Br. at 36.  Instead, it claims the new contract "was with the same customer as Akira's FDA ORA BITS contract" and was not with a "prospective customer."  Dfs. Opp. Ex. 3, ¶¶ 13-17.  Akira is incorrect.  The CMS Facts contract involved a new customer – the ORA Office of Compliance.  Id.  Moreover, for Akira to secure the new work, a new contract had to be captured and won.  Id.  When Akira won the new

---

[7] "Dfs. Opp. Ex." refers to the exhibits that were filed with this brief.

work due to Mr. Phipps' significant capture efforts, a new contract was issued and signed.  Id.  A jury should decide whether Mr. Phipps is entitled to a bonus for the CMS – Facts contract.

**ORA 1 extension (2013)**.  In his Declaration, Mr. Phipps describes how he led the capture to win the new ORA 1 extension (2013) contract for Akira.  Id. ¶¶ 18-22.  As Mr. Phipps describes, the existing contract extension was coming to a close, and if efforts were not made to secure the extension via a new contract, there would be no new work for Akira to perform.  Id.  Had it not been for Mr. Phipps' significant capture efforts, the new work would not have been won.  Id.  The capture resulted in a new contract being issued and signed.  Id; Dfs. Opp. Ex. 5.  A jury should decide if Mr. Phipps is entitled to a bonus for the ORA 1 extension contract (2013).

**ORA Roadmaps**.  Akira claims another individual (not Mr. Phipps) led the capture for this contract.  Akira Br. at 36.  Akira is incorrect.  It was Mr. Phipps who led the capture for this contract, as he describes in his Declaration.  Dfs. Opp. Ex. 3, ¶¶ 23-27.  A jury should decide whether he led capture and is entitled to a bonus for the ORA Roadmaps contract.

**ORA 2, 3, 4.**  According to Akira, no capture efforts were necessary on these contracts because they were "almost preordained" and nothing more than automatic "year-over-year contract extensions."  Akira Br. at 37.  Mr. Phipps describes a very different picture for securing these contracts.  See Dfs. Opp. Ex. 3, ¶¶ 35-45, 50-55.  He describes the capture process he led; the months of planning involved; his drafting of various white papers; his meetings with agency officials; the proposal development process he led; and the winning of the work with new contracts being signed.  Id.  A jury should decide if he is entitled to bonuses for these contracts.

**CBER**.  Akira claims it was Mr. Liang (Akira president) who discovered the CBER opportunity.  Akira Br. at 37.  Akira is incorrect.  Mr. Phipps learned of the opportunity and advised Mr. Liang of it.  Dfs. Opp. Ex. 3, ¶ 28; see also Dfs. Opp. Ex. 6 (Mr. Liang confirming,

"Josh found it on FBO.gov the day after it came out and so we bid on the CBER thing cold and surprisingly (pleasantly so) won").  Akira claims Mr. Liang prepared the proposal outline and, with Mr. Chennamaraja, decided who would write the proposal.  Akira Br. at 37.  Akira is incorrect.  Mr. Phipps prepared the proposal template and distributed writing assignments.  Dfs. Opp. Ex. 3, ¶¶ 28-31.  Out of the proposal's ten sections, Mr. Phipps wrote eight of them, and he prepared all of the diagrams.  Id.  After all of the sections were ready, he integrated them into a coherent proposal.  Id.  Mr. Phipps also worked extensively with Mr. Liang on pricing.  Id. ¶ 24.  A jury should decide whether Mr. Phipps led the capture and/or was substantially involved in capturing the CBER contract and is entitled to a bonus for the contract.

**CFSAN FAT (2015 and 2016).**   Incredibly, Akira does not even mention Mr. Phipps in connection with these contracts.  Akira Br. at 37-38.  Mr. Phipps describes his capture role in securing these contracts.  Dfs. Opp. Ex. 3, ¶¶ 46-49, 56-58.  He describes tracking the opportunities that led to the contracts; his communications with agency officials; his development of concepts and a whitepaper for the work; how he convinced the agency to locate the new work in another center of the agency so Akira could enlarge its footprint; how he led the proposal development, distributed tasks, and wrote significant portions of the proposal; and how his efforts led to an enlargement of the scope of work and additional funding for Akira.  Id.  A jury should decide whether Mr. Phipps led the capture and/or was substantially involved in capturing the CFSAN FAT contracts and is entitled to bonuses for these contracts.

**CTP**.  Again, Akira makes no mention of Mr. Phipps.  To help Akira win this work, Mr. Phipps vetted and put forward the best qualified project manager to manage the contract in the event Akira won it, and wrote Akira's winning proposal *in less than 24 hours*.  Id. ¶¶ 65-70.  A

jury, at a minimum, should decide whether Mr. Phipps was "substantially involved" in capturing the CTP contract and is entitled to a bonus for this contract.

**Performance Bonuses**. Mr. Phipps' employment agreement also allowed for "an annual performance bonus of $25,000 based on customer feedback solicited on the Employee's performance on the contracts to which the Employee is assigned." <u>See</u> Ex. 31 to Defendants' Summary Judgment Memorandum [Docket 53] at 2, ¶ 3(d)(iv). Akira claims it was Mr. Phipps' burden to obtain customer feedback, but in truth, the agreement is silent on whose burden it was to obtain the feedback. In any event, as Mr. Phipps describes, there was never any discussion of the need for customer feedback as a condition for performance bonuses, and Mr. Phipps received partial performance bonuses in the absence of any insistence that he provide such feedback. Dfs. Opp. Ex. 3, ¶¶ 71-72. Accordingly, whether customer feedback was necessary for such bonuses, or whether the parties waived the condition or modified their agreement to eliminate it, is a fact question for the jury. <u>See</u> <u>Stanley Cafeteria, Inc. v. Abramson</u>, 226 Va. 68, 73 (Va. 1983) (course of dealings between contracting parties can modify the terms of a contract).

**B.      Summary Judgment Should Be Denied To Akira on Mr. Mikhalchuk's Counterclaims**

Mr. Mikhalchuk's employment agreement allowed for "an annual performance bonus of twenty-five thousand U.S. dollars ($25,000) based on customer feedback solicited on the Employee's performance on the contracts to which the Employee is assigned." <u>See</u> Akira Br. (Ex. 38, ¶ 3(b)(v)). Akira claims it was Mr. Mikhalchuk's burden to obtain customer feedback, but in truth, the agreement is silent on whose burden it was to obtain the feedback. In any event, as Mr. Mikhalchuk describes, there was never any discussion of the need for customer feedback as a condition for performance bonuses, and Mr. Mikhalchuk received partial performance bonuses in the absence of any insistence that he provide such feedback. Dfs. Opp. Ex. 7, ¶¶ 7-8;

see also Ex. 9, p. 3 (Mr. Liang stating Mr. Mikhalchuk had earned his performance bonuses without any mentioning of customer feedback); Ex. 10, p. 1 (Mr. Chennamaraja confirming Mr. Mikhalchuk will receive $25,000 performance bonus without mentioning customer feedback).

Accordingly, whether customer feedback was necessary for such bonuses, or whether the parties waived the condition or modified their agreement to eliminate it, is a fact question for the jury. See Stanley Cafeteria, 226 Va. at 73.

## VI. DEFENDANTS' LOCAL RULE 56 RESPONSE TO AKIRA'S "STATEMENT OF MATERIAL FACTS"

As previously stated, the Court can resolve the cross-motions for summary judgment based on Akira's admissions and the legal arguments made above and in Defendants' Summary Judgment Memorandum without immersing itself in Akira's "Statement of Material Facts." Nevertheless, per Local Civil Rule 56(B), below is a paragraph-by-paragraph response to Akira's "Statement of Material Facts" with cross-references to the Material Facts and evidentiary citations set forth on pages 2-20 of Defendants' Summary Judgment Memorandum [Docket 53].

1.      Not disputed.

2.      Not disputed.

3.      Not disputed.

4.      Not disputed.

5.      Not disputed.

6.      Not disputed.

7.      **Disputed**.  Akira uses the Shipley processes, which describes the responsibilities of a Capture Manager as "identif[ying] the resources needed to pursue a business opportunity; oversee[ing] bid strategies, pricing, teaming, and proposal strategies; and manag[ing] the transition from business opportunity to proposal development to award."  See Dfs. Opp. Ex. 11

(http://www.shipleywins.com/pdf/Capture_Manager.pdf (last visited Mar. 15, 2018); Deposition of Eli Liang ("Liang Dep.")[8] at 238:15-240:22 (explaining his reliance on the Shipley process and that he requires it of his B&P people).

8.  **Disputed**.  Akira uses the Shipley processes, which describes the responsibilities of the Capture Manager as "manag[ing] the transition from business opportunity to proposal development to award."  See Liang Dep. at 238:15-240:22 (explaining his reliance on the Shipley process and that he requires it of his B&P people); Dfs. Opp. Ex. 11.  See also Dfs. Opp. Ex. 12 (Shipley Associates, Business Development Lifecycle, http://sbdl.shipleywins.com (last visited Mar. 15, 2018) (showing how the capture team is involved in the entire business development lifecycle)).

9.  Not disputed.

10.  **Disputed**.  To the extent the use of the phrase "programming support" is intended to suggest that Akira performed "software development services" for the FDA ORA BIT contract (see Akira Br. at 31), the statement is incorrect and mischaracterizes Mr. Chennamaraja's testimony, which relates to "program support" that Akira performed for the ORA.  See Deposition of Srinivas Chennamaraja ("Chennamaraja Dep.") at 18:19-19:2 ("Support the ORA, the business office, more in the role of, you know, program support") (emphasis added), 19:19-19:22 ("we did several things for them at the time as a program support management contract, whether looking at the IT architecture, infrastructure architecture") (emphasis added).  "Program support" refers to oversight of entire programs of projects.  Dfs. Opp. Ex. 3, at ¶ 2.  Akira does not perform software development services for the FDA ORA

---

[8] Unless otherwise noted, all deposition transcripts referenced in this section are attached as exhibits to Akira's summary judgment brief [Docket 71].

BIT contract, and in fact, was prohibited from bidding on any portion of the contract that would have involved software development.  Id.

      11.     Not disputed.

      12.     Not disputed.

      13.     **Disputed**.  Mr. Phipps was not "tasked with 'helping to bring new ideas and potential opportunities to Akira in the healthcare field.'"  See Defendants' Summary Judgment Memorandum [Docket 53], Material Facts ¶ 4 (It was a "shared responsibility" to look for FDA opportunities.  Ex. 4 to Defendants' Summary Judgment Memorandum [Docket 53] at 42:8-18. Defendant Phipps was not required to look for FDA opportunities.  Id. at 44:9-45:1 ("We did not require him to do it").  Akira's success in generating FDA opportunities did not depend on Mr. Phipps.  Id. at 45:21-46:3.  It was ultimately Mr. Liang's responsibility to identify FDA opportunities.  Id. at 47:4-5 ("I identified all the opportunities")).  See also Defendants' Material Facts ¶ 3 (Tom Peters and Tom Boyce were in charge of seeking health-related opportunities from the FDA and elsewhere.  Ex. 1 to Defendants' Summary Judgment Memorandum [Docket 53] at 32:1-33:1; 50:3-17; 51:7-10; 52:9-20; 81:8-20).

      14.     **Disputed**.  Plaintiff's assertion that "Akira relied heavily on employees' finding and bringing business opportunities within the government sector" is not supported by the evidence cited.  In the portion of his testimony cited, Mr. Liang testified only that Akira asked employees to bring business opportunities from the FDA to Akira's attention, but they did not require it or rely on it.  See Liang Dep. at 44:15-45:8.  See also Defendants' Material Facts ¶ 4 (It was a "shared responsibility" to look for FDA opportunities.  Ex. 4 to Defendants' Summary Judgment Memorandum [Docket 53] at 42:8-18.  Defendant Phipps was not required to look for FDA opportunities.  Id. at 44:9-45:1 ("We did not require him to do it").  Akira's success in

generating FDA opportunities did not depend on Mr. Phipps.  Id. at 45:21-46:3.  It was

ultimately Mr. Liang's responsibility to identify FDA opportunities.  Id. at 47:4-5 ("I identified

all the opportunities")).

      15.    Not disputed.

      16.    **Disputed**.  Mr. Phipps' bonus was not conditioned on "excellent work" or

customer feedback.  The language Plaintiff quotes from Mr. Phipps' At-Will Employment

Agreement in support of this assertion contains no reference to "excellent work."  In fact, Akira

argues elsewhere in its summary judgment brief that the language in question suggests only an

"implicit requirement that the customer feedback be at a minimum some level above neutral."

Akira Br. at 38.  Further, although the language of the Agreement states that the bonus will be

"based on customer feedback solicited on the Employee's performance on the contracts to which

the Employee is assigned," Akira never actually conditioned the payment of bonuses on the

receipt of customer feedback.  See Dfs. Opp. Ex. 3 at ¶¶ 71-72.

      17.    **Disputed**.  Mr. Phipps was not "expected to find new opportunities for Akira."

See Defendants' Material Facts ¶ 4 (It was a "shared responsibility" to look for FDA

opportunities.  Ex. 4 to Defendants' Summary Judgment Memorandum [Docket 53] at 42:8-18.

Defendant Phipps was not required to look for FDA opportunities.  Id. at 44:9-45:1 ("We did not

require him to do it").  Akira's success in generating FDA opportunities did not depend on Mr.

Phipps.  Id. at 45:21-46:3.  It was ultimately Mr. Liang's responsibility to identify FDA

opportunities.  Id. at 47:4-5 ("I identified all the opportunities")).  See also Defendants' Material

Facts ¶ 3 (Tom Peters and Tom Boyce were in charge of seeking health-related opportunities

from the FDA and elsewhere.  Ex. 1 to Defendants' Summary Judgment Memorandum [Docket

53] at 32:1-33:1; 50:3-17; 51:7-10; 52:9-20; 81:8-20).  Plaintiff's assertion that Mr. Phipps was

"expected to find new opportunities for Akira" is not supported by the evidence.  Mr. Phipps

testified only that, as director of healthcare, he was "helping to bring new ideas and potential

opportunities to Akira in the healthcare field specifically."  Deposition of Joshua Phipps ("Phipps

Dep.") at 13:3-6 (emphasis added).

18.     **Disputed**.  It was not Mr. Phipps' job to decide whether Akira pursued a

particular business opportunity, and the evidence cited by Plaintiff fails to support the assertion

that Akira's senior management deferred to Mr. Phipps on those issues.  To the contrary, Mr.

Chennamaraja testified that he and Mr. Liang made the final decisions about which opportunities

Akira would pursue.  See Defendants' Material Facts ¶ 5 (Mr. Chennamaraja, and at times Mr.

Liang, made final decisions on which opportunities Akira would pursue.  Ex. 1 to Defendants'

Summary Judgment Memorandum [Docket 53] at 10:5-13, 42:2-43:5; Ex. 4 to Defendants'

Summary Judgment Memorandum [Docket 53] at 89:3-7.)

19.     Not disputed.

20.     **Disputed**.  Mr. Liang had not previously assisted Mr. Mikhalchuk in finding jobs

or in receiving an H-1B visa to the United States.  See Dfs. Opp. Ex. 7 (Declaration of Andrey

Mikhalchuk) at ¶¶ 2-6.

21.     Not disputed.

22.     **Disputed** to the extent Plaintiff incorrectly cites the Deposition of Andrey

Mikhalchuk, as opposed to Mr. Mikhalchuk's At-Will Employment Agreement.

23.     **Disputed.**  Mr. Mikhalchuk's bonus was not conditioned on "high quality work"

or customer feedback.  The language Plaintiff quotes from Mr. Mikhalchuk's At-Will

Employment Agreement contains no reference to "high quality work."  In fact, Akira argues

elsewhere in its summary judgment brief that the language in question suggests only an "implicit

requirement that the customer feedback be at a minimum some level above neutral."  Akira Br. at 39.  Further, although the language of the Agreement states that the bonus will be "based on customer feedback solicited on the Employee's performance on the contracts to which the Employee is assigned," Akira never actually conditioned the payment of bonuses on the receipt of customer feedback.  See Dfs. Opp. Ex. 7 at ¶¶ 7-8.

24.      Not disputed.

25.      Not disputed.

26.      **Disputed** to the extent the quoted language does not match the language of Ms. Houle's January 12, 2015 At-Will Employment Agreement.

27.      Not disputed.

28.      **Disputed**.  In the September 2014 chat cited by Plaintiff, Mr. Phipps was venting his frustration about the way he felt he was being treated by Akira management.  Dfs. Opp. Ex. 3 at ¶ 5.  Mr. Phipps' comment that it may be time for him and Ms. Houle to "run [their] own company" was merely an expression of that frustration, and was not intended as a serious suggestion.  Id.

29.      **Disputed**.  Mr. Phipps did not have a "plan" to create his own business.  In a moment of frustration, he commented to Ms. Houle that it may be time for the two of them to run their own company, and described his thoughts on how they might go about doing that, but he was not seriously considering it.  Dfs. Opp. Ex. 3 at ¶ 5.  Further, Ms. Kelemework was not Akira's Contracting Officer's Representative for the FDA ORA BITS contract at the time, having moved from ORA to the Office of Information Management and Technology ("OIMT") on July 11, 2014.  Id. at ¶ 3.

30.     **Disputed**.  Ms. Houle was not "concerned about the cost of starting up a new company" because she was not seriously considering the possibility of doing so.    Dfs. Opp. Ex. 8 (Declaration of Lisa Houle) at ¶ 2.

31.     **Disputed**.  Mr. Phipps was not seriously considering starting a new company. Dfs. Opp. Ex. 3 at ¶ 5.  Further, Ms. Kelemework was not Akira's client point of contact at FDA at the time, having moved from ORA to OIMT on July 11, 2014.  Id. at ¶ 3.

32.     **Disputed**.  Neither Mr. Phipps nor Ms. Houle was seriously considering starting their own company.  Dfs. Opp. Ex. 8 at ¶ 2; Dfs. Opp. Ex. 3 at ¶ 5.

33.     **Disputed**.  Plaintiff cites no evidence supporting the assertion that Mr. Phipps "recruited" Ms. Munley, Mr. Mikhalchuk, and Mr. Wood.  The testimony cited by Plaintiff indicates only that Ms. Munley, Mr. Mikhalchuk, and Mr. Wood were part of Chiron.

34.     **Disputed** to the extent Plaintiff cites the wrong portion of the Deposition of Andrey Mikhalchuk.

35.     **Disputed**.  Plaintiff cites no evidence supporting the assertion that Ms. Munley, Mr. Mikhalchuk, or Mr. Wood were "recruited."  Plaintiff cites only Mr. Mikhalchuk's offer letter and a portion of the Deposition of Andrey Mikhalchuk that says nothing about Ms. Munley, Mr. Mikhalchuk, or Mr. Wood.

36.     **Disputed**.  Ms. Kelemework was not Akira's Contracting Officer's Representative at the time.  See Ex. 2 to Defendants' Summary Judgment Memorandum [Docket 53] at 3 (Admission 13).

37.     **Disputed** to the extent the assertion that the Office of Innovation Management and Technology ("OIMT") was "within Phipps' purview as Akira's Director, Healthcare IT" is intended to suggest that Mr. Phipps' email to Ms. Kelemework attaching a presentation of

Chiron's capabilities to the OIMT put Chiron in competition with Akira.  During the period of time in which Mr. Phipps was employed by Akira, Akira never had a contract with the OIMT. Dfs. Opp. Ex. 3 at ¶ 4.

38.     **Disputed**.  Conceptant performs its BAA work for the Office of the Chief Scientist, which is within the FDA's Office of the Commissioner.  See Phipps Dep. at 281:2-6; Deposition of Lisa Houle ("Houle Dep.") at 181:21-182:3.

39.     **Disputed** because the statement suggests Chiron offered software solutions to the entire FDA.  As Akira explains, the Chiron presentation was directed specifically to the OIMT.

40.     **Disputed**.  The November 13, 2015 email cited by the Plaintiff does not reflect efforts by Mr. Phipps to obtain work from U.S. Customs and Border Patrol ("CBP").  Mr. Phipps was seeking certification from CBP for a product that Chiron was developing for commercial importers.  Dfs. Opp. Ex. 3 at ¶ 6.  He was not seeking work for Conceptant.  Id.

41.     Not disputed.

42.     Not disputed.

43.     **Disputed**.  Akira does not contract to provide services to the FDA as a whole. Specifically, during the course of Defendants Phipps', Houle's, and Mikhalchuk's employment, Akira never had a contract to provide services or research for the Office of the Chief Scientist, the entity for whom the 2016 BAA was issued.  See Defendants' Material Facts ¶ 85 (At no time during Defendants Phipps', Houle's, and Mikhalchuk's employment with Akira did Akira have a contract with the FDA to provide services or research for the Office of the Commissioner or the Office of the Chief Scientist.  Ex. 6 to Defendants' Summary Judgment Memorandum [Docket 53] at 11 (Admissions 40, 42).); Id. at ¶ 86 (Akira can produce no documentary evidence that it pursued a contract or solicitation with the FDA to provide services or research for the Office of

the Commissioner or the Office of the Chief Scientist during Defendants Phipps', Houle's, and

Mikhalchuk's employment with Akira.  Ex. 30 to Defendants' Summary Judgment

Memorandum [Docket 53] at 9 (Requests 24, 26).); Phipps Dep. at 281:2-6.  Further, Akira

provides no evidence it performed the majority of its government contracting work for the FDA.

    44.    **Disputed**.  Mr. Phipps did not have "a specific duty to bring 'potential

opportunities to Akira in the healthcare field.'"  <u>See</u> Defendants' Material Facts ¶ 4 (It was a

"shared responsibility" to look for FDA opportunities.  Ex. 4 to Defendants' Summary Judgment

Memorandum [Docket 53] at 42:8-18.  Defendant Phipps was not required to look for FDA

opportunities.  <u>Id.</u> at 44:9-45:1 ("We did not require him to do it").  Akira's success in generating

FDA opportunities did not depend on Mr. Phipps.  <u>Id.</u> at 45:21-46:3.  It was ultimately Mr.

Liang's responsibility to identify FDA opportunities.  <u>Id.</u> at 47:4-5 ("I identified all the

opportunities")).  <u>See also</u> Material Facts ¶ 3 (Tom Peters and Tom Boyce were in charge of

seeking health-related opportunities from the FDA and elsewhere.  Ex. 1 to Defendants'

Summary Judgment Memorandum [Docket 53] at 32:1-33:1; 50:3-17; 51:7-10; 52:9-20; 81:8-

20).  Akira's assertion that Mr. Phipps "understood that he had a specific duty to bring 'potential

opportunities to Akira in the healthcare field'" is not supported by the evidence and

mischaracterizes Mr. Phipps' testimony.  In the portion of his testimony cited, Mr. Phipps stated

only that, as director of healthcare, he "was <u>helping</u> to bring new ideas and potential

opportunities to Akira in the healthcare field."  Phipps Dep. at 13:3-6 (emphasis added).

    45.    **Disputed**.  Mr. Phipps did not hide the BAA from Akira.  By 2016, it was crystal

clear that Akira was not interested in BAAs; that BAAs were never tracked or sought after by

any Akira personnel including Akira's CEO, owner, and President; that BAAs played no role

whatsoever in Akira's business development efforts or strategy; and that Akira had declined to

pursue specific BAAs in the past, including one from the FDA in 2013 that was virtually

identical to the 2016 BAA that Mr. Phipps brought to Mr. Chennamaraja's attention, that Mr.

Chennamaraja ignored.  See ¶ 46 below and citations therein.

46.    **Disputed**.  Akira does not focus on BAAs.  See Defendants' Material Facts ¶ 7

(While Mr. Chennamaraja "[doesn't] know that much about BAAs," Ex. 1 to Defendants'

Summary Judgment Memorandum [Docket 53] at 78:2-3, he knows BAAs "have longer cycles

[that] can stay for a long time" in which "[y]ou never know when they're going to make a

decision."  Id. at 74:14-17.  Simply put, the "BAA process can take forever."  Ex. 4 to

Defendants' Summary Judgment Memorandum [Docket 53] at 96:18-21.  Because the

probability of winning BAAs is low, BAAs do not represent best-win opportunities for Akira.

Ex. 1 to Defendants' Summary Judgment Memorandum [Docket 53] at 75:7-12, 76:5-11; Ex. 4

to Defendants' Summary Judgment Memorandum [Docket 53] at 60:4-6 ("BAAs have a lower

win probability") and 63:20-21 ("BAAs were not a high probability kind of activity").  As a

consequence, "we [Akira] did not focus much on the BAAs … [and] didn't go after the BAAs."

Ex. 1 to Defendants' Summary Judgment Memorandum [Docket 53] at 74:20-22, 76:4, 175:21-

176:1 (Akira "didn't go after any BAAs")).

See Defendants' Material Facts ¶ 8 (Between 2003 (when Akira was formed) and 2016,

Akira did not submit a single bid in response to a BAA.  Ex. 1 to Defendants' Summary

Judgment Memorandum [Docket 53] at 76:19-22, 106:3-8, 201:3-6; Ex. 4 to Defendants'

Summary Judgment Memorandum [Docket 53] at 59:16-18.  Out of hundreds of proposals that

Akira submitted between 2011 and 2016 (the time period of this case), none were in response to

a BAA.  Ex. 4 to Defendants' Summary Judgment Memorandum [Docket 53] at 60:12-61:6,

160:12-17; Ex. 3 to Defendants' Summary Judgment Memorandum [Docket 53] at 16

(Admission 55).  During that time, Akira did not submit a single bid in response to another research and development vehicle called a SBIR (Small Business Innovation Research).  Ex. 1 to Defendants' Summary Judgment Memorandum [Docket 53] at 77:8-18.  In its 15-year history (2003-2018), Akira bid (and lost) on only one BAA, which came after Defendants Phipps, Houle and Mikhalchuk left Akira.  Id. at 80:14-81:5.).

See Defendants' Material Facts ¶ 9 (During Defendants Phipps', Houle's, and Mikhalchuk's employment with Akira, not a single BAA issued by the Federal Government was identified or tracked by any Akira personnel as a potential opportunity in Akira's "Pipeline Reports" (Plaintiff's First Amended Complaint ("FAC") ¶ 65), "Total Contract Value Reports" (FAC ¶ 66), "sales, business development and business strategy documents" (FAC ¶ 64), or in Akira's "ad-hoc sales documents" including "sales presentations, sales spreadsheets, client data and potential client data documents, and sales status memos or briefings" (FAC ¶ 72).  Ex. 5 to Defendants' Summary Judgment Memorandum [Docket 53] at 1-2 (Interrogatories 2-4).  Between 2014 (when formal business development meetings began at Akira) and 2016, there were no discussions of BAAs during the meetings.  Ex. 1 to Defendants' Summary Judgment Memorandum [Docket 53] at 82:5-18.).

See Defendants' Material Facts ¶ 10 (While FAC ¶ 137 claims "Mr. Chennamaraja directed Mr. Phipps to pursue FDA Broad Agency Announcements" citing Mr. Chennamaraja's September 12, 2012 email to Mr. Phipps (Exhibit 23 to the FAC), nowhere in Mr. Chennamaraja's September 12, 2012 email to Mr. Phipps do the words "direct" or "I direct you" appear.  Ex. 6 to Defendants' Summary Judgment Memorandum [Docket 53] at 10-11 (Admissions 38-39); Docket 53-7.).

See Defendants' Material Facts ¶ 11 (While FAC ¶ 136 claims "Mr. Chennamaraja …

directed [Mr. Phipps] to seek out FDA Broad Agency Announcements" citing Mr.

Chennamaraja's June 13, 2013 email to Mr. Phipps (Exhibit 22 to the FAC), nowhere in Mr.

Chennamaraja's June 13, 2013 email to Mr. Phipps did Mr. Chennamaraja "direct [Mr. Phipps]

to seek out FDA Broad Agency Announcements."  Ex. 6 to Defendants' Summary Judgment

Memorandum [Docket 53] at 10 (Admission 37); Ex. 8 to Defendants' Summary Judgment

Memorandum [Docket 53].  Mr. Chennamaraja cannot recall ever directing Mr. Phipps to seek

out BAA opportunities from the FDA.  Ex. 1 to Defendants' Summary Judgment Memorandum

[Docket 53] at 86:6-9.).

See Defendants' Material Facts at ¶ 12 (Mr. Peters and Mr. Boyce, who were in charge of

seeking health-related opportunities from the FDA and elsewhere, never came to Mr.

Chennamaraja with a BAA opportunity.  Id. at 82:19-83:3.  Mr. Liang, who was in charge of

Akira's overall business development efforts, never came to Mr. Chennamaraja with a BAA

opportunity.  Id. at 85:1-4.  Mr. Fitzpatrick, who was in charge of seeking defense-related

opportunities, mentioned "very, very few" BAA opportunities.  Id. at 83:4-22.  Mr.

Chennamaraja himself only brought up BAAs "in passing."  Id. at 85:5-15.  Mr. Chennamaraja

cannot recall any concrete BAA opportunity being brought to his attention during the time period

of this case (2011-2016).  Id. at 87:4-9.).

Akira also disregarded specific BAAs.  See Defendants' Material Facts ¶ 13 (In 2012,

Akira was aware of a BAA opportunity involving the University of Michigan, and declined to

pursue it.  Ex. 3 to Defendants' Summary Judgment Memorandum [Docket 53] at 17 (Admission

56).  In an email at the time, Mr. Liang stated, "This BAA process will take FOREVER.  I've

gone through this before.  It is the process for research projects just only one step better than

SBIRs."  Id. at 17 (Admission 57); Ex. 9 to Defendants' Summary Judgment Memorandum

[Docket 53].  Mr. Liang's email was meant to discourage Akira personnel from pursuing the

BAA.  Docket 53-1 at 94:11-22.  The BAA "fell off the radar in terms of [ ] our focus,"

including Mr. Chennamaraja's radar.  Id. at 92:20-93:10.).

      See Defendants' Material Facts ¶ 14 (On June 13, 2013, Mr. Phipps sent an email to Mr.

Chennamaraja.  Ex. 6 to Defendants' Summary Judgment Memorandum [Docket 53] at 1

(Admission 1); Ex. 8 to Defendants' Summary Judgment Memorandum [Docket 53].  Attached

to Mr. Phipps' June 13, 2013 email was a BAA issued by the FDA (FDABAA-13-00119) ("2013

BAA").  Ex. 6 to Defendants' Summary Judgment Memorandum [Docket 53] at 2-3

(Admissions 4-6, 8); Ex. 10 to Defendants' Summary Judgment Memorandum [Docket 53].  Mr.

Phipps brought the 2013 BAA to Mr. Chennamaraja's attention.  Ex. 6 to Defendants' Summary

Judgment Memorandum [Docket 53] at 3 (Admissions 7, 9).  When Mr. Phipps stated "Also,

look at this" in his 5:11 pm email to Mr. Chennamaraja on June 13, 2013, Mr. Chennamaraja

understood Mr. Phipps was referring to the 2013 BAA appearing at the bottom of the email

chain.  Id. at 3 (Admission 10).).

      See Defendants' Material Facts ¶ 15 (After Mr. Phipps had asked Mr. Chennamaraja to

"look at this," Mr. Chennamaraja, at some point after receiving Mr. Phipps' June 13, 2013 email,

looked at the 2013 BAA appearing at the bottom of the email chain.  Id. at 3-4 (Admission 11).

Mr. Chennamaraja did not respond to the email that Mr. Phipps had sent to him at 5:11 pm on

June 13, 2013.  Id. at 4 (Admission 12).  Mr. Chennamaraja did not inform Mr. Phipps, or

anyone within Akira, that he (Mr. Chennamaraja) was interested in pursuing the 2013 BAA.  Id.

at 4 (Admissions 13-14).).

See Defendants' Material Facts ¶ 16 (Mr. Chennamaraja did not instruct or direct Mr. Phipps, or anyone within Akira, to pursue the 2013 BAA. Id. at 4-5 (Admissions 15-16). Mr. Chennamaraja did not instruct or direct Mr. Phipps, or anyone within Akira, to prepare a submission on Akira's behalf in response to the 2013 BAA. Id. at 5 (Admissions 17-18). The 2013 BAA was never added to Akira's pipeline. Id. at 5 (Admission 19).).

See Defendants' Material Facts ¶ 17 (In 2014, the FDA issued another BAA (FDABAA-14-00120) ("2014 BAA"). Ex. 11 to Defendants' Summary Judgment Memorandum [Docket 53]. The 2014 BAA was never added to Akira's pipeline, and Akira did not provide the FDA with any submission in response to the 2014 BAA. Ex. 6 to Defendants' Summary Judgment Memorandum [Docket 53] at 6 (Admissions 22-23).).

See Defendants' Material Facts ¶ 18 (In 2015, the FDA issued another BAA (FDABAA-15-00121) ("2015 BAA"). Ex. 12 to Defendants' Summary Judgment Memorandum [Docket 53]. The 2015 BAA was never added to Akira's pipeline, and Akira did not provide the FDA with any submission in response to the 2015 BAA. Ex. 6 to Defendants' Summary Judgment Memorandum [Docket 53] at 7 (Admissions 26-27).).

See Defendants' Material Facts ¶ 19 (In 2016, the FDA issued another BAA (FDABAA-16-00122) ("2016 BAA"). Ex. 13 to Defendants' Summary Judgment Memorandum [Docket 53]. The 2016 BAA sought the same services as in the 2013 BAA. FAC ¶ 138; compare Ex. 10 to Defendants' Summary Judgment Memorandum [Docket 53] and Ex. 13 to Defendants' Summary Judgment Memorandum [Docket 53]. Akira can provide no documentary evidence that Defendant Phipps was responsible for adding the 2016 BAA to Akira's pipeline. Ex. 14 to Defendants' Summary Judgment Memorandum [Docket 53] at 27 (Request 61).).

See Defendants' Material Facts ¶ 20 (Mr. Chennamaraja (Akira CEO and owner) became aware of the 2016 BAA in July 2016.  Ex. 1 to Defendants' Summary Judgment Memorandum [Docket 53] at 155:12-156:9.  Had it wished, Akira could have submitted a proposal in response to the 2016 BAA.  Id. at 185:15-21, 200:13-21.  That Defendant Conceptant submitted a proposal to the 2016 BAA did not preclude Akira from submitting its own proposal to the 2016 BAA.  Ex. 2 to Defendants' Summary Judgment Memorandum [Docket 53] at 3-4 (No. 15).

See Defendants' Material Facts ¶ 21 (Akira did not provide the FDA with any submission in response to the 2016 BAA.  Ex. 6 to Defendants' Summary Judgment Memorandum [Docket 53] at 8 (Admissions 30-31); Ex. 1 to Defendants' Summary Judgment Memorandum [Docket 53] at 200:13-21.  Akira can provide no documentary evidence that the 2016 BAA was of any economic interest to Akira, that responding to such a BAA was part of Akira's strategy focus, or that Akira would have profited from the 2016 BAA had it chose to respond.  Ex. 14 to Defendants' Summary Judgment Memorandum [Docket 53] at 32-33 (Requests 77, 95)).

See Defendants' Material Facts ¶ 22 (In 2017, the FDA issued another BAA (FDABAA-17-00123N) ("2017 BAA").  Ex. 15 to Defendants' Summary Judgment Memorandum [Docket 53].  By this time, Defendants Phipps, Houle, and Mikhalchuk were no longer employed by Akira.  FAC ¶¶ 200-02.  The 2017 BAA was never added to Akira's pipeline, and Akira did not provide the FDA with any submission in response to the 2017 BAA.  Ex. 6 to Defendants' Summary Judgment Memorandum [Docket 53] at 9 (Admissions 34-35).).

47.  **Disputed**.  The portion of Mr. Liang's testimony cited states that Akira was not the prime contractor on the two BAAs for the Naval Air Command, and therefore, would not have submitted the proposals.  See Liang Dep. at 57:17-58:8.

48.    **Disputed**.  In the portion of his testimony cited by Plaintiff, Mr. Liang testified

only that <u>he</u> wanted to pursue BAAs for which he felt Akira had the particular skills, not that

Akira wanted to pursue such opportunities.  Liang Dep. at 64:8-20.  In fact, contrary to the

assertion that Akira had "always wanted to pursue BAAs for which it had the particular skills,"

Akira does not focus on BAAs and disregarded specific BAAs.  <u>See</u> ¶ 46 above.

49.    **Disputed**.  Plaintiff's description of Mr. Phipps' testimony is incomplete.  In the

portion of his deposition testimony cited by Plaintiff, Mr. Phipps also testified that BAAs were

"too high of a risk for [Akira] to go into, and they weren't financially viable for [Akira] as a

company."  Phipps Dep. at 243:9-244:3.

50.    Not disputed.

51.    **Disputed**.  Mr. Phipps' June 16, 2016 email to Ms. Kelemework did not relate to

an opportunity for Conceptant.  At the time, Ms. Kelemework was creating a knowledge

management ("KM") approach for OIMT and asked Mr. Phipps if he had any ideas on how it

could be done.  Dfs. Opp.  Ex. 3 at ¶ 7.  Mr. Phipps emailed her some documents he had on the

subject, including a presentation he created with Akira's approval for submission to OSHERA

that described using a specific taxonomy he had developed before joining Akira.  <u>Id.</u>

52.    **Disputed**.  Mr. Phipps was not referring to the proposal Akira submitted for the

Office of the Assistant Secretary for Planning and Evaluation ("ASPE"), but rather, to the

approach that he used while working on the contract, which he had developed before joining

Akira.  Dfs. Opp. Ex. 3 at ¶ 7.  Mr. Phipps' statement was, therefore, not an admission that he

"cribbed" the presentation describing the approach from Akira work.  Although Akira asserts

that it "proposed a specific approach to search taxonomy" within its ASPE proposal, the

document does not describe the specific Unified Medical Language ("UMLS") taxonomy that is

the subject of Mr. Phipps' presentation.  Id.  Further, Mr. Phipps had created the presentation

with Akira's full approval for submission to OSHERA as part of their annual conference, and it

had been previously posted to OSHERA's website.  Id.

53.     **Disputed**.  The block of text that Plaintiff cites in support of its assertion that it

marked the ASPE proposal confidential does not contains the word "confidential."  Further, as

explained in ¶ 52 above, Mr. Phipps' June 26, 2016 email to Ms. Kelemework was not

referencing Akira's ASPE proposal.

54.     **Disputed**.  Defendants Phipps, Houle, and Mikhalchuk never planned to change

Chiron's name.  Dfs. Opp. Ex. 8 at ¶ 4.  NuCognition is not partially owned by Conceptant.  See

Phipps Dep. at 306:2-6 (the owners of NuCognition are Mr. Phipps, Ms. Houle, Mr. Mikhalchuk

and John Kirkwood).  NuCognition has never had any outside investors.  See Houle Dep. at

153:8-19.

55.     Not disputed.

56.     **Disputed**. The plan developed by Defendants Phipps, Houle, and Mikhalchuk for

Conceptant was not a "change of direction from the initial plan for Chiron."  Dfs. Opp. Ex. 3 at ¶

8.  The two companies had nothing to do with one another, aside from sharing a few members.

Id.  Further, Defendants Phipps, Houle, and Mikhalchuk did not "decide[] that the best point of

interest into FDA work was through submitting a proposal in response to the BAA."  Id.

Conceptant had no specific plans to work on FDA contracts, and pursued the BAA because Mr.

Phipps realized that his old "Med4All" concept would fit well within the scope of the BAA.  Id.

57.     Not disputed.

58.     Not disputed.

59.     **Disputed**.  Plaintiff offers no evidence to support its characterization of Defendants Houle, Phipps, and Mikhalchuk as "conspirators."  Further, though Plaintiff asserts that Defendants Houle, Phipps, and Mikhalchuk were "required to state what 'past performance' Conceptant the company had," the BAA allowed offerors to provide either corporate past performance or the past performance of key personnel.   Houle Dep. at 142:12-143:8.  See also Dfs. Opp. Ex. 13 at AKIRA0000206 ("Offerors may also submit past performance information regarding predecessor companies, key personnel who have relevant experience or subcontractors that will perform major or critical aspects of the requirement when such information is relevant to the proposed project.").

60.     **Disputed**.  Plaintiff offers no evidence to support its characterization of Defendants Houle, Phipps, and Mikhalchuk as "conspirators."  Further, Plaintiff's assertion that Defendants Houle, Phipps, and Mikhalchuk contacted the Contracting Officer at the FDA to clarify that the Past Performance referenced in Conceptant's proposal was personal performance of the key personnel because they "[p]erhaps realiz[ed] that asserting another company's past performance as their own was at best mildly deceptive" is pure speculation.  In fact, the BAA allowed offerors to provide either corporate past performance or past performance of key personnel.   Houle Dep. at 142:12-143:8.  See also Dfs. Opp. Ex. 13 at AKIRA0000206 ("Offerors may also submit past performance information regarding predecessor companies, key personnel who have relevant experience or subcontractors that will perform major or critical aspects of the requirement when such information is relevant to the proposed project.").

61.     **Disputed** to the extent the Plaintiff attempts to characterize the contents of Conceptant's proposal.  The document speaks for itself.

62.     Not disputed.

63.     Not disputed.

64.     Not disputed.

65.     **Disputed**.  Mr. Phipps does not recall telling Mr. Chennamaraja that, in hindsight, he should not have started Conceptant or blaming stress and personal issues.  Dfs. Opp. Ex. 3 at ¶ 9.  When Mr. Chennamaraja asked whether Mr. Phipps submitted the proposal, Mr. Phipps replied "no" since he was not the agent that submitted it.  <u>Id.</u>  Mr. Phipps told Mr. Chennamaraja he would not bid on new opportunities like the FDA BAA again while he worked for Akira.  <u>Id.</u>

66.     **Disputed** to the extent the quoted language does not match the cited portions of Mr. Phipps' interrogatory responses.

67.     Defendants do not dispute that this is what Mr. Liang testified to.

68.     Not disputed.

69.     **Disputed**.  Mr. Mikhalchuk's statement, "I don't think this will go anywhere," was not a lie.  By "this," Mr. Mikhalchuk was referring to Conceptant, and in fact, Mr. Mikhalchuk was genuinely skeptical that the company would survive.  Deposition of Andrey Mikhalchuk ("Mikhalchuk Dep.") at 194:22-195:14; Dfs. Opp. Ex. 7 at ¶ 9.

70.     Not disputed.

71.     **Disputed** to the extent the specific portion of the Deposition of Srinivas Chennamaraja cited suggests that the request was made during the meeting and makes no reference to Mr. Chennamaraja sending Mr. Mikhalchuk an email.

72.     **Disputed**.  Ms. Houle did not say anything about her husband during her meeting with Mr. Chennamaraja.  Dfs. Opp. Ex. 8 at ¶ 5.

73.     Not disputed.

74.     Not disputed.

75.     **Disputed**.  Plaintiff's assertion that it would have submitted a proposal for a BAA that one of its customers or one of the people that it knew brought to its attention is pure speculation.  Moreover, the assertion is contradicted by the overwhelming weight of the evidence.  See Material Facts ¶¶ 7-22 (quoted above at ¶ 46) (compiling the evidence demonstrating that Akira does not focus on BAAs and disregarded specific BAAs of which it was aware).  For example, Akira claims that it would have submitted a proposal for the 2016 FDA BAA had it known about it (FAC ¶ 148), but Mr. Liang (Akira President in charge of business development) disputed this claim at his deposition.  Liang Dep. at 162:13-18, 166:2-5 ("I would say I can't …. I'm being completely honest.  I haven't analyzed the Conceptant thing, so I myself have no strong feeling about whether we would bid it or not").  Mr. Chennamaraja (Akira CEO and owner) confirmed that Akira had the opportunity to respond to the 2016 BAA, but chose not to.  Chennamaraja Dep. at 200:13-21 ("Q. So Akira chose not to respond to that BAA, correct? A. Yeah…").

76.     **Disputed** to the extent Plaintiff asserts that Mr. Mikhalchuk began work on the FDA BAA contract in September 2016, while he was still employed by Akira.  See Mikhalchuk Dep. at 199:14-200:6 (explaining that his involvement with Conceptant was mostly related to writing the technical proposal, after which his involvement "went to almost zero").

77.     **Disputed**.  Conceptant received its first payment for work on the BAA on December 13, 2016.  See Dfs. Opp. Ex. 14 at DEF010907 (showing the "date received" for Invoice Number OHI1116 as "12/13/16").

78.     **Disputed**.  The statements cited by Plaintiff do not express an "intense dislike for Akira and for its senior management."  See Dfs. Opp. Ex. 8 at ¶ 3.  Further, although Plaintiff asserts that Ms. Houle and Mr. Phipps carried on a series of conversations "throughout their

employment by Akira," the conversations cited by Plaintiff are all from 2014 and the first half of 2015, over a year before Conceptant was formed.

79.    **Disputed**.  Conceptant received its first payment from the FDA on December 13, 2016 (see ¶ 77 above).  That was after Defendants Phipps, Houle, and Mikhalchuk had already left Akira.  See Phipps Dep. at 280:7-9; Houle Dep. at 17:9-11; Mikhalchuk Dep. at 57:11-12.

## CONCLUSION

For the reasons stated above and in Defendants' Summary Judgment Memorandum [Docket 53], summary judgment on Counts 4-8 of the First Amended Complaint should be denied to Akira and granted to Defendants Phipps, Houle, and Mikhalchuk.  In addition, summary judgment should be denied on Defendants Phipps' and Mikhalchuk's counterclaims. Finally, for the reasons stated in Defendants' Summary Judgment Memorandum [Docket 53], summary judgment on Counts 1-3 of the First Amended Complaint should be granted to Defendants Phipps, Houle, and Mikhalchuk.

March 23, 2018                              Respectfully submitted,


                                           ____/s/_____
                                           Elaine Charlson Bredehoft
                                           Virginia Bar No. 23766
                                           ecb@cbcblaw.com
                                           Peter C. Cohen
                                           Virginia Bar No. 66346
                                           pcohen@cbcblaw.com
                                           David E. Murphy, VSB 90938
                                           dmurphy@cbcblaw.com
                                           CHARLSON BREDEHOFT
                                             COHEN & BROWN, P.C.
                                           11260 Roger Bacon Drive, Suite 201
                                           Reston, Virginia 20190
                                           (703) 318-6800 Telephone
                                           (703) 318-6808 Facsimile

                                           *Counsel for Defendants, Joshua Phipps,*

*Andrey Mikhalchuk, and Lisa Houle and*
*Counter-Plaintiffs, Joshua Phipps and*
*Andrey Mikhalchuk*

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of March, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Christopher R. Shiplett
Virginia Bar No. 74210
chris.shiplett@randolphlaw.com
RANDOLPH LAW, PLLC
252 N Washington Street
Falls Church, Virginia 22046
(703) 652-3039 Telephone
(703) 852-3976 Facsimile

*Counsel for Plaintiff,*
  *Akira Technologies, Inc.*


____/s/_____
Peter C. Cohen
Virginia Bar No. 66346
pcohen@cbcblaw.com
CHARLSON BREDEHOFT
  COHEN & BROWN, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
(703) 318-6808 Facsimile

*Counsel for Defendants, Joshua Phipps,*
  *Andrey Mikhalchuk, and Lisa Houle and*
  *Counter-Plaintiffs, Joshua Phipps and*
  *Andrey Mikhalchuk*